## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

JAMES BAINES, CHRISTOPHER )
LYONS, ALLEN ESPOSITO, WILLIAM )
SAMPSON, CODY BLACKBURN, )
BONNIE YOUNG and )
LIBERTARIAN PARTY OF MAINE, )
                                     )
                Plaintiffs, )
                                      )
            v. )           Civil No.:_____
                                      )
MATTHEW DUNLAP, in his official )
capacity as Secretary of State for the )
State of Maine, )
                                      )
                Defendant. )
                                      )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.       Since 2013, the State of Maine has imposed requirements on new political parties that severely burden the constitutional rights of voters who wish to establish and associate with them, and which make it practically impossible for such a party to grow and develop public support for its platform. Specifically, a new party must enroll at least 5,000 voters in the year preceding a general election, and must certify to the Secretary of State that it has done so on or before January 2nd of the general election year – a deadline so early that, standing alone, it raises serious doubt as to the constitutionality of Maine's statutory scheme. *See* M.R.S. § 303(2) (hereinafter, all statutory citations are to the Maine Revised Statutes unless otherwise specified). A party that manages to comply with those and other applicable requirements qualifies to participate in the primary election, which is the only procedure by which the party may place its nominees on the general election ballot. *See* § 331(1). To appear on the primary election ballot, however a

candidate seeking the party's nomination must submit nomination petitions signed by a number of enrolled party members that in many cases exceeds, or nearly exceeds, the total number of party members in the district, and which in every case exceeds the constitutional limits established by Supreme Court precedent.  *See* §§ 335(2),(5).  The primary election ballot access requirements thus operate as a near-absolute bar that prevents the new party from selecting nominees and placing them on the general election ballot by the only means authorized under Maine law.  Despite the near-certain exclusion of its candidates from Maine's general election ballot, the party must then double its enrollment to 10,000 voters, each of whom must vote in the general election immediately following the one in which it first qualifies.  *See* § 301(1)(E).  If the party fails to meet this requirement, it is disqualified and its members involuntarily unenrolled.  *See* §§ 304; 306.  The party must then begin the process of qualifying as a new party all over again.

2.      The requirements that Maine imposes on new parties are not reasonably tailored to further any compelling or legitimate state interest, and they are so burdensome that no new political party can reasonably expect to fulfill them – indeed, none has.  As such, the requirements operate to freeze the political status quo in Maine.

3.      Plaintiffs James Baines, Christopher Lyons, Allen Esposito, William Sampson, Cody Blackburn, Bonnie Young and the Libertarian Party of Maine, Inc. ("LPME" and collectively, "the Libertarians") therefore bring this action against Defendant Matthew Dunlap, the Secretary of State for the State of Maine ("the Secretary"), in his official capacity, to challenge the constitutionality of Maine's ballot access requirements for new political parties.  *See* §§ 301(1)(E); 303(2); 304; 306; 331(1); 335(2),(5).  The Libertarians assert claims for the violation of their right to cast their votes effectively, to speak and associate for political purposes, to establish and grow a political party, and their right to the equal protection of law, as guaranteed by the First and

Fourteenth Amendments to the United States Constitution. They respectfully request that the Court declare the challenged provisions unconstitutional as applied separately and in combination with one another, and permanently enjoin the Secretary from enforcing those provisions, including the provision unenrolling those voters who registered as Libertarians prior to the 2018 general election. The Libertarians further request that the Court enter an order providing that LPME be permitted to select its nominees by convention until such time as the Legislature enacts constitutional procedures to replace those challenged herein.

## PARTIES

4.      Plaintiff James Baines is a voter who resides in the town of Hampden in Penobscot County, Maine. He is the current Chair of LPME. Plaintiff Baines enrolled as a member of LPME prior to the 2018 general election, but the Secretary involuntarily unenrolled him in December 2018 because LPME failed to enroll at least 10,000 members who voted in that election. Plaintiff Baines enrolled in LPME again in 2019. Plaintiff Baines wants to remain enrolled as a Libertarian voter, in accordance with the express preference he indicated on his voter enrollment card, and to support and associate with LPME and vote for LPME's candidates in Maine's general elections, but he will be unable to do so unless the party again qualifies for ballot access and its nominees obtain the required number of valid signatures to appear on the primary election ballot.

5.      Plaintiff Christopher Lyons is a voter who resides in the town of Brunswick in Cumberland County, Maine. He is a former Chair of LPME. Plaintiff Lyons enrolled as a member of LPME prior to the 2016 general election, but the Secretary involuntarily unenrolled him in December 2018 because LPME failed to enroll at least 10,000 members who voted in the 2018 general election. As a result, Plaintiff Lyons is currently designated as an unenrolled voter. Plaintiff Lyons attempted to run as LPME's nominee for United States Senate in 2018, but he was

unable to obtain enough signatures to appear on the primary election ballot. Plaintiff Lyons wants to remain enrolled as a Libertarian voter, in accordance with the express preference he indicated on his voter enrollment card, and to support and associate with LPME and vote for LPME's candidates, and he also wants to run for public office as the LPME nominee in future elections, including for United States Senate in 2020, but he will be unable to do so unless the party again qualifies for ballot access and its nominees obtain the required number of valid signatures to appear on the primary election ballot.

6.     Plaintiff Allen Esposito is a voter who resides in the town of Hampden in Penobscot County, Maine. Plaintiff Esposito enrolled as a member of LPME prior to the 2016 general election, but the Secretary involuntarily unenrolled him in December 2018 because LPME failed to enroll at least 10,000 members who voted in the 2018 general election. Plaintiff Esposito enrolled in LPME again in 2019. Plaintiff Esposito wants to remain enrolled as a Libertarian voter, in accordance with the express preference he indicated on his voter enrollment card, and to support and associate with LPME and vote for LPME's candidates in Maine's general elections, but he will be unable to do so unless the party again qualifies for ballot access and its nominees obtain the required number of valid signatures to appear on the primary election ballot.

7.     Plaintiff William Sampson is a voter who resides in the town of Dixfield in Oxford County, Maine. Plaintiff Sampson enrolled as a member of LPME prior to the 2016 general election, but the Secretary involuntarily unenrolled him in December 2018 because LPME failed to enroll at least 10,000 members who voted in the 2018 general election. Plaintiff Sampson enrolled in LPME again in 2019. Plaintiff Sampson wants to remain enrolled as a Libertarian voter, in accordance with the express preference he indicated on his voter enrollment card, and to support and associate with LPME and vote for LPME's candidates in Maine's general elections,

4

but he will be unable to do so unless the party again qualifies for ballot access and its nominees obtain the required number of valid signatures to appear on the primary election ballot.

8.      Plaintiff Cody Blackburn is a voter who resides in the town of Bangor in Penobscot County, Maine.  Plaintiff Blackburn enrolled as a member of LPME prior to the 2016 general election, but the Secretary involuntarily unenrolled him in December 2018 because LPME failed to enroll at least 10,000 members who voted in the 2018 general election.  Plaintiff Blackburn enrolled in LPME again in 2019.  In 2018 Plaintiff Blackburn ran as the LPME nominee for the Maine House of Representatives, District 125.  Plaintiff Blackburn wants to remain enrolled as a Libertarian voter, in accordance with the express preference he indicated on his voter enrollment card, and to support and associate with LPME and vote for LPME's candidates in Maine's general elections, and he also wants to run for public office as the LPME nominee in future elections, but he will be unable to do so unless the party again qualifies for ballot access and its nominees obtain the required number of valid signatures to appear on the primary election ballot.

9.      Plaintiff Bonnie Young is a voter who resides in the unorganized territory of Argyle in Penobscot County, Maine.  Plaintiff Young is LPME's Secretary.  Plaintiff Young enrolled as a member of LPME prior to the 2016 general election.  In 2018, Plaintiff Young wanted to run as LPME's nominee for the Maine House of Representatives in District 121, but the primary election ballot access signature requirement was too burdensome, and she was compelled to unenroll so she could run as an independent candidate instead.  Plaintiff Young re-enrolled as a member of LPME prior to the 2018 general election, but the Secretary involuntarily unenrolled her in December 2018 because LPME failed to enroll at least 10,000 members who voted in that election. Young enrolled in LPME again in 2019.  Plaintiff Young wants to remain enrolled as a Libertarian voter, in accordance with the express preference she indicated on her voter enrollment card, and

to support and associate with LPME and vote for LPME's candidates in Maine's general elections, and she also wants to run for public office as LPME's nominee in future elections, but she will be unable to do so unless the party again qualifies for ballot access and its nominees obtain the required number of valid signatures to appear on the primary election ballot.

10.     Plaintiff Libertarian Party of Maine, Inc. is a Maine nonprofit corporation with a principal place of business in Brunswick, Maine.  LPME is affiliated with the Libertarian Party, the third largest political party in the United States.  It was established in 1998 to promote and implement Libertarian ideas and principles by supporting the election of Libertarian candidates for public office in Maine, influencing the debate on issues of public interest, and providing more meaningful electoral choices for Maine voters, among other means.  LPME first qualified for ballot access in Maine in 2016, but was disqualified following the 2018 general election, because it failed to enroll 10,000 members who voted in that election.  LPME is injured by the burden and expense that Maine's statutory scheme imposes on it, which diminishes its capacity to participate effectively in Maine's electoral process and hinders LPME's ability to grow and develop as a political party.

11.     Defendant Matthew Dunlap is the Secretary of State for the State of Maine.  The Secretary is the State of Maine's chief elections official and is responsible for administering and enforcing the Maine Election Code, including the provisions challenged herein.  The Secretary's business address is Office of the Secretary, 148 State House Station, Augusta, Maine, 04333-0148.

## JURISDICTION

12.     This Court has subject matter jurisdiction over this case pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331, because the Plaintiffs' claims arise under the First and Fourteenth Amendments to the United States Constitution.

6

13.     This Court has personal jurisdiction over the Defendant because he is an official of Maine, residing in Maine.

14.     Venue is proper in this Court because all Plaintiffs are residents of Maine and the Defendant is a state official who maintains an office in Augusta, Maine.  *See* 28 U.S.C. § 1391(b)(1).

## FACTUAL ALLEGATIONS

### Relevant Provisions of the Maine Election Code

15.     To establish a new political party under Maine law, ten voters must submit a declaration of intent to the Secretary in December of an even-numbered year.  *See* § 303(1).  Within five business days, the Secretary must certify that the application complies with § 303(1), and if so, notify the applicants that they may enroll voters in the proposed party.  *See* § 303(2).

16.     On or before January 2nd of the next even-numbered year, the applicants must submit a certification to the Secretary stating that they have enrolled at least 5,000 members in the proposed party.  *See* § 303(2).  The Secretary must verify the proposed party's enrollment figures within 15 business days and notify the applicants whether the proposed party has met the requirements for participating in the primary election.  *See* § 303(2).

17.     All political parties in Maine, including a new party established pursuant to § 303, must select their nominees (excluding presidential electors) by primary election.  *See* §§ 331(1),(2).  The primary election is held on the second Tuesday in June of the general election year.  *See* § 339.  To have its nominees placed on the general election ballot, a party also must hold a municipal caucus in each of Maine's 16 counties and hold a state convention.  *See* §§ 303(4),(5).

18.     A candidate seeking to run in a party's primary election must submit nomination petitions signed by voters who are enrolled in the party and who are eligible to vote for the

candidate. *See* § 335(2). The signatures must be collected in a 74-day period between January 1st of the election year and March 15th, when the nomination petitions must be filed with the Secretary. *See* §§ 335(6),(8).

19.     Nomination petitions must be signed by the following numbers of voters:

- Candidates for Governor – at least 2,000 and not more than 3,000;

- Candidates for U.S. Senator – at least 2,000 and not more than 3,000;

- Candidates for U.S. House – at least 1,000 and not more than 1,500;

- Candidates for County Office (excluding County Commissioner) – at least 150 and not more than 200;

- Candidates for County Commissioner – at least 50 and not more than 75;

- Candidates for State Senate – at least 100 and not more than 150;

- Candidates for State House – at least 25 and not more than 40.

*See* § 335(5).

20.     To remain ballot-qualified following the general election cycle in which it first qualified, a new party must enroll at least 10,000 members who vote in the next general election, and each general election thereafter. *See* § 301(1)(E).

21.     A party that does not comply with § 301 is disqualified, and may not participate in a subsequent election. *See* § 304.

22.     Voters enrolled in a party that fails to comply with § 303, or that is disqualified pursuant to § 304, are unenrolled. *See* § 306.

### The Maine Election Code as Applied to the Libertarians

<u>LPME Successfully Qualified as a New Party in 2016</u>

23.     In December 2014, ten Maine voters filed a declaration of intent with the Secretary to establish LPME as a new party pursuant to § 303.  The Secretary certified the application, and LPME commenced its drive to enroll 5,000 members as required by § 303(2).

24.     The process of enrolling voters is arduous and time-consuming.  Voters must fill out a two-sided card by hand, including their full name, residential and mailing address, date of birth, previous voter registration information, Maine driver's license number or, if they do not have a Maine driver's license, the last four digits of their social security number, and they must sign and date the card.  Many towns provide outdated voter registration cards that omit new parties from the "Party Affiliation" section, thus requiring voters to select "Other" and write "Libertarian" by hand to complete their enrollment with LPME.  The entire process takes each voter at least ten minutes, on average, to complete.  As a result, under optimal conditions, a diligent and experienced worker is only able to enroll an average of five voters per hour.

25.     Furthermore, because enrollment drives typically must be conducted outside, in public spaces, inclement weather can make enrolling voters all but impossible on any given day, particularly during the cold winter months when frigid temperatures render ink pens inoperable.  This effectively shortens the enrollment period by two or three months.  The availability of suitable locations where there is sufficient foot traffic is also limited, because not every public sidewalk is a traditional public forum where protection for the right to petition is at its zenith, and enrolling voters on private property such as shopping centers is subject to even less protection, if any.  Many voters are also unwilling to stop in public and provide their signatures and personal information to a person they do not know, even if they support the new party's platform.  All of these factors can lower workers' productivity from the enrollment rate they achieve under optimal conditions.

26.     LPME recruited approximately 12 volunteers to conduct its 2016 enrollment drive. Due to their paid employment and other commitments, however, even the most dedicated volunteers were only able to work a few hours each week.  LPME was therefore obliged to hire professional petition circulators.

27.     LPME's effort to hire professional petition circulators was hampered by the limited number of firms that provide such services in Maine.  Among those firms, LPME was able to find only one that was willing to work on a Libertarian voter enrollment drive.  LPME retained that firm, Olympia Consultants, and agreed to pay a rate of $4 per registered voter.

28.     To pay for its enrollment drive, LPME raised funds from Libertarian Party members and supporters nationwide.  The Libertarian National Committee also contributed $2,000.  In total, LPME spent at least $68,608 to fund the enrollment drive.

29.     On December 1, 2015, which was the filing deadline under Maine law at that time, LPME submitted a certification to the Secretary stating that it had enrolled 6,482 members.  The Secretary thereafter notified LPME, through a deputy, that only 4,489 LPME members had been verified, leaving LPME short of the 5,000-member requirement for establishing a new party pursuant to § 303(2).

30.     On January 4, 2016, LPME and several voters filed suit to challenge the constitutionality of the procedures and requirements pursuant to which the Secretary had denied LPME's certification as a new party.  *See Libertarian Party of Maine, et al. v. Dunlap, et al.*, No. 2:16-cv-00002-JAW (D.Me. 2016).  On May 27, 2016, this Court entered an order granting the plaintiffs a preliminary injunction and directing the Secretary to allow them until July 12, 2016 to enroll the 487 additional voters needed to establish LPME as a new party under § 303(2).  LPME

enrolled more than enough voters by that date and qualified for Maine's 2016 general election ballot with 5,150 enrolled members.

31.     Pursuant to the Court's May 27, 2016 order, the only candidates that LPME was entitled to place on Maine's 2016 general election ballot were Gary Johnson and William Weld, its nominees for President and Vice President, respectively.  The Johnson-Weld ticket finished third, garnering the support of 38,105 Maine voters, or 5.1 percent of the total.

<u>Maine's Severe Primary Election Ballot Access Requirements Functionally Barred LPME From Selecting Nominees and Placing Them on Maine's General Election Ballot in 2018</u>

32.     The restrictive primary election ballot access requirements prescribed by § 335 impose severe burdens on a new party established pursuant to § 303.  As applied to LPME, which increased its membership to 6,168 members during the 2018 general election, § 335 operated as a near-absolute bar that prevented Libertarian candidates from appearing on the primary election ballot, thus preventing LPME from selecting nominees by the only procedure authorized under Maine law.  *See* § 331(1).  As a result, after becoming ballot-qualified in 2016, LPME was functionally barred from placing its candidates on Maine's general election ballot in 2018.

33.     Under § 335, candidates seeking to run as LPME's nominee for Governor or United States Senate were required to obtain signatures on nomination petitions of 2,000 enrolled LPME members in only 74 days.  During the 2018 general election, when LPME had 6,168 members, the 2,000-signature requirement amounted to a showing of support from 32.43 percent of the eligible voters.  Even if LPME had doubled its enrollment to 10,000 members prior to the 2018 general election, as required by § 301(E), § 335 still would have required candidates seeking its nomination for Governor or United States Senate to obtain signatures from 20 percent of the voters eligible to sign their nomination petitions.

34.     Under § 335, candidates seeking to run as LPME's nominee for the United States House of Representatives were required to obtain signatures on nomination petitions of 1,000 enrolled Libertarian voters in only 74 days.   In 2018, 3,033 LPME members resided in Congressional District ("CD") 1, and 3,207 LPME members resided in CD 2.   Under § 335, therefore, congressional candidates seeking to run in LPME's 2018 primary in CD 1 were required to obtain signatures from 32.97 percent of the voters eligible to sign their nomination petitions, while candidates seeking to run in CD 2 needed to obtain signatures from 31.18 percent of the eligible voters.

35.     Candidates seeking to run as LPME's nominee for State Senate faced even more restrictive requirements.   To appear on the primary election ballot, § 335 required them to submit nomination petitions signed by at least 100 enrolled LPME voters who were eligible to vote for them.   In 2018, therefore, it was mathematically impossible for many such candidates to appear on LPME's primary election ballot, because the number of signatures required exceeded the number of voters eligible to sign the candidates' nomination petitions.   In State Senate Districts 1, 2, 3 and 4, for example, there were fewer eligible voters than the number of signatures required by § 335. Section 335 thus operated as an absolute bar that made it impossible for LPME candidates to run for State Senate in those districts, and many others.   In still more districts, it was nearly impossible, because the signature requirements were a prohibitively high percentage of the total number of eligible voters.

36.     Candidates seeking to run as LPME's nominee for State Representative faced similarly restrictive requirements.   To appear on the primary election ballot, § 335 required them to submit nomination petitions signed by at least 25 enrolled LPME voters who were eligible to vote for them.   In 2018, therefore, it was mathematically impossible for many such candidates to

12

appear on LPME's primary election ballot, because the number of signatures required exceeded the number of voters eligible to sign the candidates' nomination petitions.  In State House Districts 2, 3 and 4, for example, there were fewer eligible voters than the number of signatures required by § 335.  Section 335 thus operated as an absolute bar that made it impossible for LPME candidates to run for State House in those districts, and many others.  In still more districts, it was nearly impossible, because the signature requirements were a prohibitively high percentage of the total number of eligible voters.

37.    Plaintiff Lyons attempted to run for United States Senate as LPME's nominee in 2018.  To do so, Plaintiff Lyons needed to obtain 2,000 signatures from the 6,168 eligible voters dispersed throughout the state.  *See* § 335(2),(5).  This was a near-impossible task because it necessitated making in-person appointments with each eligible voter.  Plaintiff Lyons therefore abandoned his effort in February 2018 and attempted to run as an independent candidate instead. This required Plaintiff Lyons to unenroll from LPME, start his petition drive over, and obtain 4,000 valid signatures on new nomination petitions, but any Maine voter could sign the petitions and they were not due until May 25th.  *See* §§ 354(2),(5),(7).  Hampered by his late start and lack of funds to hire paid petition circulators, however, Plaintiff Lyons' effort fell short, and he did not appear on Maine's 2018 general election ballot as a candidate for U.S. Senate.

38.    Plaintiff Young wanted to run as LPME's nominee for State House in district 131, but § 335 required her to obtain signatures from 25 of the 26 eligible voters in the district – or 96.15 percent of the total – and she therefore ran as an independent instead.

39.    Two more candidates attempted to run in LPME's 2018 primary election, but both were unable to obtain the signatures required by § 335.  John Nason, a candidate for State House in district 18, was required to obtain 25 signatures from 48 eligible voters, or 52.08 percent of the

total.  Evret Greer, a candidate for State House in district 114, was required to obtain 25 signatures from only 18 eligible voters – a mathematically impossible task.

40.     Plaintiff Blackburn was the only LPME nominee who successfully petitioned to appear on LPME's primary ballot in 2018, as a candidate for State House in district 125.  Plaintiff Blackburn was able to comply with the signature requirement imposed by § 335 only by enrolling new LPME members who then signed his nomination petitions.  Plaintiff Blackburn thus obtained 25 signatures from 58 eligible voters in the district, or 43.10 percent of the total.

<u>LPME Was Disqualified and Its Members Involuntarily Unenrolled After the 2018 General Election</u>

41.     LPME's successful enrollment drive in 2016 completely exhausted its limited financial resources.  Yet, to remain ballot-qualified, LPME was required to enroll almost 5,000 new members before the 2018 general election, and to ensure that at least 10,000 LPME members voted in that election – even though LPME was functionally barred from placing all but one of its candidates on the ballot.  *See* § 301(1)(E).

42.     Standing alone, the requirement that LPME enroll 5,000 new members in the first election cycle after it qualified was an all but impossible task.  The effort would cost LPME at least $68,000, and LPME had neither the funds nor any realistic expectation of raising that amount. Even if LPME could enroll 5,000 new members before the 2018 general election, the exclusion of its candidates from the general election ballot eliminated the primary incentive for LPME's members to vote in the 2018 general election, thus compounding the burden of complying with § 301(1)(E).

43.     LPME was thus trapped in a vicious cycle: to remain ballot-qualified, it was required to nearly double its size in the course of a single election cycle, and to ensure that 10,000 LPME members turned out to vote in 2018; but the near-certain exclusion of its candidates from

the 2018 general election ballot diminished its ability to recruit new members, much less to ensure that virtually all of them would vote in an election with almost no Libertarian candidates.  Section 301(1)(E) therefore practically guaranteed that LPME would be disqualified after the 2018 general election.

44.    Despite the long odds they faced, the Libertarians continued their effort to enroll new members prior to the 2018 general election.  They canvassed special events like Independence Day celebrations, hosted a voter registration table during Maine's mock elections and other public events, as well as at LPME events when the Libertarian vice presidential candidate visited, and enrolled new members at county and state LPME meetings, including LPME's bi-yearly state convention.  The Libertarians also promoted their voter enrollment efforts through their social media platforms.

45.    On November 6, 2018, Maine held its general election.  Plaintiff Blackburn was the only LPME nominee that appeared on the general election ballot.  He received 195 votes, or 5.63 percent of the total, in the election for State House district 125.

46.    On December 17, 2018, the Secretary notified LPME that there were 6,168 voters enrolled as Libertarians.  The Secretary therefore determined that LPME failed to comply with § 301(1)(E), and disqualified LPME pursuant to § 304.  The Secretary also designated the 6,168 voters who had registered as Libertarian as unenrolled pursuant to § 306.

47.    LPME wishes to run candidates in 2020, but must start the enrollment process all over.  In December 2018, it filed a new Declaration of Intent pursuant to § 303(1).  To become ballot-qualified, it must enroll 5,000 voters by January 2, 2020 pursuant to § 303(2).

**Maine Law Guarantees That the Republican and Democratic Parties Remain Ballot-Qualified and Imposes Minimal Burdens on Candidates Seeking Their Nomination**

48.     For more than 50 years, both the Democratic Party of Maine and the Republican Party of Maine have had more than 100,000 registered members each.  As of the November 6, 2018 general election, the Democratic Party of Maine had 349,903 registered members, and the Republican Party of Maine had 289,294 registered members.  As a result, both parties are guaranteed compliance with the requirement for remaining ballot-qualified pursuant to § 301(E), because the size of their membership ensures that at least 10,000 members will vote in each general election.

49.     In addition, § 335 imposes only minimal burdens on candidates seeking the nomination of the Democratic Party or Republican Party.  For example, to appear on the primary election ballot in 2018, a candidate seeking the Democratic Party's nomination for Governor or U.S. Senate needed to obtain signatures from only .57 percent of the voters eligible to sign the candidate's nomination petitions.  A candidate seeking the Republican Party's nomination for those offices needed to obtain signatures from only .69 percent of the voters eligible to sign the candidate's nomination petitions.

50.     Sections 301(1)(E), 303(2), 304, 306, 331(1) and 335(2),(5) are not reasonably tailored to further a compelling or legitimate state interest.

## COUNT I

**(Violation of Plaintiffs' Rights Guaranteed By the First and Fourteenth Amendments)**

51.     Plaintiffs reallege each preceding paragraph as if set forth fully herein.

52.     Sections 301(1)(E), 303(2), 304, 306, 331(1) and 335(2),(5), as applied separately and in conjunction with one another, impose severe burdens on Plaintiffs' First and Fourteenth Amendment rights, and they are not reasonably tailored to further a compelling or legitimate state interest.

53.     Sections 301(1)(E), 303(2), 304, 306, 331(1) and 335(2),(5), as applied separately and in combination, severely burden Plaintiffs' right to cast their votes effectively by preventing them from voting for Libertarian candidates in Maine's primary and general elections.

54.     Sections 301(1)(E), 303(2), 304, 306, 331(1) and 335(2),(5), as applied separately and in combination, severely burden Plaintiffs' right to speak and associate for political purposes, and to establish and grow a political party, by making it prohibitively expensive for a non-wealthy new party to become ballot-qualified and remain ballot-qualified in successive election cycles.

55.     Sections 301(1)(E), 303(2), 304, 306, 331(1) and 335(2),(5), as applied separately and in combination, severely burden Plaintiffs' right to speak and associate for political purposes, and to establish and grow a political party, by disqualifying a new party if it does not double its membership in the course of a single election cycle after it qualifies, and thereafter by involuntarily unenrolling its registered members.

56.     Sections 301(1)(E), 303(2), 304, 306, 331(1) and 335(2),(5), as applied separately and in combination, severely burden Plaintiffs' right to speak and associate for political purposes, and to establish and grow a political party, by making it practically impossible for a new party to select its nominees in a primary election and place them on Maine's general election ballot.

57.     Such burdens cause injury to and violate Plaintiffs' First and Fourteenth Amendment rights.

## COUNT II

### (Violation of Rights Guaranteed By the Equal Protection Clause)

58.     Plaintiffs reallege each preceding paragraph as if set forth fully herein.

59.     Under Maine law, the Democratic and Republican parties remain ballot-qualified in each general election cycle without the need to expend money, resources or effort to comply

with § 301(E). Further, they are able to select their nominees in primary elections and place them on the general election ballot in each election cycle with minimal effort.

60. Sections 301(1)(E), 303(2), 304, 306, 331(1) and 335(2),(5), as applied separately and in combination, impose unequal burdens on Plaintiffs, in violation of their right to the equal protection of law, by requiring a new party like LPME to expend substantial funds and resources to become ballot-qualified and remain ballot-qualified in successive election cycles, and by requiring candidates of a new party like LPME to obtain signatures from the same number of voters as established parties, but from a much smaller pool of eligible voters.

61. Sections 301(1)(E), 303(2), 304, 306, 331(1) and 335(2),(5), as applied separately and in conjunction with one another, both cause injury to and violate rights guaranteed to Plaintiffs by the Equal Protection Clause of the U.S. Constitution.

## **PRAYER FOR RELIEF**

62. WHEREFORE, Plaintiffs respectfully request that the Court:

A. Enter a declaratory judgment holding that Sections 301(1)(E), 303(2), 304, 306, 331(1) and 335(2),(5) are unconstitutional as applied separately and in conjunction with one another;

B. Enter an order enjoining the Secretary of State from enforcing the challenged provisions as applied to Plaintiffs;

C. Enter an order enjoining the Secretary of State from enforcing § 306 as applied to LPME's 6,168 registered members as of November 6, 2018, with the exception of any such member that has enrolled as a member of another party or affirmatively indicated an intention to remain unenrolled;

D. Enter an order directing the Secretary of State to permit LPME to select its nominees by convention until such time as the Legislature enacts legislation establishing constitutional procedures to replace those challenged herein;

E. Award other and further relief as the Court deems proper;

F. Award litigation costs and attorney's fees pursuant to 42 U.S.C. § 1988; and

G.  Retain jurisdiction of this action and grant the Plaintiffs any further relief which may in the discretion of the Court be necessary and proper.

Dated: November 1, 2019                              Respectfully submitted,

/s/ John H. Branson
JOHN H. BRANSON
BRANSON LAW OFFICE, P.A.
482 Congress Street, Suite 304
P.O. Box 7526
Portland, Maine 04112-7526
Tel. (207) 780-8611
jbranson@bransonlawoffice.com

Oliver B. Hall
OLIVER B. HALL*
CENTER FOR COMPETITIVE DEMOCRACY
P.O. Box 21090
Washington, DC 20009
oliverhall@competitivedemocracy.org
(202) 248-9294

William P. Tedards, Jr.
WILLIAM P. TEDARDS, JR.*
1101 30th Street NW, Suite 500
Washington, DC 20007
(202) 797-9135
Email: BT@tedards.net

*Counsel for Plaintiffs*

*Motion for admission p*ro hac vice *pending*