# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

JAMES BAINES, CHRISTOPHER )
LYONS, ALLEN ESPOSITO, WILLIAM )
SAMPSON, CODY BLACKBURN, )
BONNIE YOUNG and )
LIBERTARIAN PARTY OF MAINE, )
  )
               Plaintiffs, )
  )
          v. )     Civil No.: <u>1:19-cv-00509-LEW</u>
  )
MATTHEW DUNLAP, in his official )
capacity as Secretary of State for the )
State of Maine, )
  )
            Defendant. )
  )

## <u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION<br>AND MEMORANDUM IN SUPPORT</u>

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs James Baines, Christopher Lyons, Allen Esposito, William Sampson, Cody Blackburn, Bonnie Young and Libertarian Party of Maine ("LPME") (collectively, "Plaintiffs") respectfully move for a preliminary injunction to enjoin Defendant Matthew Dunlap, Secretary of State of Maine ("Defendant"), from enforcing M.R.S. 21-A §§ 301(1)(E), 304, 306 and 331(1) as applied to Plaintiffs in the 2020 election cycle. Specifically, Plaintiffs request that the Court enter an order providing that: (1) those voters who were registered Libertarian as of December 3, 2018 shall remain registered as Libertarian; (2) LPME shall remain ballot-qualified for the 2020 general election; and (3) LPME shall be permitted to select its nominees at its 2020 statewide convention rather than in Maine's 2020 primary election.[1]

---

[1] Hereinafter all statutory citations are to the Maine Revised Statutes unless otherwise indicated.

In support of this motion, Plaintiffs submit the following evidence attached hereto: **Exhibit 1** – Declaration of Christopher Lyons; **Exhibit 2** – *Libertarian Party of Maine, et al. v. Dunlap*, et al. ("*LPME I*"), No. 2:16-cv-00002-JAW (D. Me. 2016) (unpublished order); **Exhibit 3** – Declaration of James Baines; **Exhibit 4** – Declaration of Oliver B. Hall; **Exhibit 5** – List of LPME Members Unenrolled on December 3, 2018 ("Voter List"); **Exhibit 6** – Declaration of Cody Blackburn; **Exhibit 7** – Memorandum of Julie L. Flynn ("Flynn Mem."); **Exhibit 8** – Declaration of Bonnie Young; **Exhibit 9** – Declaration of Richard Winger; **Exhibit 10** – Transcript, Deposition of Julie L. Flynn); and **Exhibit 11** - Amended Notice of Rule 30(b)(6) Deposition of Matthew Dunlap.

## INTRODUCTION

For the limited purpose of preserving the status quo *ex ante*, Plaintiffs respectfully request that the Court enjoin Defendant from enforcing those provisions of the Maine Election Code that prevented LPME from selecting and placing its nominees on Maine's general election ballot (with one exception) during the two election cycles when it was ballot-qualified under Maine law (2016 and 2018), and which thereafter operated to disqualify LPME and unenroll the 6,240 Maine voters who registered as Libertarian. In particular, Plaintiffs request that the Court enjoin Defendant from enforcing the following provisions against them: § 301(E) (requiring that a new party enroll 5,000 new members and ensure that at least 10,000 enrolled members vote in the first general election following the one in which it qualifies); § 304 (disqualifying a party that fails to comply with § 301(E)); § 306 (unenrolling the members of a party disqualified pursuant to § 304); and § 331(1) (requiring that all parties nominate by primary election). These statutory provisions, as applied in combination with the others challenged in Plaintiffs' Complaint, make it practically impossible for Plaintiffs and other non-wealthy Maine voters to establish and associate with a new political party under Maine law. As such, the challenged provisions severely burden Plaintiffs' First and

1

Fourteenth Amendment rights to cast their votes effectively, to speak and associate for political purposes, to establish and grow a political party, and their right to equal protection of the law. Further, the challenged provisions are not reasonably tailored to protect any legitimate – much less compelling – state interest. They serve only to freeze the political status quo in Maine.

Plaintiffs satisfy each element required for a preliminary injunction. Most important, Plaintiffs have a strong likelihood of success on the merits. Plaintiffs' exclusion from the 2020 general election also constitutes irreparable harm that outweighs any conceivable injury to legitimate state interests. In addition, the requested injunction will serve the public interest by protecting the right of all Maine voters to cast their votes effectively in the 2020 general election.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

In 2016, more than 5,000 Maine residents joined together to enroll as Libertarian voters, thus establishing LPME as a ballot-qualified party under Maine law. (Ex. 1, Decl. of C. Lyons, ¶¶ 4, 12); *see* § 303. The 18-month effort was arduous and expensive. (Ex. 1, Decl. of C. Lyons, ¶¶ 5-12.) It cost LPME approximately $106,000 and completely exhausted the fledgling party's resources. (*Id.* at ¶ 11.) It also necessitated litigation, the result of which secured LPME's status as a ballot-qualified party, but only entitled LPME to place its nominees for President and Vice-President on Maine's 2016 general election ballot. *See LPME I*, at PageID 320 (attached as Ex. 2). LPME's candidates for President and Vice-President, Governor Gary Johnson and Governor William Weld, received 38,105 votes in that election, or 5.1 percent of the total. (Ex. 3, Decl. of J. Baines, ¶ 4.)

To remain ballot-qualified under Maine law, LPME was required to double its enrollment after the 2016 general election to at least 10,000 registered members, and to ensure that all 10,000

---

[2] The relevant facts are more fully set forth in Plaintiffs' Complaint ("Compl.") (ECF No. 1, ¶¶ 4-11, 15-50), which is incorporated herein by reference.

members voted in the 2018 general election. *See* § 301(1)(E). Standing alone, § 301(1)(E) imposed a severe burden, because LPME lacked the financial and other resources necessary to enroll another 5,000 voters in a single election cycle. (Ex. 1, Decl. of C. Lyons, ¶ 13; Ex. 3, Decl. of J. Baines, ¶ 5.) Even if LPME could have complied with that requirement, however, it faced yet another severe burden: LPME was required to select its nominees by primary election, *see* § 331, but it was mathematically impossible or near-impossible for many LPME candidates to qualify for the primary election ballot, because the number of signatures they were required to submit exceeded or nearly exceeded the number of voters eligible to sign their nomination petitions. (Compl. ¶¶ 32-40; Ex. 4, Decl. of O. Hall, ¶¶ 6-7; Ex. 5, Voter List); *see* §§ 335(2),(5). As a result, only one Libertarian candidate, Plaintiff Blackburn, was able to run in the primary election and qualify for Maine's 2018 general election ballot (as a candidate for State House in district 125), and he did so only by enrolling new Libertarian voters who then signed his nomination petitions. (Ex. 1, Decl. of C. Lyons, ¶ 15; Ex. 6, Decl. of C. Blackburn, ¶ 4.)

The near-total exclusion of Libertarian candidates from Maine's 2018 general election ballot all but guaranteed that fewer than 10,000 Libertarian voters would vote in that election, as required by § 301(1)(E). (Ex. 1, Decl. of C. Lyons, ¶ 16; Ex. 3, Decl. of J. Baines, ¶ 16.) Thus, in December 2018, Defendant disqualified LPME pursuant to § 304 because it failed to comply with § 301(1)(E). (Ex. 7, Flynn Mem.) Defendant also unenrolled the 6,240 Maine voters who had registered as Libertarian, contrary to the express preference indicated on their voter enrollment cards, pursuant to § 306. (Ex. 7, Flynn Mem.; Ex. 5, Voter List.)[3] Plaintiffs attempted to qualify LPME pursuant to § 303 prior to the 2020 election cycle, but the demonstrable futility of the endeavor under existing Maine law hampered their effort to raise the funds and resources necessary

---

[3] The Flynn Memorandum states that LPME had 6,168 enrolled members as of November 6, 2018. However, the Voter File listing LPME members unenrolled on December 3, 2018 lists 6,240 LPME members. Therefore, LPME appears to have enjoyed significant growth in membership until it was disqualified. (Ex. 1, Decl. of C. Lyons, ¶ 17.)

to enroll 5,000 more voters. (Ex. 1, Decl. of C. Lyons, ¶ 18; Ex. 3, Decl. of J. Baines, ¶ 10.) Plaintiffs' effort therefore fell short, and LPME is not currently ballot-qualified under Maine law.

## ARGUMENT

A party seeking a preliminary injunction must establish: "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in [its] favor, and (4) service of the public interest." *Maine Republican Party v. Dunlap*, 324 F. Supp. 3d 202, 206 (D. Me. 2018) (citation omitted). "The first prong … is the indispensable requisite," and therefore, "the thrust of the decision to grant preliminary injunctive relief boils down to a determination of whether the harm caused to the plaintiff without the injunction in light of the plaintiff's likelihood of success on the merits, outweighs the harm the injunction will cause the defendant." *League of Women Voters v. Diamond*, 923 F. Supp. 266, 268 (D. Me. 1996) (citations omitted). Here, Plaintiffs satisfy each element and they are entitled to the requested injunction.

### I.    Plaintiffs Have a Strong Likelihood of Succeeding on the Merits of Their Challenge to Maine's Requirements for Forming a New Party.

At each step in the statutory procedure for forming a new party, Maine law imposes severe burdens on the First and Fourteenth Amendment rights of citizens who seek to engage in this quintessentially-protected political activity – burdens that fall especially heavily upon non-wealthy citizens such as Plaintiffs. No legitimate, much less compelling, state interest can justify the burdens imposed. Each of these burdens is therefore individually sufficient to demonstrate the unconstitutionality of Maine's statutory scheme, and taken together, they overwhelmingly establish that Plaintiffs are likely to prevail on the merits.[4]

---

[4] Constitutional challenges to election laws are reviewed under the Supreme Court's *Anderson-Burdick* analytic framework, according to which a court must weigh "the character and magnitude of the asserted injury" to Plaintiffs' First and Fourteenth Amendment rights against "the precise interests put forward by the State as justifications..." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). The severity of the burden dictates the appropriate level of scrutiny. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Where the challenged provisions "impose 'severe burdens' on a

A.   **Maine's Provisions Governing the Formation of a New Party – §§ 301(E) and 303 – Severely Burden Plaintiffs' First and Fourteenth Amendment Rights.**

Maine residents who wish to form a new political party face a heavy burden: first they must file a declaration of intent in December of an even-numbered year – nearly two years before the general election in which they seek to participate – and then, in the intervening off-election year, they must enroll 5,000 voters as registered members of the party. *See* § 303(1),(2). They must complete their effort by January 2nd of the next even-numbered year – 10 months before the general election in which they seek to participate. *See* § 303(2).

Conducting a voter-enrollment drive is an inherently time-consuming, labor-intensive and expensive process. (Ex. 1, Decl. of C. Lyons, ¶¶ 5-9; Ex. 3, Decl. of J. Baines, ¶¶ 6-8.) It requires extensive resources – including the cost of travel, food and lodging – just to locate voters throughout the state, in sufficient numbers and in suitable public spaces, who may be willing to enroll in the new party. (*Id.*) Further, using the enrollment cards required under Maine law, it takes approximately 10 minutes to enroll a single voter. (*Id.*) And because voters are often unwilling to trust their voter registration to an unknown person, many are unwilling to complete an enrollment card, even if they support the new party's platform. (*Id.*) Other voters may support the new party's effort to participate in the political process, but are reluctant to make the snap decision – typically on a busy sidewalk or other public forum – to commit to joining a new party. (*Id.*) For all of these reasons, conducting a voter-enrollment drive is even more burdensome than collecting signatures on a nomination petition – a procedure that Maine no longer allows. (*Id.*); *see* § 303(3) (providing for formation of party by petition) (repealed).

---

party's associational rights, the regulation must be narrowly tailored to serve a compelling state interest to survive constitutional scrutiny." *Maine Republican Party*, 324 F. Supp. 3d at 208 (citation and quotation marks omitted). Less exacting scrutiny applies to regulations that impose lesser burdens, *see id*. (citation omitted), but in every case the asserted state interests "must be sufficiently weighty to justify" the burdens imposed. *Baber v. Dunlap*, 349 F. Supp. 3d 68, 78 (D. Me. 2018) (citation omitted).

The burden of completing a successful enrollment drive in Maine is exacerbated by the fact that the January 2nd enrollment deadline is 159 days before the June 9, 2020 primary election and 306 days before the November 3, 2020 general election. As this Court recognized in *LPME I*, when it enjoined Defendant from enforcing Maine's then-deadline of December 2nd:

> "[T]he great weight of authority . . . has distinguished between filing deadlines well in advance of the primary and general elections and deadlines falling closer to the dates of those elections." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 590 (6th Cir. 2006); s*ee, e.g.*, *id*. at 582 (striking petition deadline for new party formation of 120 days before the primary election); *New Alliance Party of Ala. v. Hand,* 933 F.2d 1568, 1576 (11th Cir. 1991) (striking deadline sixty days before the primary and seven months before the general election); *McLain v. Meier*, 637 F.2d 1159, 1163-64 (8th Cir. 1980) (striking deadline more than ninety days before the primary and more than 150 days before the general election); *MacBride v. Exon*, 558 F.2d 443, 449 (8th Cir. 1977) (striking deadline ninety days before the primary and nine months before the general election); *Calif. Justice Comm. v. Bowen*, No. CV 12–3956 PA, 2012 WL 5057625, at *4-9, 2012 U.S. Dist. LEXIS 150424, at *16-25 (C.D. Cal. Oct. 18, 2012) (striking deadline 135 days before the primary and ten months before the general election); *Libertarian Party of Tenn. v. Goins*, 793 F. Supp. 2d 1064, 1086-89 (M.D. Tenn. 2010) (striking deadline 120 days before the primary and at least eight months before the general election); *Citizens to Establish a Reform Party in Ark. v. Priest*, 970 F. Supp. 690, 697-98 (E.D. Ark. 1996) (striking deadline five months before the primary and eleven months before the general election); *Libertarian Party of Nev. v. Swackhamer*, 638 F. Supp. 565, 570-71 (D. Nev. 1986) (striking deadline that was effectively 140 days before the primary when the 90-day official deadline was added to the 50-day verification period).

*LPME I*, at PageID 301-02. "Even in the company of these invalidated deadlines," the Court observed, "Maine's deadline stands out." *Id.* at PageID 302. Relying on the foregoing precedent, the Court concluded that Maine's December 2nd enrollment deadline, as applied in combination with other statutory provisions, imposed a "severe" burden on the plaintiffs' rights. *See id*. at PageID 309. In particular, the Court found that the deadline burdened the plaintiffs by requiring them to demonstrate voter support during an off-election year, when "the average voter is less focused on politics," and by preventing them from responding to "any contentious issue raised in the same year as an election." *Id*. at PageID 308 (quoting *Blackwell*, 462 F.3d at 586).

6

Maine responded to this Court's decision in *LPME I* by moving the enrollment deadline from December 2nd of the off-election year to January 2nd of the election year. *See* § 303(2). This minor change did nothing to address the factors that led this Court to conclude that the deadline imposes a severe burden: under the current deadline, Plaintiffs still must obtain the required voter support exclusively during an off-election year, when voters are less engaged in the political process, and they are still prevented from responding to contentious issues raised during the election year. (Ex. 1, Decl. of C. Lyons, ¶ 9.) Consequently, the current deadline imposes a severe burden for the same reasons that the slightly earlier deadline enjoined in *LPME I* did.

Furthermore, the inherently time-consuming and labor-intensive nature of the procedure for enrolling 5,000 voters in a new party inevitably requires a substantial expenditure of valuable resources. (Ex. 1, Decl. of C. Lyons, ¶¶ 5-9; Ex. 3, Decl. of J. Baines, ¶¶ 6-8.) Assuming that every single voter who is asked agreed to enroll in the new party, the process would still require approximately 833 hours of labor. (*Id.*) But most voters do not agree, which means the enrollment process itself requires significantly more than 833 hours of labor. (*Id.*) The process of locating willing voters, traveling to meet them in suitable venues, setting up equipment, organizing and delivering enrollment cards to local elections officials throughout the state requires still more hours of labor. (*Id.*) As a result, a new party that attempts to rely entirely on volunteers working in the evenings and on weekends is unlikely to succeed. (Decl. of C. Lyons, ¶¶ 5,10.) Instead, to have a realistic chance of success, a new party must hire professional petitioners to conduct its enrollment drive. (*Id.*) This necessary expense places "a particular burden" on non-wealthy citizens such as Plaintiffs. *See Anderson*, 460 U.S. at 792 (striking down Ohio's March deadline for independent candidates). As the Court observed in *Anderson*, "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or *economic status*." *Id.* at 793 (emphasis added).

Although LPME successfully completed its 2016 enrollment drive, it did so only after this Court enjoined enforcement of the December 2nd deadline and granted the party additional time, until July 12, 2016, to enroll more voters. *See LPME I*, at PageID 320. Even with the benefit of that relief, LPME could not have succeeded without substantial financial support from Libertarian Party supporters nationwide, which enabled it to hire professional petition circulators. (Ex. 1, Decl. of C. Lyons, ¶¶ 5,10-11.) LPME spent at least $68,608 on paid petition circulators, and approximately $38,000 more on travel, food, equipment, supplies and promotional events to support the party's growth, bringing its total costs during the 18-month enrollment drive to more than $106,000. (*Id.*) The effort completely exhausted LPME's limited resources, leaving the party without funds or resources to support its candidates' election campaigns, much less to conduct another enrollment drive. (*Id.*; Ex. 3, Decl. of J. Baines, ¶ 5.)

Nonetheless, under Maine law, LPME was required to do just that – to double its enrollment to 10,000 members, and then ensure that all 10,000 members turned out to vote in the 2018 general election. *See* § 301(E). Standing alone, the additional voter-enrollment requirement imposed by § 301(E) was cost-prohibitive for a new party with the limited resources of LPME, but the burden of complying with § 301(E) was compounded by the fact that Maine's excessive primary election ballot access requirements made it mathematically impossible or near-impossible for LPME to select its nominees and place them on Maine's 2018 general election ballot. *See infra* Part I.B. As a result, the voter-turnout requirement imposed by § 301(E) was itself insurmountable: it demanded that 10,000 LPME members turn out to vote in an election in which every Libertarian candidate was excluded from the ballot (except a single candidate for State House). Because Libertarian voters have no rational incentive to vote in an election with no Libertarian candidates, the near-total exclusion of LPME's candidates from Maine's 2018 general election ballot virtually

guaranteed that it would fail to comply with § 301(E). (Ex. 1, Decl. of C. Lyons, ¶ 16; Ex. 3, Decl. of J. Baines, ¶ 9.)

Thus, while precedent establishes that the burden imposed by § 303 is severe based on the excessively early enrollment deadline and the high cost of enrolling 5,000 new voters, § 301(E) doubles that cost and requires that a new party rally 10,000 members to vote in an election in which its candidates are functionally barred from participating. Not even the most dedicated party members can be expected to comply with such an irrational requirement. Separately and as applied in combination, therefore, § 303 and § 301(E) severely burden Plaintiffs' First and Fourteenth Amendment rights.

### B. Maine's Provisions Governing a New Party's Participation in the Electoral Process – §§ 331(1) and 335(2),(5) – Severely Burden Plaintiffs' First and Fourteenth Amendment Rights.

A new party that successfully enrolls 5,000 members and becomes ballot-qualified pursuant to § 303 immediately faces yet another obstacle to its participation in Maine's electoral process – one that is also practically insurmountable. The party is required to select its nominees by primary election, *see* § 331(1), but the primary election ballot access requirements that Maine imposes pursuant to § 335 are so high as to be presumptively unconstitutional as applied. To appear on the primary election ballot, a candidate seeking the party's nomination for President, United States Senator or Governor must submit a petition signed by at least 2,000 eligible voters who are enrolled members of the party. *See* § 335(2),(5). That requirement translates to a showing of support from 40 percent of a new party's 5,000 enrolled members.

The Supreme Court has long recognized that states may require that candidates or parties demonstrate a "modicum of support" before granting them ballot access, but it has never upheld a state law requiring a showing of support greater than 5 percent of the voters eligible to vote for the candidate or party. *See Jenness v. Fortson*, 403 U.S. 431, 442 (1971) (upholding Georgia's

9

"somewhat higher" 5 percent signature requirement on the ground that it was "balanced" by the state's lack of other restrictions); *see also Storer v. Brown*, 415 U.S. 724, 739 (1974 ) (remanding for a determination as to whether California's law, as applied, would "require substantially more than 5% of the eligible pool … [which] would be in excess, percentagewise, of anything the Court has approved"); *Williams v. Rhodes*, 393 U.S. 23, 46 (1968) (Harlan, J. concurring) (concluding that Ohio's 15 percent signature requirement, standing alone, was unconstitutional). Following this precedent, lower courts have, without exception, struck down laws such as § 335, which require a showing of support greater than 5 percent of the eligible voters.[5] As the Fifth Circuit has explained, "requirements as high as five percent are not unconstitutional *per se*, but requirements substantially in excess of five percent probably are." *Dart v. Brown*, 717 F. 2d 1491, 1506 (5th Cir. 1983) (quoting L. Tribe, *American Constitutional Law*, 784 (1978)). The showing of support that § 335 requires of a new party's candidates for statewide office is therefore severely burdensome – if not unconstitutional *per se* – as applied to LPME.

Section 335 prescribes lower signature requirements for district and county offices, *see* § 335(5), but the burden imposed on candidates seeking LPME's nomination for those offices is even more severe, because the pool of eligible voters in those jurisdictions is smaller. (Ex. 4, Decl. of O. Hall, ¶¶ 6-7; Ex. 5, Voter File.) In fact, as applied to LPME in 2018, the signature

---

[5] *See, e.g.*, *Lee v. Keith*, 463 F.3d 763 (7th Cir. 2006) (striking down 10-percent requirement); *Obie v. North Carolina State Bd. of Elections*, 762 F. Supp. 119 (E.D. N.C. 1991) (same); *Greaves v. State Bd. of Elections of North Carolina*, 508 F. Supp. 78 (E.D.N.C. 1980) (same); *Lendall v. Jernigan*, 424 F. Supp. 951 (E.D. Ark. 1977) (same); *American Party of Arkansas v. Jernigan*, 424 F. Supp. 943 (E.D. Ark. 1977) (striking down 7-percent requirement); *Lendall v. Bryant*, 387 F. Supp. 397 (E.D. Ark. 1974) (striking down 15-percent requirement); *Socialist Labor Party v. Rhodes*, 318 F. Supp. 1262 (S.D. Oh. 1970) (striking down 7-percent requirement). The same standard applies in the primary election context. *See Munro v. Socialist Workers Party*, 479 U.S. 189 (1986) (upholding law requiring that candidates in "blanket primary" receive at least 1 percent of the votes cast for the office they sought); *see also Consumer Party v. Davis*, 633 F. Supp. 877, 879 (E.D. Pa. 1986) (holding primary election signature requirements unconstitutional because they made it "effectively impossible" for small party's candidates to appear on primary or general election ballots); *Candidacy of Independence v. Kiffmeyer*, 688 NW 2d 854 (Minn. 2004) (holding primary election minimum vote requirement unconstitutional on ground that it violated plaintiffs' "constitutional rights to vote and to associate for the advancement of political beliefs under the First and Fourteenth Amendments").

requirements that § 335 imposed on many candidates for district and county office were mathematically impossible or near-impossible to meet, because they exceeded or nearly exceeded the number of eligible voters in the jurisdiction. (Compl. ¶¶ 32-40; Ex. 4, Decl. of O. Hall, ¶¶ 6-7; Ex. 5, Voter File.) These facts are confirmed by Defendant's own list of enrolled Libertarian voters as of December 2018 and they are not subject to dispute. (Ex. 4, Decl. of O. Hall, ¶¶ 6-7; Ex. 5, Voter File.) The showing of support that § 335 requires of candidates for district and county offices is therefore also severely burdensome – if not unconstitutional *per se* – as applied to LPME.

The severity of the burden imposed by § 335, as applied to LPME, is confirmed by the fact that, with a single exception, no Libertarian candidate was able to comply with the signature requirements it establishes. *See Storer*, 415 U.S. at 742 ("past experience" is a reliable indicator of whether a ballot access law is unconstitutionally burdensome). Plaintiff Lyons, for example, was unable to obtain the 2,000 signatures necessary to run as LPME's candidate for U.S. Senate in 2018 – a figure that amounted to 32.43 percent of LPME's 6,168 enrolled members. (Ex. 1, Decl. of C. Lyons, ¶ 14.) Not only did this requirement grossly exceed the constitutional limits established by Supreme Court precedent, but also, Plaintiffs Lyons could not comply with it unless he made individual appointments and traveled to meet specific voters spread throughout the state. (*Id.*) Plaintiff Young was unable to run as LPME's nominee for State House in district 121, because § 335 required her to obtain signatures from 25 of the 44 LPME members in that district – or 56.82 percent of the eligible voters. (Ex. 8, Decl. of B. Young, ¶¶ 4-5.)[6] This meant that Plaintiff Young could not seek LPME's nomination unless she first demonstrated support from a majority of the eligible voters in her district. (*Id.*) Plaintiff Blackburn is the exception that proves the rule: he complied with § 335, but only by enrolling new members in LPME who then signed his nomination

---

[6] Plaintiffs' Complaint incorrectly alleges that Plaintiff Young sought to run in district 131. (Compl. ¶ 38.) In fact, she ran in district 121. The allegations in the Complaint are nonetheless accurate with respect to an LPME candidate running in district 131: the candidate would need support from 96.15 percent of the eligible voters in that district.

petitions, and even so he was obliged to demonstrate support from 43.10 percent of the eligible voters in his district. (Ex. 6, Decl. of C. Blackburn, ¶ 4.)

As further confirmation that § 335 imposes a severe burden, Lisa Savage, the Maine Green Independent Party's 2020 candidate for United States Senate, recently announced that she was unenrolling from the party to run as an independent, due to the "Sisyphean operational task" of complying with the "onerous" signature requirements that § 335 imposes on smaller parties. *See* Press Release, *Lisa Savage's Green Campaign to Take Independent Route to Ballot* (Feb. 24, 2020), available at  https://www.lisaformaine.org/green_campaign_independent_route_to_ballot (last visited March 3, 2020). In fact, no Green Party candidate for statewide office (excluding President and Vice-President) has complied with § 335 since at least 2006. *See* Dept. of the Sec. of State, *Election Results*, available at https://www.maine.gov/sos/cec/elec/results/index.html (last visited March 3, 2020). Yet the Green Party, with 43,143 enrolled members, is nearly seven times the size that LPME was during the 2018 general election. *See* Dept. of the Sec. of State, *Statewide Registered and Enrolled Data File (Active Status) (as of 11/5/2019)*, available at https://www.maine.gov/sos/cec/elec/data/index.html (last visited March 3, 2020). If the signature requirements prescribed by § 335 are so onerous that they routinely exclude Green Party candidates, they are practically impossible for a newly formed party like LPME.

Because Maine requires that new parties like LPME nominate by primary election, *see* § 331(1), and because the primary election ballot access requirements that Maine imposes pursuant to § 335 exceed the constitutional limits established by Supreme Court precedent, §§ 331(1) and 335 operated as a near-absolute bar to LPME's participation in Maine's 2018 general election, despite the fact that LPME was ballot-qualified under Maine law. *See* § 303. Further, by preventing LPME from selecting its nominees and placing them on the 2018 general election ballot, §§ 331(1) and 335 virtually guaranteed that fewer than 10,000 LPME members would turn out to vote in that

election, and that LPME would fall short of the requirement for remaining ballot-qualified pursuant to § 301(E). Standing alone and as applied in combination, therefore, §§ 331(1) and 335 severely burden Plaintiffs' First and Fourteenth Amendment rights.

     **C.**    **Maine's Provisions Governing the Disqualification of a New Party and Unenrollment of Its Members – §§ 304 and 306 – Severely Burden Plaintiffs' First and Fourteenth Amendment Rights.**

When the inevitable transpires and a new party fails to comply with the requirements for remaining ballot-qualified under § 301(1)(E), as LPME did, Maine law imposes what may be the most severe burden of all: it disqualifies the party pursuant to § 304 and automatically unenrolls its members pursuant to § 306. The party must therefore start the process of qualifying for the ballot pursuant to § 303 all over again. It must file its declaration of intent in December of an even-numbered year, enroll 5,000 members, and complete the process by January 2nd of the election year in which it seeks to qualify. *See* § 303.

At least one court that has considered a voter-disaffiliation provision like § 306 has found that it imposed a "severe" burden on a minor party's First and Fourteenth Amendment rights and thus held it unconstitutional. *See Green Party of N.Y. v. N.Y. State Bd. of Elections*, 389 F.3d 411, 420 (2nd Cir. 2004). Further, in cases where courts have not expressly found that such laws impose a severe burden, they have nonetheless held the laws unconstitutional on the ground that recognizing a voter's partisan preference (where the party has demonstrated a modicum of support) imposes a negligible burden on the state in the age of computers. *See*, *e.g.*, *Baer v. Meyer*, 728 F.2d 471, 475 (10th Cir. 1984) (state's "nominal" burden of recognizing voter's partisan affiliation in computerized record insufficient to justify burden on plaintiffs' First and Fourteenth Amendment rights); *Atherton v. Ward*, 22 F. Supp. 2d 1265,  (W.D. Ok. 1998) (state's "insubstantial" burden of registering and recording voter's partisan affiliation by computer "does not justify the heavy burden on First Amendment rights suffered by [plaintiffs]"); *Council of*

*Alternative Political Parties v. State, Div. of Elections ("CAPP")*, 781 A.2d 1041, 1051-52 (N.J. App. 2001) (state's "minimal" administrative burden of recognizing voter's partisan affiliation in computerized voter registration system insufficient to justify "considerable, albeit not severe, burden on plaintiffs' First Amendment rights…"). Similarly, in this case, Defendant's burden of recognizing the partisan affiliation of LPME's enrolled members is minimal, because Maine also maintains electronic and computerized voter rolls. (Ex. 7, Flynn Mem.) But because Maine – unlike the states in the foregoing cases – uses voter enrollment as the sole criterion by which a party can remain ballot-qualified, *see* § 301(E), the burden imposed on Plaintiffs here is far more severe.

In both *Green Party of N.Y.* and *Baer*, the minor party plaintiffs' injury arose from the challenged laws' denial of their access to information about voters who supported them. *See Green Party of N.Y.*, 389 F.3d at 421 (citing *Baer*, 728 F.2d at 475). As the Second Circuit explained:

> If an independent body does not have access to other information concerning who is affiliated with its party, it will be unable to determine from the word 'unaffiliated' whether a particular unaffiliated voter is or is not a supporter of its organization. It burdens all the plaintiff parties if they cannot determine who would like to associate with them. That they are smaller, less developed — and hence less financially established parties — makes their situation even more difficult. As *Anderson* instructs, such limitation of opportunity for independent voters reduces diversity and competition in the marketplace of ideas.

*Id.* (citing *Anderson*, 460 U.S. at 794). The plaintiffs' injuries in *Atherton* and *CAPP* were similar. *See Atherton*, 22 F. Supp. 2d at 1268 (plaintiffs' injury arose because state "prevents them from obtaining and using particularized voter information in the manner enjoyed by those who belong to recognized political parties"); *CAPP*, 781 A.2d at 1045 (plaintiffs' injury arose from state's denial of "essential information" they could use for "campaign and party-building activities, including canvassing and fundraising").

14

In this case, by contrast, the burden that § 306 imposes on Plaintiffs is far more severe, because the unenrollment of LPME's members not only deprives Plaintiffs of the essential information they need to determine which voters want to associate with them, but also, it deprives them of the one thing they must have to be ballot-qualified under Maine law – enrolled members. *See* §§ 303, 301(E). Section 306 negates the results of Plaintiffs' voter-enrollment effort and renders null and void all the time, money and resources they dedicated to it. And because Maine does not allow Plaintiffs to qualify LPME by petition, *see* § 303(3) (repealed), they have no choice, if they wish to continue their association as a political party, but to undertake the arduous and expensive voter-enrollment process anew, as if they had not already enrolled 6,240 members. This severe burden is in addition to the deprivation of information found to be a "severe," "heavy" and "considerable" burden in *Green Party of N.Y.*, *Atherton* and *CAPP*, respectively.

Standing alone and as applied in combination, therefore, §§ 304 and 306 severely burden Plaintiffs' First and Fourteenth Amendment rights.

> **D.      No Legitimate – Much Less Compelling – State Interest Justifies the Severe Burdens That Maine Law Imposes on Plaintiffs' First and Fourteenth Amendment Rights.**

The Supreme Court has long "recognized the constitutional right of citizens to create and develop new political parties," which "advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences." *Norman v. Reed*, 502 U.S. 279, 288 (1992) (citations omitted). Thus, "to the degree that a State would thwart this interest by limiting the access of new parties to the ballot," it must demonstrate "a corresponding interest sufficiently weighty to justify the limitation." *Id.* at 288-89 (citation omitted). State laws that impose a severe burden must "be narrowly drawn to advance a state interest of compelling importance." *Id.* at 289. Sections 301(E), 303, 304, 306, 331(1) and 335(2),(5) fail that test.

**§§ 301(E), 303:** Maine has determined that a new party demonstrates a sufficient modicum of support to participate in its electoral process by enrolling 5,000 members. *See* § 303. Even if the severe burden and expense of complying with that provision could be justified by Maine's legitimate regulatory interests – a dubious proposition under *Anderson* and *LPME I*, given that Maine could allow the less burdensome alternative of qualifying by petition (Ex. 1, Decl. of C. Lyons, ¶ 6; Ex. 3, Decl. of J. Baines, ¶ 7; Ex. 9, Decl. of R. Winger, ¶¶ 4-5) – no interest can justify the additional burdens that § 301(E) imposes. Defendant's designated witness, Deputy Secretary Julie Flynn, conceded as much in a deposition. (Ex. 10, Dep. of J. Flynn, 43/18 - 44/8 (conceding that 5,000 enrolled members demonstrates the "necessary modicum of support for a party to begin participating in the Maine electoral system.").) Ms. Flynn stated that the purpose of § 301(E), which requires that a new party ensure that 10,000 enrolled members vote in the first election after it qualifies, is to eliminate smaller parties who do not have "any chance of winning." (*Id*. at 14/11 - 14/23.) That is not a legitimate state interest. States may restrict ballot access to parties that demonstrate a *modicum of support*, not to parties that demonstrate a *chance of winning* an election. *See Jenness*, 403 U.S. at 442.

As to *legitimate* state interests, Defendant fails to offer any credible basis for concluding that § 301(E) is narrowly tailored to advance them. In the current election cycle, for example, Ms. Flynn acknowledged that only three parties – Democrats, Republicans, and Greens – are ballot-qualified. When asked whether the addition of a fourth party, LPME, might pose any danger of voter confusion or ballot splintering, Ms. Flynn evaded the question: "I don't know how to answer that." (*Id*., 20/17 - 21/16.) Defendant asserts no other interest to justify § 301(E).

**§ 331(1), 335(2),(5):** Defendant also fails to show that Maine has a compelling (or legitimate) interest in requiring that a new party select its nominees by primary election pursuant to § 331(1), while making it impossible or near-impossible for the new party's candidates to qualify

16

for the primary election ballot pursuant to § 335(2),(5). According to Ms. Flynn, the purpose of § 335 is to ensure that each primary candidate demonstrates a modicum of support among the general electorate. (*Id.*, 39/3 - 40/19.) But § 335 expressly provides that primary candidates must obtain signatures from voters "who are enrolled in the party," § 335(2), <u>not</u> voters who belong to the general electorate. Thus, § 335 cannot possibly serve Defendant's asserted state interest. It is not even rationally related to that interest.

Moreover, Defendant has publicly advocated in support of legislation that would amend § 331(1) to permit smaller parties such as LPME to nominate by convention rather than by primary election. Defendant prepared and submitted the proposed legislation pursuant to the "Settlement and Release Agreement" that disposed of *LPME 1*. (Ex. 11, Amended Notice of Rule 30(b)(6) Dep. of M. Dunlap, Attachment B (Settlement) ¶ 1, and Ex. B to Attachment B (Legislative Proposal) at 7 (Summary).) Defendant did so with the express intention of "address[ing] the legal issues" raised in *LPME 1*. (*See* Summary at 7.) As Ms. Flynn testified, Defendant's office, aided by counsel, prepared and presented written and oral testimony in support of the legislation, answered questions, and participated in work session discussions. (Ex. 10, Flynn Tr. 28/12 - 30/18.) Although the legislation was not enacted, Defendant's support for eliminating the primary election requirement confirms that § 331(1) is not narrowly tailored to further any compelling state interest. A less burdensome alternative – allowing smaller parties to nominate by convention – is not only available, but the method that most states use. (Ex. 9, Decl. of R. Winger, ¶¶ 6-10.)

**§§ 304, 306:** Finally, the caselaw cited herein makes clear that Maine's nominal interests (whatever they may be) in unenrolling LPME's members cannot justify the severe burdens that § 304 and § 306 impose. The evidence confirms that conclusion. Maine, like other states, is able to enroll or unenroll voters virtually instantaneously, by means of a "batch process" that imposes a minimal administrative burden, if any. (Ex. 7, Flynn Mem. (confirming that LPME members were

17

unenrolled pursuant to a "batch process" on the night of December 3, 2018).) In addition, Defendant fails to assert any legitimate – much less compelling – state interest that the disqualification and unenrollment requirements set forth in §§ 304 and 306 might further. To the contrary, Ms. Flynn stated that the purpose of these provisions is to "free[] up" voters so that they may "enroll in a different party that is more viable or help nominate candidates or even run as a nonparty candidate or as a candidate of another party ... ." (Ex. 10, Flynn Tr. 57/12 - 58/21.) But "freeing up" voters to enroll in other parties – contrary to the express preference indicated on their voter enrollment cards – is not a legitimate state interest, much less is it a compelling interest that can justify the severe burdens that §§ 304 and 306 impose on LPME and the voters who wish to associate with it. In any event, as Ms. Flynn effectively conceded, voters are free to unenroll from a party at any time, without such coercive action by the state. (*Id.* at 58/21-59/12.)

## II. The Remaining Factors Weigh Heavily in Favor of Granting Plaintiffs' Limited Request for Preliminary Injunctive Relief.

A plaintiff's likelihood of success is the "sine qua non" of the four-part test for determining whether a preliminary injunction should issue, but the remaining factors are also "important." *Sindicato Puertorriqueño v. Fortuño*, 699 F. 3d 1, 11 (1st Cir. 2012). Here, each factor weighs heavily in favor of granting the requested injunction.

**Irreparable Harm:** It is well-settled that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Sindicato Puertorriqueño*, 699 F. 3d at 10-11 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Where plaintiffs demonstrate that they are likely to prevail on First Amendment claims, therefore, "irreparable injury is presumed." *Sindicato Puertorriqueño*, 699 F. 3d at 11. But Plaintiffs do not rely on that presumption alone, because the evidence amply demonstrates that the challenged provisions infringe their "most precious freedoms." *Williams*, 393 U.S. at 30 (finding that ballot access laws

18

"place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively"). Despite LPME's status as a ballot-qualified party, the challenged provisions barred all but one of its candidates from appearing on Maine's 2018 general election ballot, the party was thereafter disqualified, and its 6,240 members were involuntarily unenrolled. As a result, unless this Court grants the requested relief, thousands of Maine voters, including Plaintiffs, will be unable to associate with LPME and vote for its candidates in Maine's 2020 general election. Such injury constitutes irreparable harm.

**Balance of Equities and Public Interest:** The balance of the equities and public interest also weigh heavily in Plaintiffs' favor. As to the equities, Plaintiffs complied with the requirements for qualifying LPME as a new party under Maine law, *see* § 303, yet they were still prevented from selecting and placing all but one of their nominees on Maine's 2018 general election ballot by operation of a primary election statutory scheme so restrictive as to be presumptively unconstitutional as applied here. *See* §§ 331(1), 335. LPME was thereafter disqualified pursuant to § 304 for failing to comply with a provision that serves no legitimate state purpose, *see* § 301(E), and its members were involuntarily unenrolled pursuant to another provision that serves no legitimate state purpose. *See* § 306. The inequity of this result is palpable: despite qualifying for the ballot under Maine law, Plaintiffs were excluded from participating in Maine's electoral process, and as a consequence, their party was disqualified, leaving them no alternative but to repeat the entire arduous and expensive statutory procedure for forming a new party – notwithstanding the demonstrable futility of undertaking such an endeavor.

By contrast, any conceivable burden that the requested injunction imposes on Defendant would be negligible. The injunction would merely restore the status quo *ex ante* by preventing Defendant from unenrolling LPME's members – a task that can be done automatically using

Defendant's computerized voter rolls – and by permitting LPME to select its nominees for the 2020 general election by convention rather than by primary election – a procedure that Defendant has publicly endorsed. The granting of such relief will not burden or harm Defendant in any way.

Finally, the requested injunction is in the public interest because Defendant has no legitimate interest in enforcing an unconstitutional statutory scheme. The requested injunction will also serve the public interest by protecting the First Amendment rights not only of Plaintiffs and the 6,240 Maine residents who seek to associate with LPME, but also all Maine voters who seek to cast their votes effectively in the 2020 general election.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Preliminary Injunction. Further, Plaintiffs respectfully request that the Court enter an order providing that: (1) those voters who were registered Libertarian as of December 3, 2018 shall remain registered as Libertarian; (2) LPME shall remain ballot-qualified for the 2020 general election; and (3) LPME shall be permitted to select its nominees at its 2020 statewide convention rather than in Maine's 2020 primary election.

Dated: March 4, 2020                                              Respectfully submitted,

                                                                 /s/John H. Branson

WILLIAM P. TEDARDS, JR.      OLIVER B. HALL             JOHN H. BRANSON*
*Pro Hac Vice*               *Pro Hac Vice*             BRANSON LAW OFFICE, P.A.
1101 30th Street NW, Ste.    CENTER FOR COMPETITIVE     482 Congress Street, Ste. 304
500                          DEMOCRACY                  P.O. Box 7526
Washington, DC 20007         P.O. Box 21090             Portland, ME
BT@tedards.net               Washington, DC 20009       (207) 780-8611
(202) 797-9135               (202) 248-9294             jbranson@bransonlawoffice.com
                             oliverhall@
                             competitivedemocracy.org

                                                        *Counsel for Plaintiffs*
                                                        *\*Counsel of Record*

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2020, I filed the foregoing document using the Court's

CM/ECF system, which will effect service upon all counsel of record.


/s/Oliver B. Hall
Oliver B. Hall
*Plaintiffs' Counsel*