UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| JAMES BAINES, CHRISTOPHER LYONS, ALLEN ESPOSITO, WILLIAM SAMPSON, CODY BLACKBURN, BONNIE YOUNG and LIBERTARIAN PARTY OF MAINE,<br><br>Plaintiffs,<br><br>v.<br><br>MATTHEW DUNLAP, in his official capacity as Secretary of State for the State of Maine,<br><br>Defendant. | Case No. 1:19-cv-00509-LEW |

## ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Families are always rising and falling in America, but the same is not true of political parties. For the last several election cycles, the Libertarian Party of Maine has struggled to rise to the level of viability, unable to consistently qualify as a party or to get its nominees on Maine ballots in accordance with state's election laws, M.R.S. 21-A §§ 301(1)(E), 304, 306, 331(1), & 335. Now before me is Plaintiffs James Baines, Christopher Lyons, Allen Esposito, William Sampson, Cody Blackburn, Bonnie Young and the Libertarian Party of Maine ("LPME")'s Motion for Preliminary Injunction to prevent the Defendant Matthew Dunlap, Secretary of State of Maine, from enforcing those ballot qualification laws as applied to Plaintiffs in the 2020 election cycle. After considering the motion, I find Plaintiffs have shown they are likely to succeed only on their voter-unenrollment claim,

and because preliminary relief is not warranted for that claim, their Motion for Preliminary Injunction is DENIED.

## BACKGROUND

Plaintiffs challenge several aspects of Maine's election law pertaining to party qualification and ballot access. They argue Maine has been shutting minor parties out of the election process without sufficient state interest in doing so. The result is a two-party race every time, anomalous in a state known for its independent politics, and with almost a third of its voters unenrolled in either major party.[1] Maine's party registration rules and ballot access laws place the following hurdles in front of prospective political parties and their candidates.

### A.  NEW PARTY QUALIFICATION

To prevent a cattle call in every election cycle, Maine systematizes the process for new party qualification. M.R.S. 21-A §§ 301(E), 303. To qualify for an election where it has not previously been on the ballot, a new party must "file a certification with the Secretary of State…that they have at least 5,000 voters enrolled in the proposed party." *Id.* § 303(2). This request must come well in advance of the upcoming election, because to qualify for the ballot that new party must hold a primary to select its candidate that will appear. Specifically, the prospective party must submit its declaration of intent "between December 1st and December 30th of an even-numbered year," *i.e.*, shortly following the previous election. *Id.* § 303(1). The new party then has until January 2nd of the next even-

---

[1] Bureau of Corporations, Elections, and Commissions, State of Maine, *Voter Registration Data, Election Data, and Online Forms,* (March 3, 2020), *available at* https://www.maine.gov/sos/cec/elec/data/index.html.

numbered year, roughly twelve months, to register the 5,000 voters needed for their application. *Id.* § 303(2).

Meeting these requirements grants status to a newly-qualified party for two election cycles. To stay on the ride, the party must at least double its enrollment by the second election, and make sure that those party members vote; to remain qualified a party must be able to show "[a]t least 10,000 voters enrolled in the party *voted* in the last general election." *Id.* § 301(1)(E) (emphasis added). Meeting this 10,000-voter threshold entitles a party to participate in the next cycle's primary election process, the necessary hurdle to obtain a spot on the state's general election ballot. *Id.* § 301(1).

### B. SELECTION OF CANDIDATES ONLY BY PRIMARY

Once qualified, parties must nominate their candidates by primary election. M.R.S. 21-A § 331(1). And, to register for a primary, a candidate must provide a petition to the Secretary of State containing a certain number of signatures. *Id.* § 335. The number of signatures a candidate needs to provide corresponds with the significance of the office he or she seeks. *See id.* § 335(2), (5) (requiring, for example, at least 2,000 signatures for a gubernatorial candidate, 1,000 for a candidate for Representative for Congress, and fewer for state government positions). The state requires a candidate to obtain signatures only from members of his or her own party, amounting to a requirement that the party can show significant support within a particular electoral division before a candidate can get on the ballot there. *Id.* § 335(2) ("A primary petition must be signed only by voters of the electoral division which is to make the nomination *and who are enrolled in the party named on the petition*.") (emphasis added).

### C. UNENROLLMENT

Also at issue in this case is Maine's practice of disqualifying parties and unenrolling their registered voters when those parties fail to meet the 10,000-voter threshold required by Section 301(1)(E). M.R.S. 21-A § 304 ("A party that does not meet the requirements of section 301 is not qualified to participate in a subsequent election."). Once Maine disqualifies a party, it unenrolls any voter that had previously registered with that party. *Id.* § 306 ("A voter who is enrolled in a party…which is disqualified under section 304, is considered an unenrolled voter for all purposes."). That voter and that party must then start again from square one. The party must begin its Sisyphean search for 5,000 voter registrations anew, and its members—be there 9,999 of them—are left to enroll with a more established party or to continue unenrolled.

## DISCUSSION

Plaintiffs seek preliminary injunctive relief that would qualify LPME, re-enroll its former members, and allow it to select nominees by convention for the upcoming 2020 election. Injunctive relief is "an extraordinary and drastic remedy that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations and quotation marks omitted). "To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). As the party seeking injunctive relief, Plaintiffs bear the burden of establishing that the factors weigh in

their favor.  *See Diaz-Carrasquillo v. Garcia-Padilla,* 750 F.3d 7, 10 (1st Cir. 2014)*; Esso Standard Oil Co. v. Monroig-Zayas,* 445 F.3d 13, 18 (1st Cir. 2006).

"Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996).  On this issue "the district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'"  *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross–Simons*, 102 F.3d at 16).  The showing required of the party with the burden to show it is "likely to succeed" varies depending on the relevance of the remaining preliminary injunction factors.  If the party fails to make a persuasive showing of likelihood of success, then generally it will lose the motion.  *Cf. New Comm. Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).  But the strength of the other three factors can inform the burden of showing likelihood of success.  In other words, although likelihood of success is the main bearing wall of the preliminary injunction standard, when the remaining factors strongly favor the party with the burden on the merits, a somewhat lesser showing as to the merits may suffice.  *Cf. Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, C.J.).  Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief."  *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

There is a long pedigree, and a well-established framework for evaluating Plaintiffs' likelihood of success on a constitutional challenge to state laws limiting access to ballots.  The Supreme Court, in *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983), and *Burdick*

*v. Takushi*, 504 U.S. 428, 434 (1992), established a three-step framework for evaluating state restrictions on ballot access. The first step of *Anderson–Burdick* is to consider the character and magnitude of the restriction: severe restrictions are subject to heightened scrutiny, minimally burdensome restrictions are subject to rational-basis review, and regulations falling in the middle warrant a flexible analysis that weighs the state's interests and chosen means of pursuing them against the burden of the restriction. *See Libertarian Party of Maine v. Diamond*, 992 F.2d 365, 371 (1st Cir. 1993) (citing *Anderson* and *Burdick*). The second step is to evaluate the state's interests and justifications for its restrictions. *Id*. The third step is to assess the legitimacy and strength of those interests to determine whether the restrictions are constitutional burdens on ballot access. *Id*.

Defendant argues Plaintiffs' request for preliminary injunctive relief fails for a variety of reasons. First, they argue Plaintiffs' claims are barred by the doctrine of claim preclusion, also known as *res judicata*, and should be dismissed. Even if the claims are actionable, Defendant argues Plaintiffs cannot meet the heavy burden of showing they are entitled to injunctive relief. For the reasons that follow, I find Plaintiffs' claims are not barred, but I deny their motion for preliminary injunction because they have not shown a likelihood of success on the merits of most of their claims, and preliminary relief is not warranted for their likely successful unenrollment claim.

### A. CLAIM PRECLUSION

Under the doctrine of federal claim preclusion, parties are barred from relitigating claims that could have been brought in an earlier suit. *Airframe Sys., Inc. v. Raytheon Co.*, 601 F.3d 9, 14 (1st Cir. 2010). Claim preclusion serves to protect "litigants against

gamesmanship and the added litigation costs of claim-splitting," and also prevents the squandering of judicial resources in unnecessary litigation. *Id*. Claim preclusion applies if three requirements are satisfied: "(1) the earlier suit resulted in a final judgment on the merits, (2) the causes of action asserted in the earlier and later suits are sufficiently identical or related, and (3) the parties in the two suits are sufficiently identical or closely related." *Id.*

The parties only dispute the second prong of the claim preclusion analysis, which resolves in Plaintiffs' favor. The First Circuit uses "a transactional approach to determine whether the asserted causes of action are sufficiently identical or related for claim preclusion purposes." *Id*. at 15. "A 'cause of action' in this context includes 'all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.'" *Id*. (internal citation omitted). The crux of this inquiry is "whether the causes of action arise out of a common nucleus of operative facts." *Id*. Following the First Circuit's lead, I will look at "'whether the facts are related in time, space, origin or motivation,' 'whether they form a convenient trial unit,' and whether treating them as a unit 'conforms to the parties' expectations.'" *Id*. (internal citations omitted)

The Defendant points to a 2016 lawsuit, where a similar group of LPME-related plaintiffs[2] challenged "numerous aspects of Maine's party qualification statute (section 303)," specifically, "the December 1 deadline in section 303(2)." Opposition at 12 (citing

---

[2] The parties do not dispute that Plaintiffs in this case share "sufficient identity" with the plaintiffs in *LPME I*. The Libertarian Party of Maine, Inc., was the lead plaintiff in *LPME I* and is also a plaintiff here. Christopher Lyons was a plaintiff in both cases as well.

7

*Libertarian Party of Maine, Inc. v. Dunlap*, 2016 WL 3039715 (D. Me. May 27, 2016) ("*LPME I*"). In *LPME I*, the plaintiffs sought to qualify as a political party prior to the 2016 election cycle, and challenged certain aspects of Section 303 as applied to their effort to qualify that year. *See LPME I*, Docket No. 2:16-cv-00002-JAW, ECF No. 1. In this lawsuit, by contrast, Plaintiffs challenge different aspects of Maine election law, that caused them a different kind of injury in a different election cycle. Last time out, Plaintiffs sought to become a political party; this time, Plaintiffs seek to remain one.

Quite simply, the facts that give rise to Plaintiffs' suit did not exist when *LPME I* was filed, and so do not satisfy the First Circuit's test for claim preclusion. For claims to be subject to preclusion, the underlying factual bases for the causes must be "related in time, space, origin or motivation," *Silva v. City of New Bedford*, 660 F.3d 76, 79 (1st Cir. 2011) (internal quotations and citation omitted), or, in other (more accessible) words, "arise out of a common nucleus of fact." *Airframe Sys.* 601 F.3d at 15. Whereas the facts giving rise to *LPME I* occurred in early 2016, the factual grist for this lawsuit all happened in 2017-18, *after LPME I* was settled. Plaintiffs challenge their exclusion from certain 2018 primary ballots, LPME's disqualification for failure to meet Section 301(1)(E)'s 10,000-voter requirement, and the subsequent unenrollment of LPME members. Plaintiffs would not have had standing to bring these challenges in 2016, and so they are not barred by claim preclusion from bringing them now. Therefore, because the factual bases of this case do not overlap in "time, space, origin or motivation" with the basis for *LPME I*, I find Plaintiffs' claims are not barred by *res judicata*.

B. **NEW PARTY ENROLLMENT REQUIREMENTS**

Plaintiffs seek to enjoin the Defendant from enforcing two related primary qualification requirements, which they believe functionally bar LPME from subsisting as a political party under Maine law. They ask me first to prevent the Defendant from enforcing Section 303(2), which requires a prospective party to register 5,000 members to qualify to hold its first primary. They also challenge Section 301(1)(E)'s requirement that at least 10,000 registered members of that party vote in each subsequent general election for the party to remain qualified to hold further primaries. Motion at 2. These steps place two hurdles in front of a prospective party: register 5,000 voters—0.47% of all active registered voters in the state, and approximately 0.8% of the total votes cast in the last two gubernatorial elections (*See* Flynn Decl. ¶ 14)—to qualify initially, and then ensure that 10,000 registered party members (just under 1% of active registered voters) participate in future years to remain qualified. Because Maine's voter registration thresholds are modest, and do not unconstitutionally burden Plaintiffs' right to associate under the First and Fourteenth Amendments, I find they are unlikely to succeed on this claim and will deny their motion to preliminarily enjoin these aspects of Maine's ballot access laws.

To begin with, Maine requires a prospective party to register just 5,000 members to qualify as a statewide party, a showing that is constitutional under both Supreme Court and First Circuit precedent. The Supreme Court has upheld much more severe burdens on ballot access for new parties time and again. *See, e.g., Burdick*, 504 U.S. at 434-37 (1% of all registered voters for party participation in statewide primary); *Jenness v. Fortson*, 403 U.S. 431, 432 (1971) (5% of state's registered voters). The First Circuit has done likewise,

recently finding that New Hampshire's more burdensome 3% signature requirement[3] did not infringe the Libertarian Party of New Hampshire's First and Fourteenth Amendment rights. *Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 23 (1st Cir. 2016) ("*LPNH*"). And Plaintiffs cannot show the burden they face from Section 303(2) is any greater than those faced by the plaintiffs in *Burdick*, *Jenness*, or *LPNH*.

Maine, like most states, requires its political parties seeking to have their nominees listed on statewide election ballots via primary first demonstrate a sufficient modicum of support among registered voters. In light of the controlling precedent concerning ballot access, I find Plaintiffs have failed to show Maine's requirement that a party corral less than half of 1% of registered voters is anything more than a "minimal burden." The state's interest in ensuring that political parties enjoy a "modicum of support" before getting unfettered ballot access is more than enough to overcome this minimal burden. *See LPNH*, 843 F.3d at 30. Therefore, because Plaintiffs fail to show Maine's 5,000-member registration requirement falls outside these long-accepted bounds of state ballot regulation, I deny their motion's request to enjoin enforcement of Section 303(2).

The same goes for Section 301(1)(E)'s requirement that 10,000 registered party members vote in subsequent elections. As the Defendant points out, many other states employ two-tiered systems that allow a party to show some support to temporarily qualify for statewide ballot recognition, and a higher level of recognition to maintain that status.

---

[3] Plaintiffs make much out of the fact that Maine requires a prospective party to obtain voter *registrations* rather than petition signatures. Motion at 6 (noting that "using the enrollment cards required under Maine law, it takes approximately 10 minutes to enroll a single voter"). And I agree, so far as it goes, that filling out a Maine voter registration card likely requires more time (and by extension LPME resources) than a simple John Hancock. This distinction does not tip the balance, however, from a "minimal burden" to a severe one.

10

*See, e.g., McLaughlin v. N.C. Bd. of Elections,* 65 F.3d 1215, 1223 (4th Cir. 1995) (upholding requirement that party's nominee for governor or president receive at least 10% of total votes cast at election to retain its party status, after initially qualifying with petition signatures equal to 2% total votes cast); *Arutunoff v. Okla. State Election Bd.*, 687 F.2d 1375 (10th Cir. 1982) (5% to qualify, 10% for retention); *Green Party of Ark. v. Martin,* 649 F.3d 675 (8th Cir. 2011) (10,000 voter signatures on petitions to qualify, 3% of total votes cast for Governor or President to retain party status). Maine's requirement that 10,000 registered voters participate in general elections for a party to retain status is kinder to newly-minted parties than any of these other, constitutional state schemes. And Plaintiffs cannot point to any contrary authority suggesting such two-tier systems are unconstitutional. Maine simply says to prospective parties: you must get 10,000 registered members voting by the second election cycle. That Maine allows parties to pre-qualify with 5,000 registrations as they ramp up to viability does not make the 10,000-registered-voter number itself unconstitutionally burdensome. At this early stage of the litigation it is Plaintiffs' burden to show they are likely to succeed, and because I find they have not shouldered that burden with respect to Section 301(1)(E), I will also deny Plaintiffs' motion to preliminarily enjoin enforcement of the 10,000-voter requirement.

### C. NOMINATION BY PRIMARY ELECTION

Plaintiffs also challenge the state's requirement that parties nominate their candidates by primary election, in particular, the barrier the state erects for a party candidate to get on a primary ballot in the first place. Maine requires candidates to submit a petition to qualify for a party primary that shows a level of voter support commensurate

with the significance of the post. M.R.S. 21-A § 335 (2) & (5) (requiring, at the most, 2,000 signatures for a gubernatorial candidate, and, at the least, 25 to run for State Senate). These signatures must come from registered voters of the candidate's party, and from the "electoral division" where he or she seeks office. *Id*. Plaintiffs believe this burden is "severe" because "in some instances, it was mathematically impossible or near-impossible for many LPME candidates to qualify for the primary election ballot, because the number of signatures they were required to submit exceeded or nearly exceeded the number of voters eligible to sign their nomination petitions." Motion at 12 (citing Compl. ¶¶ 32-40; Ex. 4, Decl. of O. Hall, ¶¶ 6-7; Ex. 5, Voter List.).

But Plaintiffs mischaracterize this signature requirement, which is hardly "mathematically impossible," and only a minimal burden on their access to primary ballots. As discussed above, Maine may condition ballot access on a "preliminary showing of a significant modicum of support." *Jenness*, 403 U.S. at 442. There are as many ways to achieve this goal as there are states. Maine creates its choke point for general election ballot placement at the primary stage, requiring a party's candidate show a "modicum of support" within his or her particular district before being able to run in a primary, and upon winning, getting automatic access to the general election ballot. *See* M.R.S. 21-A § 335. Like the 10,000-voter registration requirement, this primary-stage showing is smaller than that of other states' regimes which have been upheld. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1987) (upholding Washington statute restricting general election ballot to candidates receiving at least 1% of total vote in primary); *see also Diamond*, 992 F.2d at 372 ("A State possesses a separate, and additional, interest in ascertaining that a

political party which nominates candidates for office in an electoral subdivision of a larger political unit demonstrate support in the particular electoral subdivision for which the candidate is nominated."). That it might be "mathematically impossible" in some places is simply a reflection that LPME does not enjoy the minimum modicum of support Maine requires within that electoral division to qualify for the general election ballot. This signature requirement is a minimal burden on Plaintiffs' ballot access, well within the bounds set by the Supreme Court and First Circuit for a showing a minimum "modicum of support" before granting ballot access. Therefore, because Plaintiffs have failed to show a likelihood of success on the claim that this requirement infringes their rights under the First and Fourteenth Amendments I will deny their motion to enjoin the enforcement of Section 335 as well.

### D. DISQUALIFICATION AND UNENROLLMENT

Finally, Plaintiffs argue that Maine penalized them most severely by disqualifying LPME and unenrolling its 6,240 members when LPME failed to qualify under Section 301(1)(E) in 2018. M.R.S. 21-A §§ 304, 306. As authority, they point to several cases where courts found unenrollment schemes severely burdensome and unconstitutional where those schemes erased all information when unenrolling party members. *See, e.g., Green Party of N.Y. v. N.Y. State Bd. of Elections*, 389 F.3d 411, 420 (2nd Cir. 2004) (finding the burden "severe" because the purge of enrollment information hindered the party's "ability to identify, appeal to, inform, organize, mobilize and raise money from its supporters"). The Defendant counters that there is no harm at all because "the Secretary gave the LPME lists containing the names and addresses of every voter who had enrolled

in the party during the period from December 2015 through 2018 and had become unenrolled pursuant to sections 304 and 306." Flynn Decl. ¶¶ 38-41.  In one sense, the Defendant is correct; assuming that the loss of information is the only burden LPME suffers in the unenrollment process, Maine's system does no harm.  But, crucially, disqualification and unenrollment do much greater damage to Plaintiffs—and all parties in Maine that fail to qualify under 301(1)(E)—which results in a significant burden to a political party attempting to remain qualified under Maine's election laws.

Because Maine uses voter registrations as the barometer for support and basis for party qualification,[4] this 2018 unenrollment burdened LPME much more significantly than just through loss of information.  A ballot-access law imposes a severe burden if it "freeze[s] the status quo by effectively barring all candidates other than those of the major parties" and does not "provide a realistic means of ballot access." *Jenness*, 403 U.S. at 439.  Maine's unenrollment process does not totally bar minor parties from the ballot, so is not so "severe" as to trigger strict scrutiny; but, it penalizes minor parties and is much more harmful than the minimal burdens imposed by the registration and signature requirements in Sections 301 and 335.  By playing Lucy to non-major-parties' Charlie Brown, Sections 304 & 306 repeatedly set small parties back when they are just getting going – in any election if fewer than 10,000 of their registered members vote they face the prospect of having to start all over again seeking a new round of 5,000 registrations, a significant cost to any party, let alone a fledgling one.[5]

---

[4] Maine is one of only two states—Delaware, the other—that uses voter registration as the basis for showing a party enjoys a "modicum of support."  Decl. of Richard Winger, ¶ 4 (ECF No. 12-9).

[5] LPME, for example, alleges it cost "more than $106,000" to conduct its 18-month enrollment drive. Motion at 9 (citing Ex. 1, Decl. of C. Lyons, ¶¶ 5,10-11.).

The unconstitutionality of these provisions of Maine's scheme is clear from the Defendant's feeble attempts to justify the state's interest in unenrollment. Under *Anderson-Burdick*'s sliding scale approach, a significant (but not "severe") burden triggers "a flexible analysis that weighs the state's interests and chosen means of pursuing them against the burden of the restriction." *Diamond*, 992 F.2d at 371. As indicated above, the burden doesn't rise to the level of "severe," but it does meaningfully hamper LPME's efforts to get on the ballot; so, some scrutiny of the "state's interests and chosen means of pursuing them" is appropriate. At oral argument, counsel for Defendant suggested that the state had an interest in unenrolling voters from disqualified parties to participate in established parties' primaries. But, in a state with closed primaries like Maine, these "unenrolled" voters would have to affirmatively enroll in an established party to participate in a primary—the same process they would need to undergo had they remained enrolled with a disqualified LPME. The state also suggests there may be some administrative cost associated with maintaining a voter's designation with a party that has failed to qualify. Opposition at 26. But the state has not quantified this cost, and because they would need to house data on the newly-unenrolled voters regardless, it is not clear why the state would bear any additional burden. And finally, nowhere did the state suggest this unenrollment process serves the more familiar state interests of preventing voter confusion or ensuring ballot-qualified parties enjoy a modicum of support. Therefore, since the state has been unable to advance a colorable interest in unenrolling these voters, and because Plaintiffs are clearly burdened through the unenrollment process, I find they are likely to succeed in showing that the state infringed their rights of association under the First and Fourteenth

Amendments by unenrolling LPME and its members in 2018 pursuant to Sections 304 and 306.

### E. REMAINING PRELIMINARY INJUNCTION FACTORS

Having found Plaintiffs likely to succeed on at least one of their claims, I move on to assess whether they have met their burden of showing the remainder of the preliminary injunction factors point in their favor. Because I find that neither the balance of the equities or the public interest favor awarding preliminary injunctive relief, I will deny Plaintiffs' request to re-enroll LPME members who were unenrolled in 2018 as well.

I first note that Plaintiffs have carried their burden to show they could suffer irreparable injury absent an injunction. It is well-settled that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Sindicato Puertorriqueño v. Fortuño*, 699 F. 3d 1, 10-11 (1st Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Where Plaintiffs demonstrate that they are likely to prevail on a First Amendment claim, therefore, "irreparable injury is presumed." *Id.* at 11. This factor points in Plaintiffs' favor.

The next two preliminary injunction factors, however, do not favor granting early relief. The Plaintiffs have shown they are likely to succeed on their claim that Maine's unenrollment process is unconstitutional, not on their claims about voter enrollment requirements or required primaries. That is to say, Plaintiffs have not established LPME was unconstitutionally disqualified in 2018, only that the subsequent unenrollment of LPME voters was likely unconstitutional. Therefore, in determining whether the Plaintiffs have met their burden on the remaining factors, I look at the type of relief they request

associated with their unenrollment claim—the court-ordered re-enrollment of all 6,240 former LPME members.

Plaintiffs are required to show both a "balance of equities in [their] favor, and service of the public interest." *Arborjet*, 794 F.3d at 171. Both factors are decidedly against them. First, Plaintiffs delayed bringing suit, which makes the relief sought inappropriate. Rather than challenge the Secretary's action to disqualify the party and unenroll its voters in December 2018, when the matter could have been adjudicated in an off-election year before batch unenrollment, Plaintiffs waited until November 2019 to file suit. The LPME members who were unenrolled have therefore been unenrolled for over a year, and may have joined other political parties. Former members may also prefer their new unenrolled status. And Plaintiffs have not done the work of showing this body of voters, in fact, wants to be re-enrolled; ordering the state to reverse-engineer enrollments, therefore, has the potential to cause serious harms to these non-parties, and is not in the "service of the public interest." This difficulty posed by the late hour of this lawsuit and the relatively late filing of the present motion for preliminary injunction is of the LPME's own making, and weighs against granting preliminary relief.

Granting preliminary relief could also substantially harm Maine's interest in limiting its ballot to candidates who enjoy a "modicum of support." To allow LPME, which at last count had fewer than 300 members, to batch-enroll former members would bypass the state's compelling interests in establishing a level of support as a prerequisite to granting ballot access to the party's candidates in future years. A more fully developed summary judgment record may merit re-enrolling some LPME members, but such relief is

not warranted at this stage. Granting such relief would completely disrupt the state's orderly process of election administration and would be manifestly unfair to other candidates – both those enrolled in other parties and unenrolled – who are competing for those same elective offices and remain obligated to comply with all applicable statutory requirements.

Taking into account the public interest reflected by Maine's voter registration minimums, and the harm non-parties to this lawsuit may suffer from the preliminary relief Plaintiffs request, I therefore find both of these remaining two preliminary injunction factors weigh in Defendant's favor. Without a clear path to correct the harm Plaintiffs have identified by the likely unconstitutional 2018 batch-unenrollment of LPME members I will deny the motion for preliminary injunction because it *upends* the status quo ex ante, and is inappropriate relief to award at this early stage of the litigation.

## CONCLUSION

For these reasons, Plaintiffs' Motion for Preliminary Injunction (ECF No. 12) is DENIED.

**SO ORDERED.**

Dated this 11th day of June, 2020.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE
