## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| **JAMES BAINES, CHRISTOPHER LYONS,** )<br>**ALLEN ESPOSITO, WILLIAM SAMPSON,** )<br>**CODY BLACKBURN, BONNIE YOUNG,** )<br>**and LIBERTARIAN PARTY OF MAINE,** )<br>)<br>      **Plaintiffs,** )<br>)<br>      **v.** )<br>)<br>**MATTHEW DUNLAP, in his official capacity** )<br>**as Secretary of State of Maine,** )<br>)<br>      **Defendant.** ) | Case No. 1:19-cv-00509-LEW |

## PLAINTIFFS' EMERGENCY MOTION FOR RECONSIDERATION OF THE COURT'S ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Local Rule 7(f), Plaintiffs respectfully move for reconsideration of the Court's June 11, 2020 Order on Plaintiffs' Motion for Preliminary Injunction (ECF No. 25) ("Order"). For the reasons set forth in the attached memorandum, Plaintiffs respectfully submit that the Order contains manifest errors that require correction, and that Plaintiffs should be granted preliminary relief to prevent the injustice that will result from their exclusion from Maine's 2020 general election by operation of an unconstitutional statutory scheme. In support of this motion, Plaintiffs rely on the Second Declaration of Oliver B. Hall (attached as Exhibit A) and the Declaration of John Branson (attached as Exhibit B).

Dated: June 25, 2020

Respectfully submitted,

/s/John H. Branson
JOHN H. BRANSON*
BRANSON LAW OFFICE, P.A.
482 Congress Street, Suite 304
P.O. Box 7526
Portland, Maine 04112-7526
(207) 780-8611
jbranson@bransonlawoffice.com

/s/Oliver B. Hall
OLIVER B. HALL
*Pro Hac Vice*
CENTER FOR COMPETITIVE DEMOCRACY
P.O. Box 21090
Washington, DC 20009
oliverhall@competitivedemocracy.org
(202) 248-9294

WILLIAM P. TEDARDS, JR.
*Pro Hac Vice*
1101 30th Street NW, Suite 500
Washington, DC 20007
BT@tedards.net
(202) 797-9135

*Counsel for Plaintiffs*
*\*Counsel of Record*

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| JAMES BAINES, CHRISTOPHER LYONS,<br>ALLEN ESPOSITO, WILLIAM SAMPSON,<br>CODY BLACKBURN, BONNIE YOUNG,<br>and LIBERTARIAN PARTY OF MAINE,<br><br>                  **Plaintiffs,**<br><br>            **v.**<br><br>MATTHEW DUNLAP, in his official capacity<br>as Secretary of State of Maine,<br><br>                  **Defendant.** | )<br>)<br>)<br>)<br>)<br>)   Case No. 1:19-cv-00509-LEW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR RECONSIDERATION OF THE COURT'S ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Local Rule 7(f), a court should grant reconsideration of an order provided that a party demonstrates "that the order was based on a manifest error of fact or law." Local Rule 7(f). For the reasons set forth below, Plaintiffs respectfully submit that the Court's Order contains such errors. Further, there is still ample time for the Court to grant Plaintiffs relief that would vindicate their First and Fourteenth Amendment rights by enabling them to participate in Maine's 2020 general election without harming the state's legitimate regulatory interests. Plaintiffs respectfully submit that they are entitled to such relief, and that the Court should grant their motion for reconsideration.

### ARGUMENT

    **I.**    **Reconsideration Should Be Granted Because the Court Failed to Conduct the Supreme Court-Mandated Inquiry Into Candidates' "Past Experience" With Section 335.**

When a court reviews the constitutionality of a state ballot access law, the "inevitable question for judgment" is whether a "reasonably diligent" candidate can "satisfy the signature requirements, or will it be only rarely that [such] candidate[s] succeed in getting on the ballot?" *Storer v. Brown*, 415 U.S. 724, 742 (1974). "Past experience" should therefore guide the court's analysis: "it will be one thing if … candidates have qualified with some regularity and quite another if they have not." *Id*. This Court's Order fails to comply with this long-standing principle of ballot access jurisprudence. The Order finds that the signature requirements prescribed by Section 335 impose "only a minimal burden" on Plaintiffs (Order at PageID #491), but does not make the required inquiry into the "inevitable question for judgment" – whether "reasonably diligent" candidates can comply with the requirements. *Storer*, 415 U.S. at 742. This was error.

The uncontested evidence in the record demonstrates that reasonably diligent candidates seeking the nomination of a new party like the Libertarian Party of Maine ("LPME") cannot comply with the signature requirements established by Section 335. First, with the exception of a single candidate, no LPME candidate was able to comply with the signature requirements established by Section 335 in the two election cycles during which LPME was ballot-qualified. Second, candidates for statewide office who seek the nomination of the Maine Green Independent Party ("MGIP"), which has approximately seven times as many enrolled members as LPME did during the 2018 general election, have been unable to comply with Section 335 in any election cycle since 2006. (Dec. of L. Savage ¶¶ 12-13 (ECF No. 22-2 at PageID #478).) Third, Lisa Savage, MGIP's 2020 candidate for U.S. Senate, was compelled to unenroll from MGIP and run as an independent because she could not comply with Section 335, yet she was able obtain enough signatures to qualify as an independent in a single day. (Dec. of L. Savage ¶¶ 5,8,13-14 (ECF No. 22-2 at PageID #475,477-79).) Fourth, the Defendant has admitted, through his deputy, that the signature requirements imposed by Section 335 are so burdensome that complying with them is

2

"beyond" the ability of many MGIP candidates – let alone candidates of a much smaller new party like LPME. (Dec. of W. Tedards, Attachment 3 (ECF No. 22-1 at PageID #474).)

The foregoing evidence demonstrates that Section 335 operates as a near-absolute barrier to candidates seeking the nomination of a new party like LPME, and even to candidates seeking the nomination of a much larger established party like MGIP. It further demonstrates that Lisa Savage, a candidate who is undeniably diligent – she qualified for the ballot as an independent in a single day – could not comply with Section 335. And it demonstrates that the Defendant admits that Section 335 imposes an insurmountable burden on parties like LPME and MGIP.

The Court's Order does not address any of this evidence. Based on that omission alone, the Order runs afoul of the Supreme Court's decision in *Storer*. As the Supreme Court made clear, this Court cannot properly assess the burden imposed by Section 335 without making the required inquiry into "past experience" and whether "reasonably diligent" candidates can comply with that provision. *Storer*, 415 U.S. at 742. Here, the undisputed evidence demonstrates that Section 335 operates as a near-absolute barrier to candidates of parties like LPME and MGIP. Under *Storer*, such evidence compels a finding that the provision imposes a severe burden. *See id.* ("it will be one thing if … [reasonably diligent] candidates have qualified with some regularity and quite another if they have not"); *see*, *e.g.*, *Graveline v. Johnson*, 336 F. Supp. 3d 801, 805 (E.D. Mich. 2018) (finding that total exclusion of independent candidates from Michigan's ballot is "a reliable indicator of the unconstitutionality of Michigan's statutes" and that the statutes, as applied in combination, "severely burden the constitutional rights of the plaintiffs), *aff'd*, No. 18-1992 (6th Cir., Sept. 6, 2018) (unpublished order) (relying on "Michigan's history" of excluding independent candidates to support finding of a "severe burden" and denying stay of district court's preliminary injunction).

In lieu of conducting the required inquiry into candidates' "past experience" with Section 335, the only support this Order offers for its "minimal burden" finding is the suggestion that the "primary-stage showing" required by Section 335 "is smaller than that of other states' regimes which have been upheld." (Order at PageID #491 (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1987)).) But this merely confirms that the Court improperly applied a "litmus-paper test" – the signature requirements imposed by Section 335 measured as a percentage of the general electorate – in violation of the Supreme Court's directive that it must instead "consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged…." *Storer*, 415 U.S. at 730 (citation omitted); *see also Crawford v. Marion County Election Bd.*, 553 U.S. 181, 193 (2008) (reiterating that there is no "litmus test for measuring the severity of a burden that a state law imposes…").

Moreover, properly measured as a percentage of *eligible voters*, which is the standard the Supreme Court has applied in every one of its ballot access cases, the signature requirements imposed by Section 335 are not "smaller than" the requirement that was upheld in *Munro*. *Munro* involved a "blanket primary" in which any voter was permitted to vote for any candidate, regardless of partisan affiliation. *Munro*, 479 U.S. at 192. To qualify for the general election ballot, candidates were required to receive at least one percent of the vote cast in the primary election for the office they were seeking – that is, they had to demonstrate support from at least one percent *of the voters eligible to vote for them*. Here, by contrast, Section 335 requires that LPME candidates demonstrate support drawn only from LPME enrolled voters, which produces signature requirements exceeding 40-50 percent of the eligible voters for statewide offices and, in many districts, signature requirements exceeding the total number of eligible voters. Such requirements are unconstitutional. *See Storer*, 415 U.S. at 739 (observing that a requirement "substantially more than 5% of the eligible pool … would be in excess, percentagewise, of anything the Court has

4

approved to date…"); *see also Dart v. Brown*, 717 F.2d 1491 (5th Cir. 1983) ("... requirements as high as five percent are not unconstitutional per se, but requirements substantially in excess of five percent probably are") (quoting L. Tribe, *American Constitutional Law* (1978), 784)).

Even if the Court were to conclude that the burden that Section 335 imposes as applied to new parties like LPME is not severe, reconsideration would still be warranted because the provision is extraordinarily ill-suited to serve Defendant's asserted state interest. According to Defendant, Section 335 serves the state's interest in requiring that an LPME candidate "show a 'modicum of support' within his or her particular district…." (Order at PageID #491 (citation omitted)). But if the purpose of Section 335 is to ensure that candidates have a modicum of support among *all* voters in their districts, then there is no rational basis for the requirement in Section 335(2) that signatures be obtained *only* from enrolled members of a party. Indeed, such a limitation eviscerates Section 335's ability to serve that interest, because it prohibits Plaintiffs from obtaining signatures from the very voters from whom they must demonstrate support. This, too, compels the conclusion that Section 335 is unconstitutional as applied to LPME. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (requiring that a court "consider the extent to which [the state's asserted] interests make it necessary to burden the plaintiff's rights"); *see also Crawford*, 553 U.S. at 193 (in every case, "[h]owever slight [the] burden may appear … it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation") (quotation marks and citation omitted); *Anderson v. Quinn*, 495 F. Supp. 730, 732 (D. Me. 1980) ("the Supreme Court [has] emphasized that 'even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty,' and 'we have required that States adopt the least drastic means to achieve their ends.'") (citations omitted)).

Here, Plaintiffs have submitted a wealth of evidence to support their claim that it is the combination of the signature requirements imposed by Section 335(5) and the requirement that

signatures be obtained only from party members imposed by Section 335(2) that severely burdens a new party like LPME. (*E.g.*, Dec. of C. Lyons ¶ 14 (ECF No. 12-1 at PageID #78); Dec. of C. Blackburn ¶ 4 (ECF No. 12-6 at PageID #207-08); Dec. of B. Young ¶¶ 4-5 (ECF No. 12-8 at PageID #212-13); Dec. of L. Savage ¶¶ 11-14 (ECF No. 22-2 at PageID #478-79).) And Plaintiffs have submitted evidence that Defendant has admitted, through his deputy, that Section 335 is severely burdensome as applied to MGIP – not to mention much smaller new parties like LPME. (Dec. of W. Tedards, Attachment 3 (ECF No. 22-1 at PageID #474).) To conduct a proper constitutional analysis of Section 335, this Court is required to address these facts – *i.e.*, to identify "the character and magnitude" of Plaintiffs' asserted injury – before making a finding as to the severity of the burden imposed, and the Court is also required to consider the extent to which the state's asserted interest "make[s] it necessary" to impose that burden. *Anderson*, 460 U.S. at 789. The Order fails to do so. Had the Court conducted this analysis, it could not have concluded that Section 335(2) is reasonably tailored to further the state's asserted interest.

Accordingly, Plaintiffs respectfully request that the Court reconsider its Order, because the undisputed "past experience" evidence in the record demonstrates that reasonably diligent candidates of new or smaller parties like LPME and MGIP are unable to comply with Section 335, *see Storer*, 415 U.S. at 742, and because Defendant fails to demonstrate that Section 335 is narrowly tailored to serve a legitimate state interest or is even rationally related to such an interest. *See Anderson*, 460 U.S. at 789; *Crawford*, 553 U.S. at 193.

## II.   Reconsideration Should Be Granted Because Defendant Fails to Identify a State Interest That Justifies the Requirements Imposed By Section 301(E).

Before ruling on the constitutionality of a challenged provision, this Court is required to "identify and evaluate the precise interests put forward by the State," then to "determine the

legitimacy and strength of each of those interests," and finally to "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789.

Here, Defendant has admitted, through his deputy, that Section 301(E) does not serve any legitimate state interest:

> It would be difficult to articulate a governmental interest sufficient to justify the 10,000 voter retention requirement if it were challenged.

(Dec. of William P. Tedards, Jr., (ECF No. 22-1), Attachment 1 (written testimony of Deputy Secretary of State Julie Flynn to the Joint Standing Committee on Veterans and Legal Affairs).) And as predicted, Defendant has struggled and ultimately failed to identify any such interest. Indeed, the Court observed during the hearing on Plaintiffs' motion for preliminary injunction that Defendant had resorted to "post hac rationalizations" in an effort to justify Section 301(E).

Following Defendant's initial admission that Section 301(E) serves no legitimate state interest, Defendant first asserted one illegitimate interest – eliminating parties that do not have "any chance of winning" (Dep. of J. Flynn (ECF No. 11-10) at 14/11 – 14/23), and then another – ensuring  that a new party is "growing and adding members" (ECF No. 18 at PAGEID #: 364), before finally alighting on the asserted interest in requiring that a party "show some support" to qualify for the ballot. (Order at PageID #489.) To "determine the strength and legitimacy" of that final interest, *Anderson*, 460 U.S. at 789, the Court was required to address Defendant's admission that Section 303 more than adequately serves that interest. (Dep. of J. Flynn (ECF No. 11-10) 43/18- 44/8.)

The Court's Order fails to address any of the foregoing evidence. Once again, this omission is by itself grounds for reconsideration. The Court cannot properly assess the "strength and legitimacy" of the state's asserted interests without acknowledging that Defendant initially admitted there is no legitimate interest that can justify Section 301(E), and that Defendant

subsequently asserted two illegitimate interests in an attempt to justify that provision. Such shifting explanations cast serious doubt on the legitimacy of the interest that Defendant now proffers.

In lieu of conducting the required analysis under *Anderson*, the Court observes that "many other states employ two-tiered systems that allow a party to show some support to temporarily qualify for statewide ballot recognition, and a higher level of recognition to maintain that status." (Order at PageID #489.) But this observation disregards Plaintiffs' argument that such cases are distinguishable. In each of the cases on which the Court relies, the initial "tier" for ballot-qualification was a nomination petition signature requirement, and the second "tier" was a percentage of the vote in which the party's nominee ran. Such "two-tier systems" have a rational basis: the party demonstrates sufficient support to qualify for the ballot by obtaining voters' signatures, then demonstrates sufficient support to retain ballot access by winning voters' votes. Here, by contrast, Maine has determined that a new party demonstrates sufficient support to qualify for the ballot by enrolling 5,000 members – a "Sisyphean" task, as the Court acknowledges (Order at PageID #483)) – but then demands of the new party not that it win a sufficient percentage of the vote to retain ballot access, but rather that it enroll 5,000 new members and ensure that all 10,000 members vote in each subsequent election. Such a system does not have a rational basis: it forces the party to dedicate its limited resources to conducting further enrollment drives at the very time when it should be focusing on its "basic function … [which] is to select the candidates for public office to be offered to the voters at general elections." *Kusper v. Pontikes*, 414 U.S. 51, 58 (1973). Here, again, Defendant has admitted that Maine's statutory scheme lacks a rational basis:

> [I]f garnering 5% or more of the total vote cast for President is enough to qualify a party, (see Title 21-A section 302), why shouldn't it be enough to retain party status? The Libertarian Party candidate for President, Gary Johnson, received 38,105 votes, which was 5.09% of the votes cast for President in 2016 in Maine.

(Dec. of William P. Tedards, Jr., (ECF No. 22-1), Attachment 1 (written testimony of Deputy Secretary of State Julie Flynn to the Joint Standing Committee on Veterans and Legal Affairs).)

The Court correctly observes that Plaintiffs "cannot point to" a case striking down a statutory scheme that employs a double-enrollment requirement like Maine's, (Opinion at PageID #490), but that is because, as the Court elsewhere tacitly acknowledges, no other state has adopted such a scheme. (Opinion at PageID #493 n.4.) What Plaintiffs have demonstrated, however, is that Defendant is unable to point to any legitimate interest that Section 301(E) is needed to serve, given Defendant's admission that Section 303 more than adequately ensures that a party demonstrate a modicum of support as a prerequisite to participating in Maine's electoral process. (Dep. of J. Flynn (ECF No. 11-10) 43/18- 44/8.) Defendant's manifest failure to assert any interest that can justify the additional burdens imposed by Section 301(E) compels the conclusion that the provision is unconstitutional. *See Anderson*, 460 U.S. at 789; *Crawford*, 553 U.S. at 193; *see, e.g., Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 728-29 (1st Cir. 1994) (finding defendant's inability "to articulate any meaningful interest served by" challenged election law to be the most significant factor supporting its unconstitutionality).

Finally, Defendant has never even attempted to identify a state interest in requiring that a new party not only double its enrollment, but also ensure that 10,000 members turn out to vote in the next election after it first qualifies, as Section 301(E) requires. That is not surprising: Defendant has cited no case – and Plaintiffs are unaware of any case – recognizing that a state has an interest in requiring that a party ensure its members vote, much less that they vote in numbers approaching (or exceeding) 100 percent of the party's membership. Such a requirement is especially problematic here, because Section 335 operates as a near-absolute bar to the participation of candidates who represent new or smaller parties like LPME and MGIP. A requirement that voters enrolled with these parties vote in elections from which their party's candidates are systematically

9

excluded violates their most precious voting and associational rights, *see Williams v. Rhodes*, 393 U.S. 323, 30 (1968), because it is tantamount to a requirement that they vote for candidates whom they do not support. The Court fails to address this serious constitutional deficiency in Maine's statutory scheme because it analyzes Section 335 and Section 301(E) in isolation from one another, without addressing Plaintiffs' claim that the challenged provisions are unconstitutional *as applied in combination*. This, too, was error. *See Storer*, 415 U.S. at 737 ("a number of facially valid provisions of election laws may operate in tandem to produce impermissible barriers to constitutional rights").

* * *

The Court faults Plaintiffs because they did not file suit "in December 2018, when the matter could have been adjudicated in an off-election year before batch unenrollment," and concludes on that basis that "the relief sought [is] inappropriate." (Order at PageID #496.) To be sure, Plaintiffs themselves would have preferred to file suit that quickly, and they made every effort to do so. (*See* Dec. of J. Branson; Second Dec. of O. Hall.) Plaintiffs were diligent; what they lacked was money and resources to support a lawsuit – which is itself a function of the burden that Maine's statutory scheme imposes on them. If the Court concludes that it is inappropriate to re-enroll LPME's unenrolled members at this time, Plaintiffs respectfully request that the Court grant them the alternative relief of crediting LPME with its unenrolled members, without re-enrolling them, and allowing LPME to qualify as a new party in 2020, and to select its nominees at convention rather than by primary. That is almost precisely the relief this Court granted Plaintiffs when they first qualified as a new party in 2016. *See Libertarian Party of Maine, et al. v. Dunlap, et al.*, No. 2:16-cv-00002-JAW (D. Me. 2016) (order entered May 27, 2016). Plaintiffs respectfully submit that such relief is the appropriate remedy for the injuries they have incurred since then.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Reconsideration should be **GRANTED**.

Respectfully submitted,

/s/John H. Branson
JOHN H. BRANSON*
BRANSON LAW OFFICE, P.A.
482 Congress Street, Suite 304
P.O. Box 7526
Portland, Maine 04112-7526
(207) 780-8611
jbranson@bransonlawoffice.com

/s/Oliver B. Hall
OLIVER B. HALL
*Pro Hac Vice*
CENTER FOR COMPETITIVE DEMOCRACY
P.O. Box 21090
Washington, DC 20009
oliverhall@competitivedemocracy.org
(202) 248-9294

WILLIAM P. TEDARDS, JR.
*Pro Hac Vice*
1101 30th Street NW, Suite 500
Washington, DC 20007
BT@tedards.net
(202) 797-9135

*Counsel for Plaintiffs*
*\*Counsel of Record*

1