## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| **JAMES BAINES, et al.,** | ) | Case No. 1:19-cv-00509-LEW |
| | ) | |
| Plaintiffs, | ) | Judge Lance E. Walker |
| v. | ) | Magistrate Judge John H. Rich III |
| | ) | |
| **SHENNA BELLOWS, in her official capacity as** | ) | |
| **Secretary of State for the State of Maine,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### PLAINTIFFS' RESPONSE IN OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs James Baines, Christopher Lyons, Allen Esposito, William Sampson, Cody Blackburn, Bonnie Young and the Libertarian Party of Maine ("LPME") respectfully submit this response in opposition to the motion for summary judgment that Defendant Secretary of State Shenna Bellows ("the Secretary") filed on January 29, 2021 ("Mot."). (Dkt. 54.)

### Introduction

The Secretary's entire position in this case rests on a false premise contained in the first paragraph of her motion for summary judgment: according to the Secretary, there are "no facts" in the record that "cast[] doubt" on the "preliminary conclusion[s]" the Court reached when it denied Plaintiffs preliminary relief. (Mot. at 1.) That is incorrect. The record is replete with evidence that establishes Plaintiffs' entitlement to relief at this stage, which the Court either had no occasion or opportunity to address in its prior order. (Dkt. 25.) Such evidence includes the following: (1) all evidence demonstrating that the January 2nd filing deadline imposed by § 303(2) is unconstitutional; (2) all evidence demonstrating that, with a single exception, no LPME candidate was able to comply with the signature requirements imposed by § 335 during the two election cycles when it was ballot-qualified; (3) all evidence demonstrating that Maine Green Independent Party ("MGIP") candidates are unable to comply with § 335; (4) all evidence

1

demonstrating that MGIP's 2020 senatorial candidate Lisa Savage was unable to comply with §
335, but easily qualified for the ballot as an independent in a single day; and (5) all evidence
demonstrating that Maine has never had a cluttered general election ballot.[1] This evidence, taken
together with the other undisputed facts, demonstrates that the challenged provisions, as applied
in combination, are unconstitutional under the standards established by Supreme Court precedent.

Rather than attempting to address the foregoing evidence, the Secretary has chosen to
proceed as if it does not exist. Indeed, the Secretary fails to address virtually any of Plaintiffs'
evidence whatsoever. It is axiomatic, however, that a motion for summary judgment must be
denied unless the movant shows "that there is no genuine dispute as to any material fact…." Fed.
R. Civ. P. 56(a). Here, the facts that the Secretary declines to address are plainly material, because
they bear directly on the "character and magnitude" of the injury to Plaintiffs' First and Fourteenth
Amendment rights, the "legitimacy and strength" of the state interests the Secretary asserts in an
attempt to defend the challenged provisions, and "the extent to which those interests make it
necessary to burden [Plaintiffs'] rights." *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). The
Secretary's failure to address those facts is therefore fatal to her motion.

What the Secretary proffers in lieu of a legal argument grounded in the material facts is a
litany of unsupported assertions of opinion that the material facts flatly contradict. Most notably,
the Secretary repeatedly insists that the burden imposed by the challenged provisions is "modest,"
"minuscule" or "minimal," (Mot. at 1,2,3,10,11,12,15,16,17,24), without making any attempt to
address the facts that prove otherwise. Based on such unfounded assertions, the Secretary contends
that the Court should uphold the challenged provisions on the ground that other courts have
purportedly upheld statutory schemes that impose "more onerous" requirements. (Mot. at 11,16.)
But the Secretary is once again incorrect: no court has upheld a statutory scheme that imposes

---

[1] All statutory citations are to Title 21-A of the Maine Revised Statutes unless otherwise indicated.

burdens so severe as the challenged provisions do here. Moreover, the Secretary's attempt to defend the challenged provisions without even acknowledging the material facts is precisely the sort of 'litmus test' approach that the Supreme Court has repeatedly rejected. *See Anderson*, 460 U.S. at 789 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). To adopt the Secretary's approach here would be error. *See*, *e.g.*, *Gill v. Scholz*, 962 F.3d 360 (7th Cir. 2020) (reversing and remanding where district court upheld statutory scheme without addressing the specific facts and evidence in the record); *Cowen v. Georgia Sec. of State*, 960 F.3d 1339 (11th Cir. 2020) (same); *Bergland v. Harris*, 767 F.2d 1551 (11th Cir. 1985) (same).

There is one set of facts that the Secretary does address. In the Secretary's view, the fact that LPME's financial resources were exhausted by its 2016 enrollment drive – an effort that cost the party $106,000 (Plaintiffs' Statement of Material Facts ("Pl. SMF") (Dkt. 55-2) ¶ 3) – is compelling evidence that LPME lacks "any modicum of public support." (Mot. at 2.) But here too, the Supreme Court has rejected the Secretary's position. *See Lubin v. Panish*, 415 U.S. 709, 717-18 (1974) (rejecting "economic status" as a valid criterion for measuring the "seriousness" of a candidate or party); *Bullock v. Carter*, 405 U.S. 134, 146 (1972) (concluding that financial means "is extraordinarily ill-fitted" as a criterion to serve the state's interest in "regulat[ing] the ballot by weeding out spurious candidates…"). The facts relating to LPME's economic status are relevant, therefore, but only because they confirm that the challenged provisions impose a severe financial burden on new parties. (Pl. SMF ¶ 3,8,16,17); *see Anderson*, 460 U.S. at 793 ("[I]t is especially difficult for the State to justify a restriction that limits participation by an identifiable group whose members share a particular viewpoint, associational preference, or economic status.").

## ARGUMENT

I.   **The Secretary's Motion Should Be Denied Because the Secretary Fails to Demonstrate That She Is Entitled to Judgment as a Matter of Law.**

## A.    The Secretary Fails to Demonstrate That the Enrollment Requirement and Filing Deadline Are Constitutional.

The Secretary's attempt to defend § 303, in isolation from the other challenged provisions, is a textbook example of the fallacious 'litmus test' reasoning that violates Supreme Court precedent. Without addressing any of the material facts, the Secretary asserts that the initial 5,000-member enrollment requirement "imposes only a minimal barrier on new parties," then contends that the Court should hold the provision constitutional "as a matter of law" on the ground that other courts have purportedly upheld "far more onerous" requirements. (Mot. at 10-11 (citing *Burdick v. Takushi*, 504 U.S. 428 (1992); *Jenness v. Fortson*, 403 U.S. 431 (1971); *Libertarian Party of N.H. v. Gardner* ("*LPNH*"), 843 F.3d 20 (1st Cir. 2016)). That is the sum total of the Secretary's legal "argument" and it is wrong both as a matter of fact and as a matter of law.

First, the undisputed facts flatly contradict the Secretary's assertion that § 303 only imposes a "minimal" burden. Those facts demonstrate that enrolling voters is far more burdensome and expensive than obtaining their signatures on nomination petitions, not only because the process itself is more laborious and time-consuming, but also because voters are much more willing to sign a nomination petition than they are to make a snap decision to change their enrollment when approached in public by a stranger, even when they support the new party's platform. (Pl. SMF ¶¶ 2, 17.) That is why, given the choice, parties virtually always choose the petition method over the enrollment method, even when the signature requirement is far greater than the enrollment requirement. (PSM ¶ 16.) But because Maine does not allow such a choice, LPME was compelled to complete its 2016 enrollment drive at a cost of more than $106,000 – a massive financial burden for a new party with limited resources – and it succeeded only because this Court extended the statutory filing deadline by more than seven months. (Compl. (Dkt. 1) ¶ 30.)  And LPME is the only party that has ever successfully completed an enrollment drive under § 303 (MGIP became ballot-qualified pursuant to the "coattails" provision of § 302). (Maravell Dec. (Dkt. 55-4) ¶ 8.) As

4

this Court previously concluded, these facts show that standing alone – let alone as applied in combination with the other challenged provisions – § 303's enrollment requirement imposes a "Sisyphean" burden on new parties. (Order (Dkt. 25) at 4.) The Secretary offers no factual basis to support her assertion to the contrary.

As to the law, the Secretary offers no authority for her assertion that courts have upheld "far more onerous" requirements than § 303. The only cases that she cites – *Burdick*, *Jenness* and *LPNH* – did not involve an enrollment requirement at all, but rather upheld nomination petition signature requirements.[2] As the foregoing facts show, signature requirements are qualitatively less burdensome than Maine's enrollment requirement. (Pl. SMF ¶¶ 2-3.) Consequently, the mere fact that courts have upheld other states' *signature* requirements in the context of those states' statutory schemes says precious little about whether Maine's *enrollment* requirement is constitutional as applied in combination with the other provisions challenged here – even if those signature requirements are higher than Maine's enrollment requirement. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 359 (1997) ("No litmus-paper test separates those restrictions that are valid from those that are invidious…") (quoting *Storer*, 415 U.S. at 730); *see also Nader v. Keith*, 385 F.3d 729, 735 (7th Cir. 2004) (Posner, J.) (observing that it is "difficult to rely heavily on precedent in evaluating such restrictions, because there is great variance among the states' schemes."). Nonetheless, the Secretary insists that if the signature requirements upheld in *Burdick*, *Jenness* and *LPNH* are constitutional, then Maine's enrollment requirement "is surely constitutional as well." (Mot. at 11.) Not so. The Secretary's attempt to apply such a litmus test, without regard for the material facts, is contrary to Supreme Court precedent. *See Timmons*, 520 U.S. at 359 (quoting *Storer*, 415 U.S. at 730); *see also Anderson*, 460 U.S. at 789.

---

[2] The same is true of the cases the Secretary cites in a footnote. (Mot. at 11 n.2 (citing *American Party of Texas v. White*, 415 U.S. 767 (1974); *Rainbow Coalition of Okla. v. Okla. State Election Bd.*, 844 F.2d 740 (10th Cir. 1988); *Libertarian Party of Fla. v. Florida*, 710 F.2d 790 (11th Cir. 1983)).

The Secretary's inability to cite any cases that uphold an enrollment requirement like Maine's is unsurprising. Maine is the only state in the nation, besides Delaware, that compels new parties to qualify by this more arduous method. (Pl. SMF ¶ 15.) That is why § 303 is even more burdensome as applied in combination with the other challenged provisions – in particular § 306, which provides for the involuntary unenrollment of a new party's members following its disqualification pursuant to § 304. Taken together, these provisions operate to deprive a new party of the one thing it needs to remain ballot-qualified – enrolled members.

The state interests the Secretary asserts in an attempt to justify § 303 are also contrary to the material facts. According to the Secretary, § 303 ensures that Maine's elections do not become "a free-for-all" with "obscure parties on every general election ballot," (Mot. at 11), but the undisputed facts demonstrate that Maine's elections are nothing of the sort, and never have been. Except for MGIP, which did not comply with § 303, Maine has never had more than one ballot-qualified party other than the Republicans and Democrats, and usually – like now – it has none. (Pl. SMF ¶¶ 45-47.) And while the Secretary need not provide specific evidence to prove that Maine has suffered from the harms it allegedly seeks to avoid, *see Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986), it still must show that its asserted interests are "relevant and legitimate … [and] sufficiently weighty to justify the limitation." *Crawford v. Marion County Election Bd.*, 128 S.Ct. 1610 (2008) (citation omitted). This the Secretary fails to do.

The Secretary contends that the enrollment requirement serves Maine's interests better than a "mere signature requirement," but once again the material facts belie the Secretary's contention. (Mot. at 12.) It bears repeating that Maine is the only state in the nation, besides Delaware, that has adopted this more arduous method. (Pl. SMF ¶ 15.) Furthermore, the signature requirement that Maine imposed until its repeal in 2013 protected its interests more than adequately. ((Pl. SMF ¶¶ 45-47; *see* § 303(3).) And Maine still uses signature requirements to regulate access to the primary ballot – and once again, the undisputed facts conclusively prove that those requirements

6

are more than adequate to the task, because they operate as a near-absolute barrier to all partisan candidates except Republicans and Democrats. (Pl. SMF ¶¶ 25-34); *cf. LPNH*, 843 F.3d at 26 (observing that courts properly reject a state's adoption of a requirement where "the state itself recognize[s] that it could achieve its goals without [it]").

Although the Secretary concedes that enrolling voters is more burdensome than obtaining their signatures, she insists that the enrollment requirement is nonetheless "minimal". (Mot. at 12-13.) Once again, however, the Secretary disregards the material facts. Enrolling voters is more burdensome than obtaining their signatures not only because it requires them "to complete a brief form," (Mot. at 13), but because voters are understandably reluctant to entrust their enrollment to an unknown person who approaches them in public. (Pl. SMF ¶ 17.) This factor substantially increases the burden imposed by Maine's statutory scheme, and the Secretary fails to address it.

The burden imposed by § 303 is compounded by the January 2nd deadline it establishes. This deadline falls so early in the election year as to be unconstitutional standing alone. As this Court observed when it enjoined Maine's prior deadline of December 2nd, "the great weight of authority…has distinguished between filing deadlines well in advance of the primary and general elections and deadlines falling closer to the dates of those elections." *LPME I*, at PageID #: 301. Early deadlines like Maine's impose severe burdens because they require that parties demonstrate support during an off-election year, when "the average voter is less focused on politics," and by preventing them from responding to "any contentious issue raised in the same year as an election." *Id*, at PageID #: 308 (quoting *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir. 2006)). As Plaintiffs have explained, Maine did nothing to alleviate those burdens by moving its deadline one month from December 2nd to January 2nd. (Pl. MSJ at 15.) Maine's current deadline still "stands out," in this Court's words, "[e]ven in the company of" the other invalidated deadlines. *LPME I*, at PageID #: 302.

The Secretary makes no attempt to defend § 303 against this attack. Instead, she appears to suggest that the January 2nd deadline should be upheld because "[p]arties now have up to 390 days" to comply with § 303. (Mot. at 14.) But Plaintiffs do not challenge the January 2nd deadline on the ground that the enrollment period is too short, but because the deadline is so early – 159 days before the 2020 primary election and 306 days before the 2020 general election. More important, that is the reasoning behind the cases that hold such deadlines unconstitutional. (Pl. MSJ at 14 (citing cases).) Maine's January 2nd deadline cannot be reconciled with this precedent.

All that remains of the Secretary's attempt to defend the January 2nd deadline is her unsupported assertion that "the timing of the deadline" is not the reason that LPME is unable to comply with § 303. (Mot. at 14.) Here, too, the facts prove otherwise: on the only occasion when LPME complied with § 303, it was able to do so only because this Court extended the filing deadline by more than seven months, until July 12th. It is undisputed that LPME would not have complied but for that later deadline.

The only justification the Secretary asserts for the January 2nd deadline is that it "is the latest feasible date" that can accommodate Maine's primary election. (Mot. at 14.) Even if that were true – and this "fact" is very much in dispute given that every other state that holds primary elections has significantly later filing deadlines – it would still be insufficient to justify Maine's January 2nd deadline. Time and again, federal courts have invalidated filing deadlines – many of them later than Maine's – notwithstanding the states' assertion that the deadline is necessary to accommodate its primary election. *See*, *e.g.*, *Libertarian Party of Ohio*, 462 F.3d at 593-95 (invalidating November deadline that fell 120 days before March primary); *MacBride v. Exon*, 558 F.2d 443, 448-49 (8th Cir. 1977) (invalidating February deadline that fell 90 days before May primary); *Citizens to Establish a Reform Party v. Priest*, 970 F. Supp. 690, 698-99 (E.D. Ark. 1996) (invalidating January deadline that fell four and a half months before May primary); *Libertarian Party of Nev. v. Swackhamer*, 638 F. Supp. 565, 569-70 (D. Nev. 1986) (invalidating

8

April deadline that fell 140 days before September primary); *Libertarian Party of S.D. v. Krebs*, 290 F. Supp. 3d 902, 912-13 (D. S.D. 2018) (invalidating March 27 deadline that fell 72 days before June primary); *Green Party of Tenn. v. Goins*, 793 F. Supp. 2d 1064 (M.D. Tenn. 2010) (invalidating March deadline that fell 120 days before primary).

As the foregoing cases demonstrate, Maine's January 2nd filing deadline remains an outlier, even compared to the deadlines that these cases invalidate. It is 159 days before Maine's primary and 306 days before Maine's general election. The Secretary has cited no case that supports the constitutionality of such an early deadline, and Maine's interest in holding a June primary is insufficient to justify it. The deadline is unconstitutional.

### B.   The Secretary Fails to Demonstrate That the The 10,000-Voter Enrollment and Turnout Requirement Is Constitutional.

The Secretary's attempt to defend § 301(E), in isolation from the other challenged provisions, suffers from the same defects as her discussion of § 303: it disregards the material facts and fails to cite valid legal authority for her assertions. It also rests on the Secretary's false assertion that § 301(E)'s 10,000-voter requirement is "common among states." (Mot. at 15.) That is incorrect. Maine is one of only two states that compels new parties to qualify by voter enrollment alone, and Maine stands alone in the nation by imposing a second voter enrollment requirement pursuant to § 301(E). As a result, Maine's unique dual-enrollment requirement imposes burdens far more severe than the so-called "two-tier" cases on which the Secretary purports to rely.

Once again, the Secretary begins her discussion by opining, without reference to the material facts, that the burden imposed by § 301(E) is "minimal," "light" and "modest," (Mot. at 15-16), and once again the facts contradict her opinion. The facts demonstrating the severity of the initial enrollment requirement imposed by § 303 apply with equal force to the dual enrollment requirement imposed by § 301(E). *See supra* Part I.A. As applied to LPME, the burden imposed by § 301(E) was even more severe, because the provision required that LPME enroll 5,000 new

members at a time when its resources were completely drained from its first enrollment drive. (Pl. SMF ¶ 3.) Taken together, the undisputed facts show that complying with §§ 303 and 301(E) would have required LPME to expend more than $200,000 – a financial burden that is hardly "minimal" or "light" even for a well-funded major party, and which proved insurmountable for a non-wealthy new party like LPME. (Pl. SMF ¶¶ 2-4.)

The burden imposed by § 301(E) is especially severe because a new party must comply with it within the first election cycle after it initially qualifies, which forces it to divert its limited resources – if any remain following its first enrollment drive – away from supporting its candidates' electoral campaigns and toward the all-important existential task of doubling the size of its membership. As the Supreme Court has recognized, the "basic function of a political party is to select the candidates for public office to be offered to the voters at general elections." *Kusper v. Pontikes*, 414 U.S. 51, 58 (1973). In Maine, however, a new party must neglect that basic function, if not abandon it altogether, lest it fall short of the enrollment requirement under § 301(E) and face disqualification pursuant to § 304 and the unenrollment of its members pursuant to § 306.

Section 301(E) does not merely require that a new party double its size within the first election cycle after it qualifies, of course, but also that the party ensure that 10,000 members turn out to vote in each general election thereafter. *See* § 301(E). In this respect, too, Maine's statutory scheme stands alone. *See* USA.Gov, *Voting and Election Laws: Is Voting Mandatory in the United States?*, available at https://www.usa.gov/voting-laws (accessed February 12, 2021) ("In the U.S., no one is required by law to vote in any local, state, or presidential election.") Thus, while American citizens have been free to vote, or not, from the birth of the republic (with notable exceptions not relevant here, *see*, *e.g.*, U.S. Const. amends. XV (black suffrage), XIX (woman suffrage)), the right of Maine residents like Plaintiffs to exercise this "most precious" freedom in the manner of their choosing – including by not voting – has been eliminated by § 301(E). *See*

10

*generally Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *see also California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000) ("a corollary of the right to associate is the right not to associate.").

Maine's compulsory voting requirement is constitutionally suspect on its face. The Secretary cannot point to any other state that imposes such a requirement, nor to any case recognizing that a state has a legitimate interest in imposing such a requirement, much less to a case that upholds such a requirement. But the requirement is especially suspect as applied in combination with the other challenged provisions – and § 331 and § 335 in particular – because the undisputed facts show that those two provisions operate as a near-absolute barrier to a new party's ability to place its candidates on the primary, and thus the general election ballot. (Pl. SMF ¶¶ 25-34.) In LPME's case, therefore, § 301(E) required that its members turn out to vote in general elections in which no Libertarian candidates appeared on the ballot (with the exception of a single candidate for State House). (Pl. SMF ¶ 9.) Under such circumstances, the chance that a new party will comply with § 301(E)'s compulsory voting requirement vanishes to the point of non-existence. Partisan voters have little reason to vote in an election from which their party's candidates are excluded. *See Williams*, 393 U.S. at 30 ("the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot.").

According to the Secretary, the heavy burden that § 301(E) imposes on Plaintiffs' voting rights is alleviated by the "two options" of casting a write-in vote or an unmarked blank ballot. (Mot. at 26.) The Supreme Court, however, has expressly rejected the Secretary's position. *See Anderson*, 460 U.S. at 799 n.26 (casting a write-in vote "is not an adequate substitute for having the candidate's name appear on the printed ballot.") And if casting a write-in vote is not an adequate substitute, then *a fortiori* casting a blank ballot is not either.

The Secretary attempts to minimize the heavy burden imposed by § 301(E) by suggesting that "[o]ther non-major parties" have complied with it, (Mot. at 16), but that is incorrect. MGIP is

11

the only such party that has complied with § 301(E), but § 301(E) was not part of Maine law when MGIP became ballot-qualified in 1988. (Maravell Dec. ¶¶ 8, 14-15.) By the time that § 301(E) took effect, in 2010, MGIP had been a qualified party for 12 years, and thus had the opportunity to grow in size to 34,294 enrolled members before becoming subject to the provision's requirements. (Maravell Dec. ¶ 15.) Contrary to the Secretary's assertion, therefore, no new party has ever become ballot-qualified in Maine and then complied with § 301(E) in the first general election thereafter, as LPME was required to do.

The only legal authority the Secretary cites in support of § 301(E) are those that uphold so-called "two-tier" systems, (Mot. at 16 (citing *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1223 (4th Cir. 1995); *Arutunoff v. Okla. State Election Bd.*, 687 F.2d 1375 (10th Cir. 1982); *Green Party of Ark. v. Martin*, 649 F.3d 675 (8th Cir. 2011)), but those cases are unavailing. Plaintiffs do not challenge the constitutionality of two-tier systems *per se*, but rather Maine's particular system, which requires that Plaintiffs enroll 5,000 members pursuant to § 303, then enroll 5,000 more members within the first election cycle immediately thereafter and ensure that 10,000 members vote in every subsequent general election pursuant to § 301(E). None of the cases the Secretary cites upholds such a system. Rather, each of those cases upholds a system that first requires a party to qualify for the ballot by obtaining signatures on a nomination petition, and then permits the party to retain ballot access provided that its candidate receives a certain percentage of the vote in an election.[3] Such systems do not impose the heavy burdens that Maine's system imposes.

As an initial matter, none of the two-tier cases that the Secretary cites involves an enrollment requirement, much less the dual enrollment requirement that Maine imposes pursuant to § 303 and § 301(E). Thus, those cases say nothing about the constitutionality of such a

---

[3] That is also true of the cases the Secretary cites in a footnote. (Mot. at 16 n.5 (citing *Patriot Party of Pa. v. Mitchell*, 826 F. Supp. 926, 937 (E.D. Pa.), *aff'd*, 9 F.3d 1540 (3rd Cir. 1993); *Green Party of Alaska v. State Div. of Elections*, 147 P.3d 728, 730 (Alaska 2006)).

requirement. Furthermore, the Secretary is incorrect to suggest that the cases uphold "more onerous" thresholds for a party to retain ballot access. (Mot. at 16.) They do not. They impose a different requirement for a party's initial qualification (signatures on a nomination petition) than the requirement for the party to remain ballot-qualified (a percentage of the vote in the election for which the party qualifies). The Secretary's unsupported assertion that obtaining a percentage of the vote is necessarily more onerous than obtaining a number of signatures on a nomination petition is without merit.

More important, the two-tier cases on which the Secretary purports to rely involve systems, unlike Maine's, that are rationally related to and consistent with a new party's "basic function" of selecting candidates and running them for office in general elections. *See Kusper*, 414 U.S. at 58. Under such systems, the party qualifies to retain ballot access provided that one of its candidates receives the requisite level of voter support in the election. Maine's system, by contrast, is fundamentally inconsistent with a new party's basic function of running candidates in general elections. It interferes with that basic function by compelling the party to divert its limited resources to an enrollment drive in the first election cycle after it qualifies pursuant to § 303, lest it fail to meet the 10,000-member enrollment and voter turnout requirement pursuant to § 301(E), thus leading to its disqualification pursuant to § 304 and the involuntary unenrollment of its members pursuant to § 306. The Secretary is unable to cite any case that upholds such a system.

Finally, the Secretary has admitted that § 301(E) serves no legitimate state interest, and that "[i]t would be difficult for us to articulate a governmental interest sufficient to justify the 10,000-voter retention requirement if it were challenged in court…." (Pl. SMF ¶ 19.) As predicted, the Secretary has in fact struggled to identify any such interest in the course of this litigation. The Secretary first asserted one illegitimate interest – eliminating parties that do not have "any chance of winning" (Dep. of J. Flynn (Dkt. 11-10) at 14/11 – 14/23), and then another – ensuring that a new party is "growing and adding members" (Dkt. 18 at PageID #: 364), before finally alighting

13

on the interest that she now asserts in requiring that a party show "a modicum of support" to retain ballot access. (Mot. at 15.) But that interest, as the Secretary has also admitted, is adequately served by the 5,000-member enrollment requirement imposed by § 303. (Dep. of J. Flynn (Dkt. 11-10) 43/18- 44/8.) Furthermore, the undisputed facts prove that § 303 is sufficient to protect Maine's interest in limiting access to its ballot: except for the Republicans and Democrats, only two parties – LPME and MGIP – have appeared on Maine's general election ballot in the last two decades, and Maine has never had a "cluttered" general election ballot. (Pl SMF ¶ 45.)

The Secretary's admission that § 301(E) serves no legitimate state interest, and her subsequent failed attempts to justify it by invoking illegitimate interests, are directly relevant to a proper analysis of the challenged provisions under the *Anderson-Burdick* framework. These facts are relevant to the "legitimacy and strength" of the interest the Secretary now asserts in an effort to defend § 301(E), as well as "the extent to which [that] interest[] make[s] it necessary to burden the plaintiff[s'] rights. *Anderson*, 460 U.S. at 789; *see Libertarian Party of Ark. v. Thurston*, 962 F.3d 390, 403 (8th Cir. 2020) ("We harbor serious doubt that the generalized desire to maintain the integrity of elections and prevent ballot overcrowding can be viewed as a compelling state interest when the prior version of the statute undisputedly succeeded at preventing ballot overcrowding."). Even under a deferential standard of review, therefore, such facts must be addressed. *See Crawford*, 128 S.Ct. 1610 ("However slight [the] burden [imposed by a challenged provision] may appear … it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.").

### C.   The Secretary Fails to Demonstrate That the Primary Election Requirements Are Constitutional.

The facts demonstrating the severity of the burden that Maine imposes on new parties like LPME by requiring that they select their nominees by primary election pursuant to § 331, and by requiring that primary election candidates meet signature requirements that exceed or nearly

exceed the number of eligible signers in many jurisdictions pursuant to § 335, are undisputed. Once again, however, the Secretary disregards these facts and asserts, without support, that the provisions impose a "minimal" burden. (Mot. at 18.) The Secretary is incorrect.

Maine is the only state in the nation with partisan registration that imposes the same set of primary election ballot access signature requirements upon all parties, regardless of their size, while simultaneously prohibiting non-members from signing nomination petitions. (Pl. SMF ¶ 24; *see* § 335(2),(5).) As applied, therefore, § 335 imposes a *de minimis* burden upon candidates seeking to run in the Republican or Democratic primaries, while imposing burdens that are practically impossible for candidates of a new party like LPME or even a smaller established party like GPIL to meet. In 2020, for example, the 2,000 signatures required of candidates seeking a party's nomination for statewide office amounted to only 0.677 percent of the eligible signers as applied to Republicans, and only 0.517 percent of the eligible signers as applied to Democrats, but amounts to 40 percent of the eligible signers of a new party that qualifies with 5,000 members under § 303. (Pl. SMF ¶ 22.) Predictably, such onerous requirements operate as a near-absolute barrier that excludes all partisan candidates except Republicans and Democrats from appearing on Maine's primary (and thus general) election ballot. (Pl. SMF ¶¶ 25-28.)

The foregoing facts demonstrate that § 331 and § 335 impose severe and unequal burdens under the standards established by Supreme Court precedent. Under the "past experience" test from *Storer*, 415 U.S. at 742, for example, courts applying the *Anderson-Burdick* analysis hold that laws that operate as an absolute or near absolute barrier to ballot access impose a severe burden. *See*, *e.g.*, *Nader v. Brewer*, 531 F. 3d 1028, 1038 (9th Cir. 2008) (evidence that no candidate had complied with challenged provision in 11 years established severe burden); *Lee v. Keith*, 463 F. 3d 763, 769 (7th Cir. 2006) (evidence that no candidate had complied with challenged provisions in 25 years established severe burden); *see also Libertarian Party of Ark.*, 962 F.3d at 399 (explaining that past experience "is relevant to show the necessity or burdensomeness of the

restrictions, and … is also material to the question of whether the statutes are narrowly tailored to a compelling state interest"); *New Alliance Party of Alabama v. Hand*, 933 F. 2d 1568, 1574 (11th Cir. 1991) (explaining that *Anderson* "does not require a different analysis than does *Storer*, but rather expands on the analysis which a trial court must undertake."). Here, too, the past experience evidence establishes that § 331 and § 335 severely burden new parties like LPME; at a minimum, it contradicts the Secretary's unsupported assertion that the burden is only minimal, and thus precludes resolution of this disputed issue by summary judgment.

The facts also demonstrate that § 331 and § 335 impose grossly unequal burdens on new parties like LPME. The provisions grant major party candidates ballot access provided that they make a *de minimis* showing of support from the voters eligible to vote for them, but require that new party candidates demonstrate a level of support that in many cases exceeds the number of voters eligible to vote for them. The Secretary contends that such unequal treatment is "a reasonable way for Maine to limit access to its general election ballot to candidates and parties who enjoy a modicum of support," (Mot. at 18), but § 335 regulates access to the *primary* election ballot, not the general election ballot. Sections 303 and 301(E) regulate access to the general election ballot, and do so more than adequately. Indeed, if § 335 did not exist at all when LPME was ballot-qualified in 2016 and 2018, § 303 and § 301(E) still would have ensured that no more than four partisan candidates appeared on the general election ballot for any office. And because § 335 regulates access to the primary election ballot, Supreme Court precedent prohibits Maine from demanding a showing of support that greatly exceeds 5 percent of the voters eligible to vote in that election. (*See* Pl. MSJ (Dkt. 55) at 17-20.) Moreover, if the Secretary is correct that the purpose of § 335 is to regulate access to the general election ballot, (Mot. at 18), then there is no rational basis for § 335(2), which prohibits candidates from obtaining signatures from voters who are eligible to vote in the general election but are not party members.

The Secretary declines to address the severe and unequal burdens that § 331 and § 335 impose on new parties, or the lack of a rational basis for § 335(2), and simply asserts that the decision in *Libertarian Party of Maine v. Diamond*, 992 F.2d 365 (1st Cir. 1993), "controls" this case. (Mot. at 17.) That is incorrect. Neither *Diamond* nor any other case provides grounds for deciding this case without addressing the specific facts and evidence. Furthermore, the Secretary disregards the critical facts that distinguish this case from *Diamond* and demonstrate that it supports Plaintiffs' position, not the Secretary's.

In *Diamond*, the plaintiff party had become ballot-qualified pursuant to § 302 – the "coattails" provision – not pursuant to § 303, as LPME did here. This distinction is critical because a party that organizes on the coattails of a formerly independent candidate has done nothing to demonstrate that it enjoys a modicum of support among the electorate. *See Diamond*, 992 F.2d at 371 and n.6. As the First Circuit expressly concluded, in doing so, the party "bypassed the requirement of mustering significant numerical support among eligible voters, rather than demonstrating its capacity to do so." *Id.* at 371. The Court therefore found that, with respect to the plaintiff candidates, who were all running for district or local offices, "the State had a legitimate interest in ensuring a modicum of candidate support among the relevant voter constituencies, over and above any general support which might be imputed to the Party based on" its qualification under the coattails provision. *Id.* at 372.

Here, by contrast, LPME did the exhaustive work necessary to demonstrate the modicum of support required to become ballot-qualified pursuant to § 303. It did not bypass that requirement by qualifying pursuant to § 302, like the plaintiff in *Diamond*. The Court's conclusion that the state had a legitimate interest in requiring that individual candidates demonstrate a modicum of support is therefore inapplicable here. But even under *Diamond's* rationale, Plaintiffs are still entitled to relief with respect to their candidates' qualification for statewide office, because they demonstrated the requisite level of support among the statewide electorate. As the Court expressly

acknowledged, its rationale applied only because "all the [plaintiff] candidates sought elective office at the district or local level, rather than statewide…." *Id.*[4]

### D. The Secretary Fails to Demonstrate That the Disqualification and Unenrollment Requirements Are Constitutional.

As this Court previously recognized, the unenrollment of any voter registered with a party that has been unable to meet the "10,000 vote" retention requirement of § 301(1)(E) has no apparent purpose other than making the voter and the party "start again from square one. The party must begin its Sisyphean search for 5,000 voter registrations anew." (Dkt. 25, PageID #: 483). The Court thus concluded that "the unconstitutionality of these provisions of Maine's scheme is clear." (*Id.*, PageID #: 494.)

Asking the Court to "revisit" this conclusion," (Mot. 19), the Secretary first asserts the same hypothetical state interest as before – *i.e.*, an interest in enabling voters to participate in established party primaries, (Def. SMF ¶¶ 115-118) – and then alleges a list of programming tasks in an attempt to create an impression of complexity but once again with no quantification of burden or cost. (Def. SMF ¶¶ 110-114, 120-126.) These tasks appear to be unnecessary to accomplish the simple objective of reversing the "batch process" by which the Secretary unenrolled LPME's 6,240 voters in one evening (Pl. SMF ¶ 12). As the Deputy Secretary explains:

> The record of a disenrolled voter's prior enrollment in the party remains in CVR .... At any point in time a list of all the voters who had been enrolled in the LPME during a given time period could be generated in a report by having a computer specialist write a specific query to select and retrieve that data.

(Flynn Supp. Decl ¶ 24 (Dkt. 49).)

The Secretary has not previously suggested that the unenrollment provision serves any state interest in preventing voter confusion or ensuring that parties enjoy a modicum of support. (Dkt.

---

[4] The Secretary asserts that Maine provides a "workaround" for the burdens imposed by its primary scheme, by allowing LPME's candidates to unenroll and run as independents. The Supreme Court has rejected the Secretary's view. *See Storer*, 415 U.S. at 745 ("the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other.").

25, PageID #: 494.) The Secretary now presents new allegations of confusion, lack of support, and unfairness, but these are unavailing.

First, the Secretary asserts an interest in preventing parties from circumventing the purpose of § 301(1)(E) by allowing disqualified parties to re-apply repeatedly. (Mot. at 21.) But the purpose of § 301(1)(E) is to regulate continuing qualification, which is achieved through § 304, the disqualification mechanism. The purpose of § 301(1)(E) is *not* to force parties to re-run voter enrollment drives, which is the only discernable purpose of § 306.

Second, the Secretary asserts that unenrollment is necessary to ensure that a party has a "current modicum of support" by "demonstrat[ing] that it can enroll 5,000 voters in a 390-day period." (Mot. at 21-22.) But LPME has already demonstrated that. This is just another way of saying that the purpose of § 306 is to make the party re-run an entire enrollment drive.

Third, the Secretary asserts that voters will be confused because they will be enrolled in a party that "does not exist" under Maine law. (Mot. at 22.) That is not true. As the Secretary points out, the party can (and presumably will) simply re-apply and attempt to overcome the State's "choke points" in the next round. There would be no lengthy period of disqualification.

Finally, the Secretary asserts that allowing a party with more than 5,000 enrollees to requalify rather than re-running an enrollment drive would be unfair to other parties seeking to qualify (Mot. at 23), because the reapplying party will be able to "leverage" the support of voters whom they have already enrolled. What the Secretary seems to suggest is that LPME should never have a *chance to grow*, but instead, as punishment for not passing the 10,000-vote requirement the first time, LPME and its voters must be sent back to "square one."  That is what is "unfair." Other new parties (if any) would not be disadvantaged by allowing a party to avoid a re-run. They have to complete an initial qualification no matter what, and they would no doubt be pleased to know that they would not be required to re-run their own enrollment drives if they are unable to meet the § 301(1)(E) requirement the first time.

### E.   The Secretary Fails to Address the Challenged Provisions' Combined Effect.

The Secretary's improper attack on LPME's financial status betrays the fundamental error of her position. Because the Secretary incorrectly believes that Maine has a legitimate interest in redlining its electoral process to exclude non-wealthy parties, (Mot. at 2), she makes no attempt to address the challenged provisions' overall impact as applied in combination with one another, which is to make it practically impossible for a non-wealthy new party to gain ballot access, place candidates on the general election ballot, and retain its ballot-qualified status for more than two election cycles before it is disqualified and its members involuntarily unenrolled, while guaranteeing that the two oldest and largest parties remain ballot-qualified in perpetuity and run their candidates with minimal burden and no expense. As such, the challenged provisions "operate to freeze the political status quo." *Jenness*, 403 U.S. at 438. This is not "as it should be" as the Secretary blithely suggests, (Mot. at 18), but proof-positive that the challenged provisions, in their totality, are unconstitutional.[5]

### CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.

DATED:  February 19, 2021                    Respectfully submitted,
                                             /s/John H. Branson
                                             JOHN H. BRANSON*
                                             BRANSON LAW OFFICE, P.A.
                                             482 Congress Street, Suite 304
                                             P.O. Box 7526
                                             Portland, Maine 04112-7526
                                             (207) 780-8611
                                             jbranson@bransonlawoffice.com

                                             OLIVER B. HALL
                                             *Pro Hac Vice*
                                             CENTER FOR COMPETITIVE
                                             DEMOCRACY

---

[5] For the reasons previously stated, (Dkt. 22 at 3-7), the Secretary's assertion that Plaintiffs' claims are barred by *res judicata* has no merit. (Mot. at 28-30.) Plaintiffs hereby adopt and incorporate that prior discussion by reference.

P.O. Box 21090
Washington, DC 20009
oliverhall@competitivedemocracy.org
(202) 248-9294

WILLIAM P. TEDARDS, JR.
*Pro Hac Vice*
1101 30th Street NW, Suite 500
Washington, DC 20007
BT@tedards.net
(202) 797-9135

*Counsel for Plaintiffs*
*\*Counsel of Record*

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 29th day of January, 2021, I electronically filed the above document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Phyllis Gardiner
Assistant Attorney General
6 State House Station
Augusta, ME 04333-006
(207) 626-8830
Email: phyllis.gardiner@maine.gov

JONATHAN R. BOLTON
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8800
jonathan.bolton@maine.gov

To my knowledge, there are no non-registered parties or attorneys participating in this case.

Dated: _____            /s/ Oliver B. Hall_____
                                  Oliver B. Hall
                                  *Attorney for Plaintiffs*