UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JAMES BAINES et al., <br><br> Plaintiffs, <br><br> v. <br><br> SHENNA BELLOWS, in her official capacity as Secretary of State for the State of Maine, <br><br> Defendant. | Docket No. 1:19-cv-00509-LEW |

**SECRETARY OF STATE'S REPLY IN SUPPORT
OF SUMMARY JUDGMENT**

The opposition of the plaintiffs (collectively "LPME") to the Secretary of State's motion for summary judgment (ECF No. 54) ("Def.'s Mot.") only further confirms that Maine's party qualification and nomination provisions impose only reasonable burdens on LPME while serving Maine's interest in limiting ballot access to parties and candidates with a significant modicum of public support. The Secretary is thus entitled to summary judgment on all of LPME's claims.

**Reply Argument**

**I.    The Challenged Restrictions Do Not Violate LPME's Rights**

   **A.    The Initial Enrollment Requirement and Deadline Are Constitutional**

The Secretary demonstrated in her motion that the initial enrollment requirement of 21-A M.R.S. § 303, requiring a new party to enroll 5,000 voters in roughly a year, easily survives the low level of scrutiny required under the *Anderson-Burdick* test for election laws that impose only reasonable nondiscriminatory restrictions on ballot access. Def.'s Mot. at 10–15; *see Libertarian Party of N.H. v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011).

1

LPME responds by claiming that the summary judgment record, consisting largely of the same facts that proved insufficient to support a likelihood of success at the preliminary injunction phase, show that these laws in fact impose a severe burden on LPME, triggering heightened scrutiny. Pls.' Opp. to S.J. (ECF No. 57) ("Opp.") at 4. LPME's showing is no more persuasive now than it was at the preliminary injunction phase.

As it did in its motion for preliminary injunction, LPME asserts that it is more costly and time-consuming to enroll voters than it is to obtain petition signatures, and that the caselaw cited by the Secretary concerning signature thresholds is therefore inapposite. Opp. at 5–6. But even assuming enrollments are harder to gather than signatures, Maine's enrollment threshold is far below some of the signature thresholds upheld in those cases—more than compensating for any variance in burden. Most notably, in *Jenness* the Supreme Court upheld a signature requirement of 5% of registered voters in 180 days. *Jenness v. Forston*, 403 U.S. 431, 432, 442 (1971). Maine's requirement, in contrast, requires enrollments of less than 0.5% of voters in as much as 390 days. Thus, even assuming that "voters are much more willing to sign a nomination petition than they are to make a snap decision to change their enrollment," Opp. at 4, that fact alone would not establish a burden exceeding the one upheld in *Jenness*. Rather, in order for Maine's threshold overall to be as burdensome as the threshold in *Jenness*, it would have to be roughly 20 times more burdensome to enroll a voter than to obtain a voter's signature.

LPME's evidence does not come close to such a showing. LPME's statement of material facts in support of its own summary judgment motion contains broad generalizations concerning burden, but the evidence supporting those statements is lacking. LPME asserts, for example, that, when they have a choice, parties "virtually always" choose the petition method over the enrollment method. Opp. at 4 (citing Pl. SMF (ECF No. 55-2) ¶ 16). But the actual testimony

cited in support of this supposed fact—in addition to being undesignated and inadmissible expert testimony, *see* Def's Opp. SMF (ECF No. 59) ¶ 16—says only that parties with a choice "frequently" choose the petitioning alternative. Winger Decl. (ECF No. 12-9) ¶ 5. The declarant goes on to give only two examples—one from 73 years ago—of parties making such choices. *Id.*

LPME also makes much of the $106,000 that it allegedly[1] spent in order to satisfy the enrollment requirement in 2015. The First Circuit, in considering a party's alleged need to spend $50,000 to qualify for the ballot, noted that such a sum "just isn't what it once was, especially in politics," and suggested it would be "strange to say that a viable statewide political party cannot be expected to shoulder a $50,000 burden for statewide ballot access for its nominees." *Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 30 (1st Cir. 2016). While LPME claims to have spent somewhat more than $50,000, the First Circuit's observation still holds. In the modern political era, where political candidates routinely spend exponentially more than $106,000 on a single statewide race, such a cost should similarly not be considered a substantial burden. That is particularly so where Maine's requirement—unlike a signature requirement— also benefits the party, by growing the party's membership and facilitating nominations under § 335(5). And, if nothing else, the fact that LPME was able to raise enough funds to successfully qualify in 2016 shows that the burden is reasonable.

In addition, the $106,000 figure assumes that nascent parties have no choice but to hire professional firms to enroll voters for them. But a party with a significant modicum of public support should also be capable of recruiting volunteers. LPME's low-end figure of 833 hours of labor (based on an improbable estimate that it takes 10 minutes for a voter to complete a simple

---

[1] Campaign finance reports show that LPME spent somewhat less, approximately $74,000. DSMF ¶¶ 94–97. The Secretary acknowledges that, for purposes of her summary judgment motion only, the Court must accept the larger number.

registration card), *see* Lyons Decl. (ECF No. 12-1) ¶ 6, could be accomplished by 10 individuals volunteering 2 hours per week. Even assuming, as LPME vaguely asserts, that the actual time required is significantly above 833 hours, this remains a reasonable burden for a party with a modicum of support.

LPME also fails to acknowledge that, as the First Circuit has observed, Maine offers parties other ways of placing their candidates on the ballot. Parties can choose not to seek qualified status and run candidates instead via nominating petition, with the party's successful candidates identified on the ballot with the party's political designation. *See Libertarian Party of Me. v. Diamond*, 992 F.2d 365, 374–75 (1st Cir. 1993). Parties can also qualify via the "coattails" provisions of 21-A M.R.S. § 302. These alternatives further undermine LPME's claim that the burdens of the 5,000-enrollment threshold are severe.

LPME attacks the legitimacy of the state's interests in reducing ballot clutter, citing the fact that Maine has successfully prevented such clutter in the past. Opp. at 6. But LPME goes on to acknowledge that *Munro v. Socialist Workers Party*, 479 U.S. 189 (1986), expressly states that a state need not prove past injury to justify ballot-qualification requirements. *Id.* at 195. Since the enrollment threshold, while perhaps less common, is nonetheless a straightforward measure of a party's public support, it falls squarely within the category of ballot access limitations that courts routinely recognize as furthering a legitimate state interest. *See, e.g.*, *Jenness*, 403 U.S. at 442; *Gardner*, 843 F.3d at 32.

LPME also argues that the 5,000-enrollment threshold is impermissible because "the signature requirement that Maine imposed until its repeal in 2013 protected its interests more than adequately." Opp. at 6. But that is not the test. Where a law imposes only reasonable burdens on ballot access, the state is not required to choose the least restrictive option to further

4

its interests.  *See Rogers v. Corbett*, 468 F.3d 188, 195 (3d Cir. 2006); *Krislov v. Rednour*, 226 F.3d 851, 863 (7th Cir. 2000).  And LPME does not dispute the Secretary's point that an enrollment requirement better measures a voter's true support for the party, since it requires at least a nominal commitment from the voter.  Maine was within its rights to switch to this superior measure of public support, even if its old method was not producing ballot clutter.

In any event, LPME's own experience shows that it is simply not true that Maine's signature requirement was less onerous than the current enrollment requirement.  When LPME tried to qualify as a party under the old signature threshold, it failed.  Def.'s SMF (ECF No. 53) ("DSMF") ¶¶ 34–37.  LPME was able to qualify as a party only after Maine switched to an enrollment-based threshold.  What is more, unlike a signature requirement, the enrollment requirement dovetails with the 10,000-voter retention requirement in § 301(1)(E), since it results in the party gaining at least a 5,000-enrollment head start toward reaching the latter threshold.  Indeed, Maine switched to the enrollment threshold in part to eliminate the burden on parties of obtaining signatures on petitions while separately trying to enroll voters.  DSMF ¶ 43.

LPME also argues, relying primarily on this Court's decision in *Libertarian Party of Maine, Inc. v. Dunlap*, No. 2:16-CV-00002-JAW, 2016 WL 3039715 (D. Me. May 27, 2016) ("*LPME I*"), that § 303's January 2nd deadline for securing the 5,000 enrollments is too far ahead of the June primaries.  Opp. at 7–8.  But *LPME I* concerned an old version of § 303 with an earlier deadline of December 1.  The Legislature has since addressed nearly all of the Court's concerns with that earlier version of the statute.  Most notably, it extended the certification deadline by a month, responding specifically to *LPME I*'s observation that "the gap between December 1 and January 1 strikes the Court as unnecessary."  *LPME I*, 2016 WL 3039715, at *12; *see* 21-A M.R.S. § 303(2).  The deadline is now virtually simultaneous with the start of the

5

period for the new party's candidates to begin gathering primary nomination signatures. *See id.* § 335(6). Further compression of the schedule would require either reducing the new party's candidates' 2.5 month period to get voters to sign their nominating petitions, *see id.* § 335(8), or reducing the roughly six-week period after filing those petitions for the Secretary to prepare and print ballots before the federal deadline for transmitting overseas ballots in late April or early May. *See* 52 U.S.C. § 20302(a)(8)(A); *cf. Anderson v. Celebrezze*, 460 U.S. 780, 800 (1983) (observing 75 days was a "reasonable time" between the deadline for submitting nomination paperwork and the election). These time periods cannot reasonably be shortened without abandoning the primary system altogether, something Maine cannot be required to do. DSMF ¶ 61; *see California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000).

LPME cites a handful of cases invalidating periods between qualification deadlines and elections. Opp. at 8–9. But those cases do not excuse LPME from having to demonstrate that the January 2nd deadline imposed an actual burden upon it. *See Arizona Green Party v. Regan*, 838 F.3d 983 (9th Cir. 2016) (upholding Arizona's 180-day period between qualification deadline and primary where plaintiffs failed to show it imposed a burden). As the Ninth Circuit observed: "[t]hat filing deadlines of similar lengths may prove unconstitutionally burdensome in the context of some election schemes does not eliminate the need for evidence that a severe burden was imposed by the filing deadline in *this* case." *Id.* at 990 (emphasis in original).

Here, there is simply no chance that any sort of realistic extension of the January 2 deadline would have made any difference in LPME's most recent qualification effort. In the 388 days it had to gather enrollments after the 2018 election, LPME managed to enroll just 258 voters—4,742 voters short of the requirement. DSMF ¶ 75. Given the magnitude of this shortfall, the idea that LPME's enrollment difficulties could be due to the fact that "the average

voter is less focused on politics" in a non-election year, or that LPME was prevented from responding to "any contentious issues raised in the same year as an election" in its search for enrollments, Opp. at 7 (quoting *LPME I*, 2016 WL 3039715, at *9), is entirely implausible.

Perhaps realizing the implausibility of any such argument, LPME points to the fact that, during its *first* attempt to qualify in 2015, "it was able to do so only because this Court extended the filing deadline by more than seven months." LPME's explicit argument that the Court should strike down § 303 because of a burden LPME suffered during a previous attempt to qualify that LPME litigated, settled, and dismissed with prejudice, DSMF ¶¶ 50–56, only highlights the *res judicata* problem with its current claims. *See* Def.'s Mot. at 28–30. But putting that problem aside, LPME in 2015 fell only 487 enrollments short of the threshold. DSMF ¶ 48. Even assuming *arguendo* that an unconstitutionally early deadline was the reason it fell short, LPME could have easily made up those enrollments in the extra month available under the current version of § 303. While LPME characterizes *LPME I* as having extended the deadline by "more than seven months," Opp. at 8, most of that time was taken up by the litigation of *LPME I* and was not available to LPME to enroll additional voters. The actual relief afforded by the Court was to give LPME from May 27 to July 12, 2016—one and a half months—to enroll the 487 voters necessary to reach 5,000 enrollments. 2016 WL 3039715, at *14. During that period, LPME was able to enroll 637 voters, 150 more than needed. DSMF ¶ 54. The facts in *LPME I* thus suggest that the time provided by the current version of § 303 would have been more than sufficient to allow LPME to meet the 5,000-enrollment threshold.

> **B.  The 10,000 Vote Threshold for Maintaining Qualified Status Is Constitutional**

The Secretary in her motion also demonstrated the constitutionality of § 301(1)(E)'s requirement that a newly qualified party "ramp up to viability," P.I. Order (ECF No. 25) at 10–

11, over the course of two election cycles by enrolling enough voters so that 10,000 of the party's voters participate in the general election.  As the Secretary showed, and as this Court has recognized, this requirement is consistent with various other "two-tiered" party qualification requirements that have been upheld in other states.  *See* Def's Mot. at 16 (citing cases).

LPME's opposition claims that the burden imposed by this requirement is nevertheless severe because "a new party must comply with it within the first election cycle after it initially qualifies," supposedly requiring it to divert resources away from supporting candidates.  Opp. at 10.  But that is incorrect.  In the wake of *LPME I*, § 301(1)(E) was amended to *exempt* new parties from having to comply with the 10,000-voter threshold in the first election cycle after it initially qualifies.  *See* 21-A M.R.S. § 301(1)(E).  Moreover, because the requirement is synergistic with the initial qualification requirement—both require the party to amass enrollments—a new party will already be well on its way to meeting the requirement before it has nominated a single candidate.  And, of course, one way for a party to build enrollments over the two election cycles it is given is to nominate and support compelling candidates who will motivate voters to enroll in the candidate's party (potentially while signing their nominating petitions), accomplishing the very goal that LPME claims § 301(1)(E) forces it to ignore.

LPME also argues that the 10,000-voter requirement somehow amounts to "compulsory voting."  Opp. at 11.  But nothing in § 301(1)(E) requires any individual voter to show up at the polls.  Assuming LPME's point is that LPME-enrolled voters might feel pressured to show up to vote in order to prevent disqualification of their party, it is unclear how § 301(1)(E) imposes any more "compulsion" than other indisputably constitutional participation thresholds, such as a requirement that an LPME candidate for president or governor receive a percentage of votes cast.

*See, e.g.*, *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1219 (4th Cir. 1995). In either situation, an LPME voter might feel pressured to vote in order to maintain party qualification.

LPME also takes issue with the Secretary's point that there cannot be compulsion because a party-enrolled voter can return an unmarked ballot or vote for a write-in candidate and still have their vote count toward the threshold. Opp. at 11. LPME points to a footnote in *Anderson* observing that a state cannot cure an unconstitutional ballot restriction by allowing for write-in candidacies. *Anderson*, 460 U.S. at 799 n.26. But that misses the point. *Anderson*'s concern was about undue restrictions on ballot access. But LPME's argument has been that Maine forces voters to choose between allowing their party to be disqualified or voting for candidates whom they do not support. *See* Order on Motion for Recons. at 4 (ECF No. 35). The Secretary's evidence shows that Maine imposes no such dilemma on voters. DSMF ¶¶ 15–16.

The Secretary also noted in her motion that another small party, the Maine Green Independent Party ("MGIP"), has complied with § 301(1)(E)'s requirement for years, demonstrating that it is not burdensome. Def.'s Mot. at 16. LPME responds by noting that MGIP was not subject to § 301(1)(E) until 2010, after it had been qualified for 12 years. Opp. at 11. Yet LPME's own evidence notes that even by 2006 MGIP had 29,347 enrolled voters. Maravell Decl. (ECF No. 55-4) ¶ 13. And MGIP accrued that number of enrollees organically, without being incentivized by a voter-participation threshold. This evidence thus suggests that, had the 10,000-voter threshold existed in 1998, MGIP could have met its requirements.

LPME takes issue with the caselaw relied upon by the Secretary (and the Court) upholding two-tier systems, arguing that those decisions are inapposite because they did not consider the precise enrollment-based measures of support used by Maine. Opp. at 12. But LPME cites no caselaw considering enrollment-based systems either. Absent such cases,

9

caselaw concerning similar measures is instructive. And those cases show that Maine's retention requirement imposes a comparatively low burden on voters. For example, *McLaughlin* and *Arutunoff* both upheld retention requirements that a party's candidates for president or governor exceed 10% of the vote in the previous election. *McLaughlin*, 65 F.3d at 1219; *Arutunoff v. Okla. State Election Bd.*, 687 F.2d 1375, 1379 (10th Cir. 1982). Such requirements would be far more burdensome on LPME than Maine's requirement that party voters consisting of 1.2% to 1.5% of the total vote turn out at the polls. LPME's last presidential ticket, for example, secured only 1.7% of the vote in the 2020 election. DSMF ¶ 78. MGIP's gubernatorial and presidential candidates have also consistently fallen short of 10%.[2] Maravell Decl. ¶¶ 6, 8, 11, 12. It is doubtful that either LPME or MGIP could meet the requirements upheld in those cases.

LPME also argues that the Secretary's caselaw is inapposite because a party qualification requirement based on votes cast for the party's candidates is "rationally related to and consistent with" a party's basic function of selecting candidates and running them for office, while Maine's 10,000-voter requirement is not. Opp. at 13. But LPME points to no caselaw requiring states to choose measures of public support that focus on candidate success. Indeed, the signature-gathering requirements that typically constitute the first tier of these two-tiered processes have no relationship at all to a party's candidate-related activities. In any event, the 10,000-voter requirement in fact bears a strong relationship to a party's candidate-related efforts. One of the best things a party can do to ensure the success of its candidates is to encourage its own voters to go to the polls. The 10,000-voter participation threshold encourages precisely that behavior.

---

[2] MGIP's 2020 presidential candidate received 8,230 votes, 0.9% of total votes cast. *See* https://www.maine.gov/sos/cec/elec/results/2020/presandvisecnty1120.xlsx.

Finally, LPME attempts to call into question Maine's interest in the 10,000-voter threshold requirement by quoting legislative testimony by the Deputy Secretary of State. Opp. at 13. But the Deputy Secretary was testifying about a former version of the statute that required parties to meet the 10,000-voter requirement two years sooner. *See* Def.'s Opp. SMF ¶ 19. Moreover, she was speaking specifically in the context of LPME's predicament in 2016, in which it would have needed to satisfy the since-amended requirement only four months after LPME had met the 5,000-enrollment requirement under the extended deadline ordered in *LPME I*. *Id.* In short, there has been no "admission," Opp. at 14, that the current version of § 301(1)(E) serves no legitimate state interest.

### C.     The Signature Requirements for Nominating Petitions Are Constitutional

The Secretary showed in her motion that Maine's modest numerical signature requirements for nominating candidates impose only a modest burden on candidates while furthering Maine's important interests in ensuring that both parties and candidates enjoy the requisite modicum of popular support, and further pointed out that the First Circuit has already upheld the signature requirements in *Diamond*. Def.'s Mot. at 17–19.

LPME's opposition tries to distinguish *Diamond* to avoid its controlling effect. Opp. at 17. LPME points out that *Diamond* involved a party that had qualified under the "coattails" provisions of § 302, which allows for a party to initially qualify based on the performance of its candidate in the prior election. But while LPME is correct that the First Circuit found the party's use of the coattails provision significant, in that it allowed the party to avoid demonstrating a modicum of support for the party itself, that was not the entire basis for its decision. *Diamond* went on to observe that:

> a State possesses a *separate,* and *additional,* interest in ascertaining that a political party which nominates candidates for office in an electoral subdivision of a larger political unit

>> demonstrate support in the *particular electoral subdivision* for which the candidate is nominated.

*Diamond*, 992 F.2d at 372 (emphasis in original). Those important state interests are furthered by the requirements of § 335 for non-statewide candidates, regardless of the method by which the party qualified. Moreover, even as to statewide candidates, LPME has not established the sort of statewide modicum of party support that *Diamond* suggests could be sufficient to obviate the need for a showing under § 335. Specifically, it has never come close to meeting the 10,000-voter threshold in § 301(1)(E) that Maine has established as its ultimate measure of support.

LPME also fails to address the other interest that the First Circuit held to be served by § 335: ensuring "active participation by a significant number of a party's members or supporters in the course of the nominating process." *Diamond*, 992 F.2d at 373. If voters unaffiliated with LPME could sign nominating petitions for LPME candidates, a candidate could qualify to run in LPME's primary without obtaining the support of even a single LPME enrollee. In the event of an uncontested primary, that candidate could go on to appear on the general election ballot as LPME's candidate despite having received virtually no support from anyone associated with the party. *Diamond* recognizes that Maine has an interest in preventing such a result separate and apart from its interest in preventing ballot clutter.

LPME also claims that the fact that few of its candidates appeared on the ballot in the single primary election in which it was qualified shows that § 335 operates "as an absolute or near absolute barrier to ballot access." Opp. at 15. The Court has already rejected the notion that it must conduct such a "past experience" analysis. *See* Order on Mot. for Recons. (ECF No. 35), dated July 13, 2020 at 2–3. Moreover, LPME's claim ignores an alternate explanation for its dearth of candidates in 2018: few LPME members made any effort to run. LPME identifies only one enrollee, Plaintiff Lyons, who attempted and failed to gather the signatures required to

12

run for statewide office. *See* Lyons Decl. ¶ 14 (ECF No. 12-1). LPME further identifies a candidate for state representative, Bonnie Young, who apparently did not even attempt to collect the 25 required signatures, assuming it would be too difficult, and chose instead to qualify for the general election ballot as an unenrolled candidate. Yong Decl. ¶ 4 (ECF No. 12-8). And LPME identifies a third candidate—Cody Blackburn—who successfully met the signature requirements for state representative. The experience of these three individuals in a single election does not suggest that § 335 imposes a severe burden. Nor is it remotely comparable to a case like *Lee v. Keith*, 463 F.3d 763 (7th Cir. 2005), relied upon by LPME, Opp. at 15, in which no candidate had qualified under the challenged requirements over a 25-year span. *Id.* at 769; *see also* Def.'s Opp. SMF (ECF No. 59) ¶ 25 (noting that over 100 MGIP candidates for House and Senate have qualified for MGIP primaries since 2000 as well as two MGIP gubernational candidates).

### D. The Disqualification and Unenrollment Requirements Are Constitutional

The Secretary demonstrated in her motion that § 306's provision that a voter enrolled in a disqualified party is "considered an unenrolled voter," imposes no burden at all on parties, since it is merely a logical consequence of the party losing qualified status. The Secretary further demonstrated that the unenrollment provision serves a number of important state interests, including preventing parties from gaming the qualification system, ensuring a current modicum of support, avoiding voter confusion, ensuring a level playing field for new parties, and avoiding significant administrative burdens.[3] Def.'s Mot. at 19–24.

---

[3] In its opposing statement of material facts, LPME purports to deny or qualify many of the detailed facts offered by the Secretary showing the burdens and other difficulties of implementing a new designation of "enrolled in a disqualified party." *See* Pl.'s Opp. SMF ¶¶ 120–134. However, LPME fails to support these denials or qualifications (along with a number of other denials or qualifications in its statement) with record citations. The Court should treat these statements as admitted. *See* L.R. 56(f).

The most notable aspect of LPME's opposition is that it has virtually no response to the Secretary's point that striking down § 306 would allow parties to circumvent the 10,000-voter participation threshold in § 301(1)(E) by simply enrolling 5,000 voters, participating in two election cycles, and then, after being disqualified under § 301(1)(E), immediately requalifying as a new party under § 303 on the strength of its previous enrollments.  All LPME offers in response is an assertion that "[t]he purpose of § 301(1)(E) is *not* to force parties to rerun voter enrollment drives."  Opp. at 19 (emphasis in original).  Whether or not that is true, § 301(1)(E) does have the important purpose of measuring public support.  The Secretary's unrebutted point is that, without § 306, § 301(1)(E) would become dead letter.

LPME also fails to persuasively respond to the Secretary's point that § 306 ensures that the party has a *current* modicum of support and is not just relying on past support from old enrollments.  LPME argues that it "has already demonstrated" such a current modicum of support.  Opp. at 19.  But the opposite is true.  Since its disqualification, LPME has been unable to accrue any significant number of enrollments.  When it attempted to qualify in 2019, it managed a mere 258 enrollments during the yearlong qualification period.  DSMF ¶ 75.  Its efforts to qualify in 2021 have, as of January 29, 2021, generated only 56 enrollments.  *Id.* ¶ 109.  LPME's failure to demonstrate any modicum of support since 2016 proves the Secretary's point that Maine should not be forced to simply accept years-old demonstrations of support that may no longer reflect current sentiment.

LPME also argues that there will be no voter confusion if voters are permitted to remain enrolled in a party not recognized by Maine law because the disqualified party "can (and presumably will) simply reapply."  Opp. at 19.  But while LPME has serially reapplied for party status, it does not follow that all parties will do so.  The Americans Elect Party, for example, was

disqualified in 2012 and has not subsequently requalified. SMF ¶ 33; *see* 2d Supp. Flynn Decl. (ECF No. 58) ¶ 11.

### E. The Combined Effects of the State's Qualification Requirements Do Not Violate the First and Fourteenth Amendments

Unable to show the unconstitutionality of any one of the challenged ballot-access provisions, LPME lobs a broadside attack at Maine's framework as a whole, claiming that it amounts to a form of "redlining" to exclude "non-wealthy parties." Opp. at 20. But a party need not be "wealthy" to qualify under Maine's framework, it need only have enough support to be able to generate a combination of volunteers and funds necessary to enroll a tiny fraction of Maine's electorate over a nearly four-year period. Moreover, a party unwilling to raise the money and expend effort necessary for qualification (or even to send a mailing to its enrollees, DSMF ¶ 88) can nevertheless place candidates on the general election ballot—with the "Libertarian" designation next to their names—by helping them qualify as unenrolled candidates. That Maine's system has resulted in many minor party and independent candidates running for and even winning office only proves the point that is does not unduly burden the associational rights of small parties and their members.

## II. LPME's Claims Are Barred by *Res Judicata*

LPME offers no response to the Secretary's showing that LPME's claims are barred by *res judicata* due to its settlement and dismissal with prejudice of *LPME I*. Def.'s Mot. at 28–30. The Court should conclude that the claims are barred for the reasons stated in the motion.

### Conclusion

For the foregoing reasons, the Court should grant summary judgment to the Secretary on all of LPME's claims.

| | |
|---|---|
| Dated: March 19, 2021 | AARON M. FREY<br>Attorney General<br><br>`/s/ Jonathan R. Bolton`<br>Jonathan R. Bolton<br>Assistant Attorney General<br>Office of the Attorney General<br>6 State House Station<br>Augusta, ME 04333-0006<br>Tel. (207) 626-8800<br>jonathan.bolton@maine.gov |