UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| JAMES BAINES *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:19-cv-00509-LEW |
| | ) | |
| SHENNA BELLOWS, Secretary of State for the State of Maine, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This is a case about the legal-political infrastructure that an association of like-minded citizens must navigate in Maine to qualify for ballot access as a minor political party and that party candidates must navigate to demonstrate local public support for their candidacies. At its root, the question to be answered is whether the legal edifice Maine has erected around ballot access for minor political parties is a reasonable safeguard or an impermissible rearguard depriving them of the freedom to associate for political ends and to equal protection under the law in violation of the First and Fourteenth Amendments of the United States Constitution.

### BACKGROUND

In this action, the Plaintiffs, James Baines, Chair of the Libertarian Party of Maine, Christopher Lyons, former party chair and Libertarian U.S. Senate candidate-hopeful in

1

2018[1], Allen Esposito, party adherent, William Sampson, party adherent, Cody Blackburn, party adherent and Maine House District 125 Libertarian candidate-hopeful in 2018, Bonnie Young, party adherent and Maine House District 121 Libertarian candidate-hopeful in 2018, and the Libertarian Party of Maine, Inc.[2] (the "Party"), band together to challenge the constitutionality of Maine's system of party-based election qualification and candidate nomination. On November 11, 2019, they filed their Complaint seeking declaratory and injunctive relief in two counts: the first alleging violation of their right of association under the First and Fourteenth Amendments to the United States Constitution and the second alleging violation of their right to equal protection under the law under the Fourteenth Amendment to the United States Constitution. *See* Complaint (ECF No. 1).

Defendant Shenna Bellows, Secretary of State for the State of Maine (the "Secretary"), opposes Plaintiffs' claims. However, during the travel of this case she or her deputy has advised the Maine Legislature to improve Maine's ballot access laws to avoid an unfavorable ruling. The Legislature has passed certain bills toward this end.

The matter is now before the Court on competing motions for summary judgment. *See* Def.'s Mot. (ECF No. 54); Pls.' Mot. (ECF No. 55). In the main, the material facts

---

[1] By "hopeful" I mean to convey that the individual in question made some attempt to comply with Maine's party-candidate nomination requirements but was unable to do so and therefore did not appear as a party candidate on the ballot in the year in question.

[2] The Libertarian Party of Maine, founded in 1972, is the official Maine affiliate of the Libertarian Party of the United States. The Libertarian Party of Maine's bylaws provide that any registered voter in Maine who signs the party's foundational principle, either on Facebook or in person, is a member of the Party. The Libertarian Party of the United States is an American political party founded in Colorado Springs, Colorado, in 1971. The national party is organized in all 50 states plus the District of Columbia. It is the third largest political party in the United States by voter registration, with 652,261 voters registered as Libertarians as of 2020 and automatic ballot access in 30 states plus the District of Columbia. The Libertarian Party of the United States runs hundreds of candidates in every election cycle, for positions ranging from city council to President of the United States.

consist of the workings of the system itself. Other material facts relate to the Libertarian Party of Maine's history of qualifying for and then failing to qualify for participation in Maine elections, as well as the experience of various candidates enrolled in the Libertarian Party of Maine or the Maine Green Independent Party. This is by no means the first litigation to challenge Maine's electoral system. To the extent that it is relevant to the background of this litigation the history of prior litigation is related herein.

### A. Maine Law of Party Qualification and Candidate Nomination

The statutory scheme challenged in this action is found in Title 21-A of the Maine Revised Statutes. The litigants are concerned chiefly with Chapter 5 governing "nominations," which encompasses, among other things, both "party qualification" (subchapter 1, article 1) and party-based candidate nomination, dubbed "nomination by primary election" (subchapter 1, article 4). In addition to the party-focused provisions, Plaintiffs ask that I consider, by way of comparison, Maine law governing the nomination of unenrolled candidates, a process that proceeds "by petition" (subchapter 2).

#### 1. Party qualification

Maine law governing the qualification of political parties for ballot access is found in Title 21-A, Chapter 5, Subchapter 1, Article 1 of the Maine statutes. *See* 21-A M.R.S. §§ 301 ("Qualified parties"), 302 ("Formation of new party; organization about a candidate), 303 ("Formation of new party; organization by party enrollment"). Although these statutes speak in terms of the "formation" of a party, they do not actually prescribe rules for party formation. Rather, they establish standards by which political groups already nominally organized as parties or political associations may be deemed "qualified" under

3

state law.[3] By becoming a qualified party, a party assumes the privilege and the burden of participating in Maine's state-run primary[4] elections, *see id.* § 301(1); earns an automatic ballot line for its nominees in the general election, *see id.* § 301(2); and gains the ability to enroll voters as party members in the paper-card and computerized Central Voter Registration ("CVR") system[5] administered at the state level by the Division of Elections[6] and at the local level by municipal clerks and registrars, *see id.* § 141.

The process by which a party obtains qualified status in Maine unfolds in, essentially, three stages: declaration, qualification, and preservation. The declaration stage begins when a group of ten or more unenrolled voters applies by "fil[ing] a declaration of intent with the Secretary of State" in which they designate the name of their party. *Id.* § 303(1). The declaration is due in December of an even-numbered year—that is, one month after a general election. *Id*. After receipt of a properly filed declaration of intent—and at

---

[3] Of course, a political party exists in fact before it is qualified under state law to participate in elections; but because Maine statutes speak in terms of "new parties" and party "formation," I will do so as well.

[4] Maine law requires that parties and party-candidates participate in the primary election process. 21-A M.R.S. § 331. "'Primary election' means the regular election for the election of nominees of a party for the general election." 21-A M.R.S. § 1(32). The primary election process is a time-honored component of party-based electoral politics, and it is the product of progressive political reform. States have mandated that party candidates participate in primary elections in part to ensure that party candidates are chosen by intra-party popular vote rather than hand-picked by party bosses.

[5] The CVR is used by the Secretary and municipal registrars as a tool to keep track of voters' enrollments. Under current administrative practice, a party that has newly petitioned the Secretary to pursue qualified status based on enrollments and/or has already achieved qualified status will have its name printed on voter registration cards created by the Division of Elections to facilitate voter registration. The Division prints the names of qualified parties on the registration cards to enable check-box party enrollment by voters so inclined. When a voter completes a registration card and checks a box for party enrollment, the local registrar or clerk will access the CVR and record therein the fact that the voter has enrolled in the party. The physical card is then preserved in the municipality's local records.

[6] The Secretary of State's Office, through the "Elections Division," oversees all statewide elections and administers the Maine election laws set forth in Title 21-A of the Maine Revised Statutes. The Elections Division's responsibilities include overseeing the political party qualification process, printing and distributing candidate nomination petition forms (party and non-party), reviewing completed candidate nomination petitions filed with the Secretary of State, pursuant to 21-A M.R.S. §§ 337(1), 356(1), and preparing primary and general election ballots for all candidates for federal, state, and county offices, as well as for statewide referenda. 21-A M.R.S. § 601.

the start of the next odd-numbered year—the Secretary will authorize voters to enroll in the new party. *Id.* § 303(2).

In the qualification stage, the nascent party seeks to fully qualify to participate in the next general election by provisionally enrolling at least 5,000 voters "[o]n or before January 2nd of the next even-numbered year."[7] *Id.* § 303(2). To enroll in the party, voters may either complete and file voter registration cards directly with their local municipal registrars, *see id.* § 141, or complete cards and give them to the applicants to file at the local level on their behalf, *see* Stipulation 1 (ECF No. 72). Only with the Secretary's authorization in place will local clerks and registrars be able to record the voter's party enrollment in the CVR. At this stage, the emerging party is merely authorized to accrue enrollments *en route* to achieving qualified status. Thus, the enrollment of a voter in the new party is, initially, provisional only. If the party succeeds in achieving 5,000 enrollments by the deadline, then the Secretary will qualify the party to participate in the candidate nomination process of two general elections.

Having qualified to participate in the primary process, the party is not out of the woods; in the third stage, the party must preserve its status either by enrolling several thousand more voters or by nominating gubernatorial or presidential candidates who earn substantial support in subsequent general elections. The new party is given an initial grace

---

[7] Alternatively, a party may gain qualified status for one election cycle if it adopts the political designation of a candidate for either Governor or President who received five percent or more of the vote cast in Maine in the general election. *Id.* §§ 302(1), 351, 354(1). This is sometimes referred to as the "coattail" method of qualification. A minor party qualified by this method is not likely to remain qualified by this method unless it eventually enrolls enough voters to qualify based on total enrollments.

period of 34 months—from the time of qualification until the second general election thereafter—during which it will remain qualified. *Id.* § 301(1)(E). After this initial grace period, the party must show at each ensuing general election either that it has 10,000 enrolled members or that its candidate for Governor or President received at least 5% of the statewide vote. L.D. 1061 (130th Legis. 2021).[8] Should a party fail to clear both hurdles at any future general election, it will be disqualified. 21-A M.R.S. § 304 (citing § 301).

Once a party has been disqualified under § 304, the Secretary will proceed to strike its members' party enrollments from the CVR through a "batch process" that purges the CVR electronic enrollment record for all voters enrolled in the party. The voters will still be registered to vote in their respective municipalities, but they will no longer be recorded as members of the disqualified party. The Secretary has chosen to perform the batch unenrollment based on her interpretation of 21-A M.R.S. § 306, which reads: "A voter who is enrolled in a party which failed to meet the requirements of section 302 or 303, or which is disqualified under section 304, is considered an unenrolled voter for all purposes." *Id.* § 306. Members of disqualified parties thus find themselves once again at square zero: if they wish to compete in future elections, they must file a declaration with the Secretary, ask all

---

[8] During the pendency of this action, the Maine legislature passed "An Act To Protect Minor Political Parties That Seek To Retain Qualified Party Status," which changed § 301(1)(E)'s former requirement—that at least 10,000 of the party's enrolled voters actually turned out to vote at the general election—to permit parties to retain qualification either by sufficient turnout *or* by sufficient enrollment. *See* L.D. 1061 (130th Legis. 2021). The Secretary argues that this amendment moots Plaintiffs' challenge to § 301(1)(E), *see* 2021 Letter of Jonathan Bolton (ECF No. 73), while Plaintiffs suggest that it merely evidences that the prior version of § 301(1)(E) violated their rights, *see* 2021 Letter of John Branson (ECF No. 74). I disagree with both arguments. Because the Libertarian Party of Maine never reached 10,000 enrollments, the voter-turnout requirement was not an essential reason for the Party's ballot disqualification; the lack of enrollments was alone sufficient for disqualification. Accordingly, I do not find Plaintiffs' challenge to § 301(1)(E) to be moot, nor will I consider the legislature's effort to fix Maine's political system to be evidence of an unreasonable burden.

formerly enrolled members to complete new voter registration cards, and hope once more to meet the deadlines and enrollment thresholds prescribed under Maine law.

### 2.      Party-Based Candidate Nomination

By Maine law, once the Secretary of State bestows ballot qualified status on a party and until the Secretary takes that status away, persons enrolled in the party are authorized to pursue candidacies for office as party candidates beginning no sooner than January 1 of an election year. 21-A M.R.S. § 335(6). To sustain a party-based candidacy in Maine, prospective candidates are required to secure signatures on nominating petition papers distributed by the Secretary. *Id.* § 334. Because of the January start date, the prospective candidates of a new minor party cannot collect signatures during their party's initial drive for voter enrollments, which by law takes place in an odd-numbered (i.e., non-election) year.

Maine also requires party candidates to draw nominating signatures exclusively from members of their own party who reside in and are registered to vote in the applicable "electoral division" for the public office the candidate is pursuing. *Id.* § 335(2). The candidate's "primary petition must be filed in the office of the Secretary of State before 5 p. m. on March 15th of the election year in which it is to be used." *Id.* § 335(8). Success in this endeavor means a candidate's name will be printed on party-specific primary ballots.[9]

---

[9] An otherwise qualified candidate enrolled in the party who fails to satisfy the petition requirement may still run and receive the party's nomination as a write-in candidate during the primary election. 21-A M.R.S. § 338. However, in that case the candidate may only be nominated based on receipt of "a number of valid write-in votes equal to at least twice the minimum number of signatures required under section 335, subsection 5." *Id.* § 723(1)(A). In other words, if the candidate cannot collect enough signatures to be nominated as one of the party's candidates for the office in question, then the candidate can still secure a place on the general election ballot if he or she can persuade enough voters in the district to turn out for the party primary and write his or her name down as a write-in candidate.

Assuming the candidate remains in the race following the primary election, the Secretary will then list the candidate on the general election ballot alongside the party's designation.

The number of signatures a party candidate must collect to secure a nomination is not dependent on the size of the party. Major and minor party[10] candidates must all clear the same hurdles, which range from twenty-five signatures for a candidate for State Representative to 2,000 signatures for a candidate for Governor, President, or U.S. Senator. *Id.* § 335(5).[11] In addition, as indicated above, the only valid signatures a party candidate may collect are those contributed by other voters enrolled in the candidate's party.

### 3. *Comparing Maine's minor-party candidate nomination process with its independent candidate nomination process*

To better appreciate the burdens the party-candidate nomination process places on minor-party candidates, it is helpful to compare the process that applies for independent candidates.

Preliminarily, one may only mount an independent candidacy for elective office in Maine if one is not enrolled in any qualified party.[12] 21-A M.R.S. § 353. Like party candidates, independent candidates must file nominating petitions with the Secretary

---

[10] Maine law provides definitions for "major" and "minor" parties. "'Major party' means a political party polling the greatest or the next greatest number of votes cast for Governor at the last gubernatorial election." 21-A M.R.S. § 1(22). "'Minor party' means a political party other than a major party." *Id.* § 1(24).

[11] To earn the right to place a candidate's name on the ballot for a national or state-wide office like governor or U.S. senator, the Party and/or the party candidate would have to collect 2000 signatures from persons enrolled in the Party. For county and Maine senate and house district offices, and either of Maine's two U.S. House seats, the Party would have to collect for a candidate 1,000 signatures for a U.S. House seat, 100 for a state senate seat, 25 for a state house seat, and 50 or 150 for county office and, again, the signatures would have to come from persons residing in the district in question who were also enrolled in the Libertarian Party of Maine. 21-A M.R.S. § 335(2), (5).

[12] At present, the qualified parties are, in alphabetical order, the Democratic Party of Maine, the Maine Green Independent Party, and the Republican Party of Maine.

bearing the signatures of registered voters. *Id*. As compared to party candidates, independent candidates need to collect twice as many signatures for a given office,[13] but may draw them from any registered voter in the applicable district including party-enrolled voters. *Id.* § 354. Like party candidates, independent candidates cannot collect nomination signatures until January 1 of the election year; but unlike party candidates, independents have until May 25 of that year to submit their signed nominating petitions. *Id.*

After the independent candidate secures the needed nomination signatures, he or she sits out the primary election and is guaranteed a spot on the general election ballot. The independent candidate is also entitled to have a political designation printed on the ballot next to his or her name, which legend may be evocative of recognizable political organizations but may not incorporate the name of a qualified party. *Id.* § 354(1). By law, this designation is limited to three words, as it is for prospective parties. *Id.* §§ 307(1), 354(1).

Maine law thus provides a more flexible route to the ballot for independent candidates as compared to minor-party candidates. While independent candidates face somewhat higher signature requirements (double the number), the fact that those signatures can be gathered from *any* voter means that independent candidates also enjoy a far larger pool of potential signatories. The higher signature requirement for independent candidates is also tempered by the nearly twice-as-long signature collection period—whereas party candidates have 74 days to collect nominating signatures, independent candidates enjoy

---

[13] Independent nominations for statewide offices require 4,000 signatures; for U.S. House Districts, 2,000; for State Senate Districts, 200; for State House Districts, 50. 21-A M.R.S. § 354(5).

144 days to accomplish this task. For a minor-party candidate in a party with 5,000 to 10,000 enrolled members—only a fraction of whom live in any given electoral district—this smaller pool and tighter timeline are especially salient.

### B. Recent History of Minor Parties in Maine

The Libertarian Party of Maine is not the only political minority to have found Maine's party-based candidate nomination process onerous and resource-intensive. Since 1990, several of Maine's minor parties have initially obtained qualifying party status by enrolling the requisite number of voters or, more often, riding on the coattails of popular presidential or gubernatorial candidates.[14] All of these parties have found themselves disqualified and their voters unenrolled at the end of or shortly after the qualification grace period, and only one party has rebounded from disqualification to become an established force in Maine politics.

The Maine Green Independent Party is the exception that proves the rule. The "Green Party" initially qualified in Maine in 1994, only to lose qualifying status in 1996 due to underwhelming performance by the party's presidential nominee, Ralph Nader. The party reemerged two years later as the Maine Green Independent Party, carried along by Patricia LaMarche's performance in the 1998 gubernatorial race. Since then, the Maine Green Independent Party has garnered more than 40,000 enrollments and its candidates regularly file nominating petitions under § 335 to participate in primary elections for state senate and state house seats (roughly 110 candidates since 2000).

---

[14] These parties are the Green Party (1994–96), the Green Independent Party (1998–present), the Libertarian Party of Maine (1991–92, 2016–18), Americans Elect (2012–14), and the Reform Party (1996–2000).

Even so, the Maine Green Independent Party has found ballot access in Maine to be more challenging than have the Democratic or Republican parties. In 2020, for example, long-time Green Independent Lisa Savage unenrolled from the party and ran for U.S. Senate as an independent because she found the nomination provisions for minor party candidates to be overly burdensome. PSMF ¶ 26; Savage Decl. ¶ 7. Running as an independent, Savage was able quickly to amass far more than the 4,000 signatures she needed to earn a spot on the ballot.[15]

## C. History of the Libertarian Party of Maine

### 1. Initial grasps at party qualification

The Libertarian Party of Maine first qualified for ballot access in 1991 after Andrew Adam, an independent who won 9.3% of the vote in the 1990 gubernatorial election, permitted the party to use his name and qualify under § 302's "coattail" provision, whereby a party may qualify on the "coattails" of an independent Presidential or Gubernatorial candidate who receives at least 5% of the vote. *See Libertarian Party of Maine v. Diamond*, 992 F.2d 365, 368 (1st Cir. 1993). The Party had previously tried to qualify for the ballot via the voter enrollment process, but had fallen short of the then-existing enrollment threshold. *See id.* at 369. The Party's candidates, however, had trouble collecting enough signatures from in-district, enrolled party members to appear on the primary ballot, and unsuccessfully challenged Maine's requirement that party candidates be nominated at

---

[15] In fact, Savage collected 9,000 signatures from registered Maine voters—nearly double the statutory requirement for independent senatorial candidates—in a single day. This rapid pace of signature collection was due, at least in part, to the fact that Savage was able to gather signatures outside of polling locations during the 2020 presidential primary.

primary elections. *See id.* The Party was disqualified the following year after it failed to enroll enough voters to meet Maine's statutory threshold.

Since then, several unenrolled candidates have appeared on the ballot in Maine with the "Libertarian" designation. "Libertarian"-designated unenrolled Presidential candidates have run in Maine in six of the last seven elections. One candidate for the State Senate appeared on the general election ballot with the "Libertarian" or "Libertarian Party" designation in 1998, 2000, and 2002. Candidates for State Representative appeared on the general election ballot with the "Libertarian" or "Libertarian Party" designation in 1998 (3 candidates), 2000 (8 candidates), and 2002 (1 candidate). Another candidate used the designation of Independent Libertarian in 2000. Because the Party was not qualified for most of that time, the candidates ran as independents with the "Libertarian" label affixed as their chosen designation.

### 2. *The Party's second qualification and ensuing litigation*

In December 2014, the Party filed a declaration of intent to re-qualify as the "Libertarian Party of Maine." The Party conducted a party-enrollment drive throughout 2015, and around the end of that year filed a certification with then-Secretary of State, Matthew Dunlap claiming to have 6,482 enrollments. Secretary Dunlap verified only 4,513 enrollments upon consulting the CVR, and on that basis refused to qualify the Party for the 2016 primary and general elections.

On January 4, 2016, the Libertarian Party of Maine and six individuals filed suit to challenge the constitutionality of the qualification-by-enrollment scheme, raising both facial and as applied challenges. *See Libertarian Party of Maine v. Dunlap*, No. 2:16-cv-

12

00002-JAW, 2016 WL 1642593 (D. Me. Apr. 25, 2016). During the progress of the case, the Party obtained injunctive relief that preserved credit for the 4,513 enrollments and extended the deadline to enroll more voters into July.[16] With that additional time, the Party was able to secure the additional enrollments needed to qualify. The parties to the *Dunlap* litigation stipulated to dismissal of the action on February 8, 2017, after reaching a settlement that disavowed liability or fault on the part of any litigant. *See* Stipulation of Dismissal at 1, *Libertarian Party of Maine v. Dunlap*, No. 2:16-cv-00002-JAW, 2016 WL 3039715, at *1 (D. Me. Feb. 08, 2017).

Following a strong performance by the Party's candidates for President and Vice President in the November 2016 election, in which they received more than 38,000 votes in Maine, the Party was able to qualify for the next election in 2018 notwithstanding the fact that it still had fewer than 10,000 enrolled members. But as was the case when the Party qualified in the 1990s—and as has been the case for other minor party candidates in Maine—the Party's candidates often found it challenging to secure the requisite signatures to appear on the primary ballot due to a shortage of in-district, enrolled party members. Pls.' Mot. 7. The Secretary agrees that this presented a challenge for some prospective candidates, but observes that it meant the candidates and other party members needed to engage in canvassing to see whether some voters in these divisions would be willing to

---

[16] In the *Dunlap* litigation, Judge Woodcock assessed a severe burden on associational rights based, in part, on the high rate of rejections and the lack (at that time) of any procedure for a party to challenge the Secretary's disqualification of enrollments. *See Libertarian Party of Maine v. Dunlap*, No. 2:16-cv-00002-JAW, 2016 WL 3039715, at *9 (D. Me. May 27, 2016) (Order on Motion for Reconsideration). Given the exigencies then in existence, Judge Woodcock granted the Party additional time beyond the state law cutoff date in which to collect the remaining enrollments needed to support its bid for qualifying status, to in turn support the nomination of the Party's candidates for President and Vice President. *Id*. at *14.

change their enrollment status in order to support the Party's candidates. *See* Def.'s Opp'n 20–21 (ECF No. 59). At least one of the Party's candidates, Plaintiff Cody Blackburn, did exactly that in State House District 125. Def.'s Opp'n 20.

Following the *Dunlap* litigation, the Maine Legislature amended § 301(1)(E) to extend the time period for a newly qualified party to achieve 10,000 voter enrollments until the second general election after the party's initial qualification, thereby expanding the grace period for newly qualified parties. *See Act to Amend the Election Laws Relating to Party Qualification*, L.D. 1571, § 1 (128th Legis. 2017). The enactment included a retroactivity clause applicable to the Libertarian Party of Maine that effectively extended the Party's deadline to reach 10,000 enrollments until the November 2018 general election. *Id.* § 4. The Legislature also enacted a law that extended the December 1st deadline for collecting the initial 5,000 enrollees to the second day of January in an election year. *Id.* § 2.

### 3.  Disqualification and unenrollment

The Registered and Enrolled Report for the general election of November 8, 2016, shows that Libertarian Party of Maine had enrolled 5,616 voters as of that election. The Registered and Enrolled Report for the general election of November 6, 2018, shows that a total of 6,168 voters were enrolled in the Party. Because the Party had fewer than 10,000 registered voters enrolled as of the November 2018 general election, the Secretary of State's office informed Party Chair Christopher Lyons that the Party was disqualified for failure to meet the 10,000-voter participation requirement in § 301(1)(E). On December 4, 2018, the Secretary of State's Office formally disqualified the Party from election

14

participation pursuant to § 304. Pursuant to the Secretary's interpretation of § 306, the Secretary then changed the enrollment status of all voters enrolled in the Libertarian Party of Maine to unenrolled. No notice went out from either a state or local registrar to inform the voters of the change in their enrollment status. Each voter's paper voter registration cards, presumably, remained unchanged.

On December 3, 2018, ten registered voters filed a Declaration of Intent to regain ballot qualification for the Libertarian Party of Maine by means of the enrollment process. The Secretary of State's office accepted the Declaration on December 11, 2018 and informed the applicants that the Party was authorized to begin enrolling voters and that January 2, 2020, was the deadline to certify that it had enrolled at least 5,000 voters. However, the Party did not submit a certification of party enrollment on or before January 2, 2020. Although the Secretary provided the Libertarian Party of Maine's representatives with lists that identified voters who previously enrolled in the party—before the unenrollment in 2018—the Party did not make a serious attempt at re-enrolling them during its subsequent qualification drive. Evidently, this was an economic assessment; efforts to obtain financial support from the National Committee of the Libertarian Party in 2018 were unsuccessful. As of January 2, 2020, the Party had only 258 enrolled members in the CVR. Accordingly, on January 2, 2020, Secretary Dunlap disqualified the party and changed its voters' enrollment status to unenrolled.

Despite the Libertarian Party of Maine's failed enrollment drive in 2020, the Libertarian Party presidential candidate and vice-presidential candidate qualified for the November 2020 general election ballot by petition, pursuant to 21-A M.R.S. §§ 351–355.

However, they received only 14,152 votes in the November 2020 election, not enough to secure the Party qualified status in the next election.

The Secretary accepted a new Declaration of Intent to Form a Party by Enrollment, filed by ten individuals on December 7, 2020, and promptly notified the lead applicant, Plaintiff James Baines, that the Party could begin enrolling voters. However, the Party did not pursue an enrollment drive after assessing the costs and practical impediments imposed by Maine law, including the need to re-enroll voters who had already expressed their desire to be enrolled as members of the Party. As of January 29, 2021, the CVR system reflected that 56 voters were enrolled in the Party.

### D. This Case, and June 11, 2020 Preliminary Injunction Order

In November of 2019, Plaintiffs filed this as-applied challenge to several provisions of Maine election law that have hindered their ability to obtain and maintain "qualifying" status and nominate a slate of candidates. Plaintiffs then moved for a preliminary injunction to prevent the Secretary from enforcing certain aspects of Maine's ballot access laws against them, which I denied.

In my Order on Plaintiffs' Motion for Preliminary Injunction, I concluded that Plaintiffs were likely to succeed in their challenge to the forced unenrollment of party members, but were not likely to succeed in their remaining claims. However, I denied injunctive relief because the balance of equities did not justify the proposed remedy (unilateral re-enrollment of voters after a year of unrolled status), which would have upended the status quo given the passage of so much time. *Baines v. Dunlap*, 466 F. Supp.

3d 273, 278 (D. Me. 2020), *reconsideration denied,* No. 1:19-cv-00509-LEW, 2020 WL 3961946 (D. Me. July 13, 2020).

## ANALYSIS

Plaintiffs seek to improve the odds of succeeding in their thus-far Sisyphean effort to keep qualified status by challenging several features of Maine election law. Specifically, Plaintiffs challenge: the voter enrollment thresholds for earning and maintaining party qualification under §§ 301(1)(E) and 303(2); the time constraints for enrolling new members in order to qualify under §§ 301(1)(E) and 303(2); the party disqualification provision under § 304; the Secretary's mass-unenrollment of enrolled party members pursuant to §§ 304 and 306; and the petition and primary process for party nominees under §§ 331(1) and 335.[17] *See* Pls.' Mot. 4–6. Plaintiffs allege that these provisions, individually and in tandem, violate their right to associate under the First Amendment and their right to equal protection of the law under the Fourteenth Amendment.

For her part, Secretary Bellows contends that Maine law sets a low threshold for party participation in state elections and that the Libertarian Party of Maine's difficulties gathering enrollments and nominating signatures simply reflects that the Party lacks a modicum of popular support in Maine. *See* Def.'s Mot. 2. Moreover, the Secretary argues that purging enrollments is necessary to ensure that the Party cannot automatically requalify by "coasting on past support that may no longer exist" and so voters who enrolled in the Party are not left confused about their enrollment status following the Party's

---

[17] Another primary prong in Plaintiffs' challenge was the former requirement that 10,000 voters not only enroll but also turn out to vote. During the travel of this case the State amended the law to remove the turnout requirement, rendering the issue moot, at least for purposes of summary judgment.

disqualification. Def.'s Mot. 3. The Secretary also suggests that cause may exist to rule definitively against the Libertarian Party based on its most recent lack of effort "to enroll or even reach voters." Def.'s Mot. 9.

The matter is before the Court on competing motions for summary judgment. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 247–48 (1986). A material fact is one that has the potential to determine the outcome of the litigation. *Id.* at 248; *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). To raise a genuine issue of material fact, the party opposing the summary judgment motion must demonstrate that the record contains evidence that would permit the finder of fact to resolve the material issues in their favor. *Triangle Trading Co. v. Robroy Indus*., *Inc*., 200 F.3d 1, 2 (1st Cir. 1999). The material facts in this case are undisputed; accordingly, determination of the merits portion of this case based on the summary judgment record is appropriate. However, the summary judgment record is not designed to resolve the issue of remedy. The remedy portion of the case will require further proceedings.

I structure my discussion to follow Plaintiffs' challenges, mindful of Plaintiffs' admonition that they are challenging not only specific burdens but also the way they combine, as "a number of facially valid provisions of election laws may operate in tandem

to produce impermissible barriers to constitutional rights." Pls.' Mot. 12 n.3 (quoting *Storer v. Brown*, 415 U.S. 724, 737 (1974)).

### A. Governing Legal Principles

"It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). The First Amendment, as applied to the states through the Fourteenth Amendment, protects the right of citizens to associate for political purposes and stands as bulwark against governmental attempts to restrict these rights. *Lyman v. Baker*, 954 F.3d 351, 376 (1st Cir. 2020) (citing *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986)). The right of association necessarily maps out wide terrain in a representative democracy, which terrain encompasses, among other things, party-based campaigning, independent campaigning, electioneering, participatory politicking, and other forms of free speech and associational activity designed to secure political office. *California Democratic Party v. Jones*, 530 U.S. 567, 574–75 (2000).

In addition, the Fourteenth Amendment's Equal Protection Clause provides a bulwark against unfair electoral systems that have the effect of disadvantaging certain classes when it comes to participation in representative democracy. *See Williams v. Rhodes*, 393 U.S. 23, 29 (1968). Thus, for example, "[b]allot access restrictions that fall unequally on similarly situated candidates or parties may threaten the right to equal protection of the laws guaranteed by the Fourteenth Amendment." *Barr v. Galvin*, 626 F.3d 99, 109 (1st Cir. 2010). "The point, of course, is that ballot access must be genuinely open to all, subject to

reasonable requirements." *Lubin v. Panish*, 415 U.S. 709, 719 (1974) (striking down California law that required candidates to pay an excessive fee to run for office without allowing any alternative means of demonstrating support). Because the right to equal protection and the right to associate so often overlap in election law—especially in the context of ballot access regimes—courts generally treat cases that implicate both constitutional rights as singular constitutional claims. *See Anderson v. Celebrezze*, 460 U.S. 780, 787 n.7 (1983).

At the same time, "the Constitution grants to the States a broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' which power is matched by state control over the election process for state offices." *Tashjian*, 479 at 217 (quoting U.S. Const. art. I, § 4, cl. 1). Recognizing, perhaps, the dangerous propensity of democratic societies to bring about their own downfalls, *see* The Federalist No. 10, at 76 (Alexander Hamilton) (Clinton Rossiter ed., 2003), courts have permitted "substantial regulation of elections" to ensure that elections are both "fair and honest," *Storer*, 415 U.S. at 730. During the first half of the twentieth century, it was a Progressive Era, good-government mindset that led states to "limit the size of the ballot" so as to "afford to the voters the opportunity of exercising more discrimination in their use of the franchise." *Lubin,* 415 U.S. at 712.

Because laws governing elections "will invariably impose some burden upon" fundamental rights of political participation, courts have sought to balance these dueling constitutional mandates by adopting a "flexible standard" for analyzing election laws. *Burdick*, 504 U.S. at 433–34. Under the so-called *Anderson-Burdick* standard, the federal

courts apply "a balancing test" that weighs the burden that the challenged law imposes on political participation against the state's interest said to justify the burden. *Lyman*, 954 F.3d at 376 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 558 (1997)). To withstand constitutional challenge, a state's interest must be legitimate, and the strength of the state's interest must grow by degrees proportional to the "character and magnitude" of the burden imposed. *Anderson*, 460 at 789.

Where the court finds that a challenged law imposes a "severe" burden on constitutional rights, the law must be justified by "compelling" state interests and "narrowly tailored" to address those interests. *Timmons*, 520 U.S. at 358. "[T]aken as a whole," *Williams*, 393 U.S. at 34, the burden of a state's ballot access regime is severe if a "reasonably diligent" party or candidate could not be expected to satisfy the prerequisites for ballot access, *Storer*, 415 U.S. at 742; however, an actual "showing of personal due diligence is not an element of a ballot access claim," *Perez-Guzman v. Gracia*, 346 F.3d 229, 243 (1st Cir. 2003). Accordingly, "[p]ast experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates [or minor parties] have qualified with some regularity and quite a different matter if they have not." *Storer*, 415 U.S. at 742.

Lesser burdens, on the other hand, will survive challenge so long as the restriction is "reasonable [and] nondiscriminatory" and the state can articulate an "important" interest that renders the burden "necessary." *Anderson*, 460 U.S. at 788–89. While this standard of review is "less exacting" than that employed on more burdensome election restrictions, *Timmons*, 520 U.S. at 358, even less burdensome regulations must be well-fitted to address

legitimate ends without unnecessarily trammeling associational or equal protection rights, *see Bullock v. Carter*, 405 U.S. 134, 146 (1972) (striking down plausibly "rational" filing fee requirement because it was "ill-fitted" to state's interest and "other means to protect those valid interests [were] available").

While the state must point to "precise interests" that justify burdening political participation, *Anderson*, 460 U.S. at 789, courts have generally been highly solicitous toward states' asserted interests. Typically, the state need not "make a particularized showing of" the interest justifying the election restriction. *Munro v. Socialist Workers Party*, 479 U.S. 189, 194–95 (1986). State aims previously recognized as legitimate include "regulating the number of candidates on the ballot," "prevent[ing] the clogging of . . . election machinery," avoiding voter confusion, and preventing "frivolous . . . candidacies." *Bullock*, 405 U.S. at 145. The Supreme Court has even suggested—albeit in dicta—that states are free "to enact reasonable election regulations that may, in practice, favor the traditional two-party system." *Timmons*, 520 U.S. at 367.

### B. Enrollment Thresholds

Plaintiffs contend that Maine sets overly burdensome requirements for the number of voters that a party must enroll to qualify for automatic ballot access. *See* Pls.' Mot. 12–17. Although Plaintiffs do not contend that an enrollment-based metric, as opposed to a signature-based petition metric, is *per se* unconstitutional, they emphasize that securing support based on party-enrollment is a more difficult proposition than securing support

22

based on petition drives in which unenrolled voters can demonstrate support with a mere signature. Pls.' Mot. 15.

As a purely numerical matter, Maine's initial party qualification threshold and retention threshold are constitutional. The Supreme Court has made clear that a state may condition ballot access for minor parties "upon a showing of a modicum of support" among voters, *Munro*, 479 U.S. at 193, insofar as the state has a legitimate interest in winnowing the field of candidates to prevent voter confusion and provide meaningful choices on the ballot, *Bullock*, 405 U.S. at 145. While "[n]o bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms," *Timmons*, 520 U.S. at 359, the Supreme Court and circuit courts have consistently upheld state ballot access regimes that imposed signature requirements equal to five percent of the electorate or less, *Libertarian Party of New Hampshire v. Gardner*, 843 F.3d 20, 26 (1st Cir. 2016).

At all times relevant to this action, there have been more than 1,000,000 but fewer than 1,100,000 registered voters in the State of Maine. Thus, by garnering 5,000 enrollees—as required to gain initial access to the ballot—and then 10,000 enrollees—as required to maintain ballot access—a party demonstrates that it has enrollment-level support of roughly 0.5% and 1.0% of the electorate, respectively. These numbers are reasonable, falling at the bottom end of the range that courts have consistently upheld. After all, the magnitude of a one percent enrollment measure does not strike me as overly burdensome for a party intent on having a statewide political presence—especially where, as here, the state affords an intermediate enrollment threshold that allows a newly qualified

party to build momentum toward that goal.[18] Instead, the requirement is reasonably related to the state's legitimate interest in maintaining an orderly ballot. *See Diamond*, 992 F.2d at 371. The measure is also politically neutral and non-discriminatory as applied to political parties active in Maine elections. *See Barr*, 626 F.3d at 109.

To be sure, I must consider not just the magnitude but the "character" of the burden that Maine places on minor parties by imposing a threshold of party enrollments rather than mere signatures. *Lyman*, 954 F.3d at 376. *See also Perez-Guzman*, 346 F.3d at 241 (finding that "synergy" between factors placed otherwise permissible signature requirement "beyond the pale"). Maine, like most other states, once granted ballot access based on petition signatures rather than enrollments, but since 2013 has conditioned ballot access on the number of voters who are enrolled as party members. *See Act to Amend the Election Laws*, L.D. 504 (126th Legis. 2013). Plaintiffs rightly note that the enrollment requirement for party qualification is more burdensome than the former petition requirement, insofar as voters cannot simply sign a petition but must affirmatively enroll in the party to support its qualification drive. *See Libertarian Party of Arkansas v. Thurston*, 962 F.3d 390, 400 (8th Cir. 2020) (considering "the ability of voters to sign multiple petitions and sign petitions without pledging votes," in challenge to ballot access regime). Unlike a petition-based system, an enrollment-based system burdens not only the party's associational freedom,

---

[18] Plaintiffs suggest that Maine's two-tiered approach to party qualification—whereby a party first qualifies for the ballot by enrolling 5,000 voters, then retains that status by increasing enrollment to 10,000 voters—is constitutionally suspect. Pls.' Mot. 26. But the fact that Maine's ballot access regime is tiered ultimately lowers the bar to ballot access, providing nascent parties with a scaffolded approach to movement building. *See McLaughlin v. N. Carolina Bd. of Elections*, 65 F.3d 1215, 1222–23 (4th Cir. 1995). Because of the tiered approach, I need not address the thornier question of whether it would be unduly burdensome for Maine to demand 10,000 enrollments during a solitary off-election year to gain ballot access.

but also the freedom of unenrolled voters who might support a party's push to access the ballot while not wishing to pledge themselves to the party. *See Tashjian*, 479 U.S. at 216 n.7.

Nevertheless, I am not persuaded that this characteristic automatically results in a severe burden on associational freedom. Courts have consistently upheld petition requirements that are notably higher than Maine's enrollment requirements. *See, e.g.*, *Perez-Guzman*, 346 F.3d at 243 (state interest in protecting elections "is directly served by [a] five percent petitioning requirement"). While enrolling an additional party member is no doubt more difficult than finding an additional petition signature, the State has reasonably concluded that an enrollment threshold equivalent to one percent of the electorate represents a fair modicum of popular support on which to condition party-based access to the general election ballot on a statewide basis. In any event, the matter appears to be resolved in this Circuit. *See Barr*, 626 F.3d at 110 ("Where, as here, the necessary number of enrolled voters required to achieve party recognition [(i.e., one percent of registered voters)] is reasonable, that methodology constitutes an appropriate screen.").

As I said in my Order on Plaintiffs' Motion for a Preliminary Injunction, these modicum requirements do not cross the constitutional line suggested by available precedent. *See Baines*, 466 F. Supp. 3d at 282–83. There is no self-evident reason why a minor party with statewide ambition cannot be expected to demonstrate enrollment of 1/100th of the statewide electorate to maintain ongoing access to the ballot; though the one-percent enrollment threshold appears to me to be as high as commonsense reasoning would support. Given my finding, I conclude that the Secretary is entitled to summary judgment

on Plaintiffs' claims that 5,000 enrollments for initial party qualification and 10,000 enrollments for retention of qualified party status are overly burdensome.

### C. Candidate Nomination Requirements

Plaintiffs also challenge the laws governing a party's nomination of candidates.[19] Plaintiffs argue that by requiring parties to nominate candidates via primary election yet conditioning access to the primary ballot on candidates garnering in-district signatures drawn exclusively from party-enrolled voters, Maine effectively forecloses minor party candidates from running for office and discriminates against them based on their party-enrolled status as compared to unenrolled candidates seeking the same office.[20] Pls.' Mot. 17 (citing 21-A M.R.S. §§ 331(1), 335(2),(5)).

The Secretary responds that the First Circuit's 1993 opinion in *Diamond*, in which it upheld the party-member signature requirement against an as-applied challenge, controls

---

[19] Plaintiffs' challenge to the candidate qualification requirements is not mooted by the fact that the 2016 and 2018 elections have passed or by the Party's loss of qualified status. While the Libertarian Party of Maine has lost the right to nominate candidates at Maine's primary elections and the Plaintiffs therefore "lack a legally cognizable interest in the outcome" of this issue, *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013), the question of whether the party-member signature requirement may constitutionally be applied to the Libertarian Party of Maine after it has met the state's modicum requirement is "capable of repetition, yet evading review," *Storer*, 415 U.S. at 737 n.8. Given the tight timeline between when a party qualifies for ballot access and when candidates must submit nominating petitions—just seventy-four days—it is unlikely that the Party or another similarly situated small party would be able to mount a timely legal challenge in the future. *See Diamond*, 992 F.2d at 369 n.5. "The 'capable of repetition, yet evading review' doctrine, in the context of election cases, is appropriate when there are 'as applied' challenges as well as in the more typical case involving only facial attacks," because the "construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated before an election is held." *Id.*

[20] While Plaintiffs also appear to argue that they should be permitted to nominate candidates by convention rather than primary, *see* Pls.' Mot. 20, the Supreme Court has made clear that "a State may require parties to use the primary format for selecting their nominees." *California Democratic Party*, 530 U.S. at 572 (citing *Am. Party of Texas v. White*, 415 U.S. 767, 781 (1974)). Precedent also plainly supports the imposition of reasonable signature requirements for primary candidates, *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 204 (2008), and the requirement that those signatures be collected from in-district voters, *Norman v. Reed*, 502 U.S. 279, 294 (1992). Accordingly, I limit my analysis to the one aspect of Maine's candidate-nomination procedure that my judicial superiors have not, to my knowledge, categorically upheld: the party-member signature requirement, *see* § 335(2).

Plaintiff's case. Def.'s Mot. 17–18. The Secretary further argues that, in any event, a candidate running on behalf of a party lacking the membership to "gather even 25 signatures" in a state legislative district "has no constitutional right" to be listed on a primary or general election ballot. Def.'s Mot. 18. Citing past examples, the Secretary suggests that committed minor party candidates will work past the limitations of the party-member signature requirement by enrolling voters in order to obtain their signatures, or by unenrolling from the party to pursue independent candidacies. Def.'s Mot. 18–19.

In *Diamond*, the First Circuit affirmed this Court's Opinion and Order that the plaintiffs therein, the Libertarian Party of Maine and eighteen affiliated candidates, constitutionally could be required to demonstrate a modicum of support for individual candidacies by securing the requisite nomination signatures exclusively from party-enrolled voters. *See* 992 F.2d at 372. The court found that in the particular "circumstances" present in *Diamond*—where the party had qualified on the coattails of a sympathetic independent rather than through its own organizing efforts—"the State retained a legitimate interest in ensuring that the Party in fact possessed a minimal level of support among the electorate, as a prerequisite to listing the appellant candidates on the primary and general election ballots." *Id.* at 371. In those circumstances, the *Diamond* court found that the application of the party-member signature requirement to the plaintiffs advanced the state's twin interests in "ensuring sufficient party support among the electorate and sufficient

candidate support within the party," without imposing any "impermissible burden on associational rights."[21] *Id.* at 373 n.9.

Where the First Circuit has spoken, I must faithfully apply that precedent. *See Eulitt ex rel. Eulitt v. Maine, Dep't of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004). However, precedential decisions do not necessarily "resolve future as-applied challenges," *Wisconsin Right to Life, Inc. v. F.E.C.*, 546 U.S. 410, 412 (2006), and it is the job of district courts in election law cases to make the requisite "factual determination[s]" as to whether an election regulation has unduly burdened the plaintiffs' right to political participation, *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 458 (2008). That the Libertarian Party of Maine qualified for ballot access by satisfying Maine's enrollment thresholds distinguishes this case from *Diamond* and renders *Diamond* merely persuasive for the purposes of adjudicating Plaintiffs' as-applied challenge, just as the *Diamond* plaintiffs "absence of any prior numerical showing of support distinguishe[d]" that case from otherwise applicable Supreme Court precedent. *Diamond*, 992 F.2d at 371 n.6

The state's interest in applying the party-member signature requirement to the Plaintiffs now before me is inadequate to justify the substantial burden imposed by the

---

[21] The Secretary also relies on *Diamond* for the proposition that that the party-member signature requirement furthers the state's "*separate*, and *additional*, interest in ascertaining [that a party and candidate have] support in the *particular electoral subdivision* for which the candidate is nominated." *Diamond*, 992 F.2d at 372 (citing *Norman*, 502 U.S. at 295) (alteration in original). But I read this language in *Diamond* as justifying Maine's requirement that parties nominate candidates via petition and primary rather than at a convention—not as justifying the party member signature requirement. *Cf. Diamond*, 992 F.2d at 373 n.9 (discussing "purpose of Maine's party-member signature requirement," and making no reference to state interest in ascertaining local support). Requiring candidates first to gather signatures from residents of their electoral district and then to win a local primary election furthers the state's "legitimate interest in ensuring a modicum of candidate support among the relevant voter constituencies." *Id*. This interest was therefore salient in *Diamond*, where the plaintiffs sought to circumvent Maine's entire primary apparatus and place candidates on the ballot via nominating convention. *Id.* at 369. By contrast, whether a candidate's nomination signatories are members of the candidate's political party is irrelevant to the question of local support.

requirement. On the burden side of the ledger, I find that the burden imposed on the Plaintiffs is substantial, though not "severe." The party-member signature requirement burdens associational rights—not only the rights of the Party and its candidates, but also the rights of unenrolled voters. In *Tashjian*, the Supreme Court invalidated a state law forbidding political parties from opening up their primaries to unenrolled voters on the grounds that such a prohibition "limit[ed] the Party's associational opportunities at the crucial juncture at which the appeal to common principles may be translated into concerted action." *Id.* at 216. The party-member signature requirement imposes the same limitation on association between party candidates and unenrolled voters at an equally "crucial juncture," effectively nipping nascent political movements in the bud. That a voter need only enroll in the Party to sign a nominating petition is no saving grace, as the state may not "condition[] the exercise of the associational right upon the making of a public statement of adherence to the Party." *Tashjian*, 479 U.S. at 216 n.7.

The party-member signature requirement also limits effective participation. One "hallmark" of a burden on political participation "is exclusion or virtual exclusion from the ballot." *Libertarian Party of Conn. v. Lamont*, 977 F.3d 173, 177 (2d Cir. 2020) (quoting *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016) (alterations omitted)). And experience shows that Maine's electoral system has largely excluded the Libertarian Party's local-district candidates from the ballot, notwithstanding the Party's ostensible ballot access. During the relevant periods of time—that is, when the Party was ballot-qualified from 1991 to 1992 and from 2016 to 2018—the Party's candidates struggled to

garner enough signatures to earn a spot on the primary ballot.[22] By limiting a party's ability to demonstrate local support to the restrictive manner set in § 335(2), Maine's purported grant of ballot access to qualified minor parties shows itself to be ballot access in name only. *Cf. Williams*, 393 U.S. at 31 (finding that the "right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes").

Contrary to the Secretary's suggestion, the fact that a candidate may escape the party-signature requirement by unenrolling and running as an independent does not lessen the burden on minor party adherents; if anything, the law's disparate treatment toward independent candidates and members of ballot-qualified minor parties is further evidence of the harm to Plaintiffs' constitutional rights. Political participation—especially for minor parties—is as much about expression as it is about actually winning votes. *See Anderson*, 460 U.S. at 788; *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. at 186. Running as a libertarian-identified independent candidate is "entirely different" from and not "a satisfactory substitute" for mounting a full-fledged, Libertarian party campaign. *Storer*, 415 U.S. at 745. That candidates may evade the party-member signature requirement simply by unenrolling from their chosen party—and thereby effectively increasing the pool of available nomination signatories by several orders of magnitude— illustrates how Maine's "[b]allot access restrictions . . . fall unequally on similarly situated candidates." *Barr*, 626 F.3d at 109. In short, I "can hardly accept as reasonable an

---

[22] That candidates from other minor parties have had similar experiences, *see* Savage Decl. ¶ 7 (ECF No. 22-2), is not immediately relevant to Plaintiffs' as-applied challenge; but it further illustrates the near-exclusion of minor party candidates under § 335.

alternative that requires candidates and voters to abandon their party affiliations in order to avoid the burdens . . . imposed by state law." *Bullock*, 405 U.S. at 146–47.

However, I do not find that the burden imposed on Plaintiffs by the signature requirement warrants the talismanic label of "severe." Precedent instructs me to take a holistic view of the state's ballot access provisions. *See Williams*, 393 U.S. at 34. Just as the presence of restrictive co-requisites can render one provision of a state's election law more burdensome, *see Storer*, 415 U.S. at 737, so too can the presence of relatively mild co-requisites render a challenged provision *less* burdensome. Here, as restrictive as it is to limit the pool of available nomination signatories to party members, the number of signatures required to earn a place on the ballot is "not high," *Diamond*, 992 F.2d at 373, and a candidate who fails to make the primary ballot may advance to the general election with sufficient write-in support, 21-A M.R.S. §§ 338, 723(1)(A). Thus, while the party-member signature requirement has effectively "fr[ozen] the political status quo," *Jenness v. Fortson*, 403 U.S. 431, 438 (1992), some minor party candidates have proven themselves capable of overcoming this hurdle with additional effort. Similarly, the associational harm of forbidding the Party from collecting the signatures of unenrolled voters at the initial nomination stage is tempered—though only slightly—by the fact that the Party may later associate with unenrolled voters by permitting them to vote in its primary election, *see* 21-A M.R.S. § 340(1). Nevertheless, taking Maine's ballot access regime "as a whole," *Williams*, 393 U.S. at 34, the party-member signature requirement imposes a heavy burden on the Plaintiffs, though not one so severe as to place it at the uppermost level of *Anderson-Burdick*'s "sliding scale," *Barr*, 626 F.3d at 109.

Even under the "less exacting review" reserved for less-than-severe burdens on political participation, *Timmons*, 520 U.S. at 358, the party-member signature requirement fails to pass constitutional muster. Regardless of the severity of the burden on Plaintiffs' political rights, that burden must be "necessary" in light of the state's legitimate interests, *Anderson*, 460 U.S. at 789, and must not outweigh the state's interests, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (citing *Norman*, 502 U.S. at 288–89). Application of the party-member signature requirement to Plaintiffs—when the Party was ballot qualified—was neither necessary nor reasonably calibrated to further Maine's interest in "ensuring sufficient party support among the electorate and sufficient candidate support within the party." *Diamond*, 992 F.2d at 374 n.9. Maine already requires that a party demonstrate sufficient popular support by enrolling voters or receiving a particular share of the vote, *see* §§ 301–03, and requires that a candidate show sufficient support within the party by winning a primary election, *see id.* § 331. These interests were salient in *Diamond*, where the plaintiffs "*bypassed* the requirement of mustering significant numerical support" in their own right by qualifying on the coattails of an independent candidate, making the party-member signature requirement a necessary indication "that the Party in fact possessed a minimal level of support among the electorate." *Diamond*, 992 F.2d at 371 (emphasis in original). But where, as here, the Party "already [has] demonstrated a 'significant modicum of support'" in accordance with Maine law, the state

"[c]learly . . . retain[s] little compelling interest" in "reevaluating" the party's support, *id.* at 371 n.6. The party-member signature requirement is all burden and no benefit.

"Weighing 'the character and magnitude'" of the burden that the party-member signature requirement has imposed on Plaintiffs against the State's "precise interests" in applying the requirement to the Plaintiffs, *Barr*, 626 F.3d at 109 (quoting *Werme v. Merrill*, 84 F.3d 479, 483 (1st Cir. 1996)), I conclude that any interest in double-checking the Party's *bona fides* at the local level is unnecessary and insufficiently weighty to justify the heavy burdens imposed by the party-member signature requirement in this case.

### D. Unduly Restrictive Temporal Burden

Plaintiffs challenge the Maine scheme's January 2 cutoff day for completion of a new minor party's initial enrollment drive. Specifically, Plaintiffs complain that, by requiring a newly established party to enroll 5,000 voters by January 2 of an election year in order to gain ballot access, the Maine scheme compels new minor parties to enroll 5,000 persons during an "off" year when the election is far off and there is little public interest in politics. Pls.' Mot. 13.

I am not persuaded that Maine's decision to relegate the initial, 5,000-enrollment burden to an off-election year lacks a legitimate purpose or is unduly burdensome. An entire year is a considerable amount of time and—at least in the current era—the public retains a substantial interest in politics even during off-election years. Politicking is greatly assisted today, as measured by decibel if not by wisdom, by social media and other modern communications technology. *See Gardner*, 843 F.3d at 30. I see no reason why it is unreasonable to expect that 5,000 party enrollments take place in an off-election year, given

33

the ease of communicating with the electorate and the ability of any dedicated libertarian voter to enroll in the party on her own behalf at any time during that year. In any event, there is no indication on this record that the January 2 deadline has actually limited Plaintiffs' ability to qualify for ballot access, suggesting that "the Libertarian Party's real complaint is not with the seasonality of the enrollment requirements, but with the enrollment requirements themselves." *Libertarian Party of Maine, Inc. v. Dunlap*, No. 2:16-CV-00002-JAW, 2016 WL 3039715, at *9 (D. Me. May 27, 2016).

In short, a January 2 deadline for ballot qualification is reasonably calibrated to the state's interest in shifting focus from the party qualification drive to the candidate nomination drives as a precursor to the primary election. Accordingly, the temporal parameters of Maine's 5,000-voter enrollment requirement for a new party to initially qualify for ballot access do not violate the Constitution.[23]

### E. Forced Disaffiliation

Finally, there is the matter of the Secretary's trap-door treatment for minor parties and their adherents whenever a party-qualification requirement gets in the way of the minor party's participation in an upcoming election. The Secretary refers to this administrative scheme as the "batch elimination process;" I refer to it plainly as "the purge."

Maine law provides that a "party that does not meet the requirements of section 301 is not qualified to participate in a subsequent election," § 304, and further states that a

---

[23] As for the 10,000-enrollment requirement, the current temporal limit of nearly four years is not unduly burdensome—courts have upheld shorter timespans for parties to reach higher thresholds of support. *See, e.g.*, *Gardner*, 843 F.3d at 27 (seven-month timespan for party to gather signatures from three percent of electorate was reasonable).

"voter who is enrolled in a party which failed to meet the requirements of section 302 or 303, or which is disqualified under section 304, is considered an unenrolled voter for all purposes." *Id.* § 306. The Secretary has construed these provisions to mean that a party's members must be unenrolled upon the party's disqualification. The Secretary asserts that, under § 304, a disqualified party "ceases to exist" in the eyes of the law so "there is no longer anything" in which voters may enroll. *See* Def.'s Mot. 20. Further, the Secretary reads § 306's provision that a member of a disqualified party "is considered" unenrolled "for all purposes" to mean that the voter in fact *is* unenrolled. § 306; *see* Def.'s Mot. 20. While I see good reason to question these arguments—both as an ontological matter and as a matter of statutory interpretation—it is not my role to second-guess the Secretary's construction of Maine's election laws.

Applying the *Anderson-Burdick* framework, the unenrollment provision places a very substantial burden on Plaintiffs' right to associate. *See McLaughlin v. N. Carolina Bd. of Elections*, 65 F.3d 1215 (4th Cir. 1995). "There are few greater burdens that can be placed on a political party than being denied access to the ballot." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 593 (6th Cir. 2006). By forcing Plaintiffs to start over from square zero each time the party fails to meet a statutory enrollment threshold, Maine has done just that.[24]

---

[24] The Secretary contends that it is logically impossible for Plaintiffs to have been burdened "at all," because "once a party is disqualified, it ceases to exist" in the eyes of the law. Def.'s Mot. 19 (citing *Arutunoff v. Oklahoma State Election Bd.*, 687 F.2d 1375, 1379 (10th Cir. 1982)). But the very existence of this case makes clear that the Secretary's neat syllogism is unsound—whether recognized by law or not, "a party continues to exist so long as it retains enough of the features that ordinarily serve to constitute a voluntary association of persons: chiefly membership, a name, and a purpose." *McLaughlin*, 65 F.3d at 1228.

A few factors stand out to me as making this provision particularly burdensome. Purging a disqualified party's members and preventing new members from joining their ranks, strikes at the heart of political organization and movement building. A political party's continued growth and vitality depend on its ability to identify and organize its supporters, and on voters' ability to join the party should they desire to do so. In any given year, thousands of new voters register in Maine, where they have the options of joining one of the established parties or declaring themselves unenrolled. By disqualifying a party, the State thus strikes a double blow to nascent political organizations—not only does it unenroll their hard-won supporters, it also deprives them of the natural growth by inertia that established parties enjoy.

Second, I consider the "[p]ast experience" of newly established political parties in Maine, *Storer*, 415 U.S. at 742, specifically the fact that Plaintiffs and other minor parties have repeatedly fallen just short of achieving sustained ballot access. The Libertarian Party of Maine has itself twice qualified for ballot access, only to twice see its party-building efforts dashed away. Similarly, three other minor parties have qualified for ballot access in Maine's recent history, only to quickly lose qualified status and see their voter enrollments purged; and of these, only the Green Independent Party rebounded from disqualification and disaffiliation to establish itself as a sustained force in Maine politics. [25] *Cf. McLain v. Meier*, 637 F.2d 1159, 1165 (8th Cir. 1980) (recognizing the unconstitutional burden on

---

[25] Technically, the Maine Green Independent Party is a distinct entity from the Maine Green Party, which qualified for ballot access from 1994-1996. For all practical purposes, they are the same political organization.

plaintiffs' associational rights where, over three decades, only one minor party gained ballot access).

Third, I consider the fact that Maine law does not leave open any obvious alternatives for minor parties who wish to gain ballot access but find themselves trapped in the cul-de-sac of qualification and unenrollment. Many states make up for their burdensome ballot qualification regimes by creating intermediary designations whereby members of political minorities can still exercise their associational rights—and, crucially, can continue to grow their membership.[26] Maine may constitutionally choose to regulate its electoral system differently than other states. But the fact that no such alternative to qualification exists in Maine only emphasizes the burden that minor parties experience.

Lastly, I note that the "overall burden" of the purge is particularly sharp when "viewed collectively" with the rest of Maine's ballot access requirements. *Thurston*, 962 F.3d at 399 (listing factors to be reviewed to be considered by court in ballot access case). Maine imposes the purge in response to a relatively common event for small parties, given the high threshold that Maine imposes for continued ballot access. As I noted above, Maine's threshold for continued ballot access—either 10,000 enrolled members or 5% of the popular vote—only just falls within constitutional bounds. The purge's effect on disqualified parties is enhanced by the fact that Maine conditions party qualification on

---

[26] *See, e.g.*, Conn. Gen. Stat. § 9-451 (discussing nominations by "minor parties"); Mass. Gen. Laws ch. 50, § 1 (defining "political designation" to include a grouping of individuals who wish to form a political party but have yet to meet the membership threshold), ch. 53, § 8 (providing that nomination papers may list candidate's membership in recognized political designation); N.H. Rev. Stat. § 655:40-a (procedures by which "political organization may have its name placed on the ballot"); N.Y. Elec. Law §§ 6-138(3) (procedures for nomination by an "independent body"), 7-104 (name of independent body appears on ballot); Vt. Stat. tit. 17, § 2381(a)(2) (process by which minor parties may nominate candidates).

enrollment rather than mere petition signatures—making each party member lost in the purge all the move valuable to the party. In the context of a less-restrictive ballot access regime than Maine's forced disaffiliation might be little more than an administrative speed bump for small parties; but under Maine law, it poses a Jersey barrier.

On the other side of the *Anderson-Burdick* scale, the Secretary fails to articulate a sufficiently weighty interest to justify the burden that the purge places on a non-ephemeral political party that has met Maine's initial qualification threshold but struggles to establish enough support to earn continuing ballot access. Most notably, the Secretary argues that failing to purge members of disqualified parties would burden state administrators by forcing them to track party membership, and would burden voters by preventing them from voting in primaries for qualified parties.[27] *See* Def.'s Mot. 22–24.

Of course, a system that allowed *any* putative political party to enroll voters would burden state administrators and confuse voters. But the potential costs of simply retaining enrollment lists for a previously qualified and continuously organized party is vanishingly small, particularly in light of other provisions of Maine law limiting who may qualify as a political party in the first instance. *See Baer v. Meyer*, 728 F.2d 471, 475 (10th Cir. 1984);

---

[27] The other supposed state interests proffered by the Secretary hardly merit discussion. It seems clear that a disqualified party with thousands of enrolled members still in the CVR would not be a "new party" for the purposes of § 302 and § 303, thus the concern of disqualified parties circumventing ballot access laws is unfounded. *See* Def.'s Mot. 21. Nor does the purge advance Maine's interest in ensuring that parties have a current modicum of support, as the Secretary overstates the concern presented by stale voter enrollment, *see* Def.'s Mot. 21—should a voter wish to change her enrollment, she is capable of making that change in the voter rolls herself, and Maine administrators are capable of tracking any such changes in party membership. Moreover, the Secretary's paean to fairness between the Libertarian Party and other new parties, *see* Def.'s Mot. 23, is particularly ironic in the context of this litigation—any concerns about disparate treatment between political groups are *at least as salient* with respect to disparate treatment between major and minor parties as with respect to disparate treatment between existing minor parties and new minor parties.

*see also Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411, 422 (2d Cir. 2004). Only one party—the Maine Libertarian Party—would warrant such listings at present, and only three additional parties—the Democratic, Republican, and Green Independent parties—would be poised to trigger such listings in the future if their support were to drop off by all but unimaginable orders of magnitude. Even if such a policy had been in place to apply to the Reform Party and Americans Elect when those parties were disqualified, at most a few thousand committed partisans would have remained enrolled for a brief period after the parties were disqualified—a small administrative burden indeed compared to the burden imposed on the associational rights of political minorities.

The CVR already preserves a record of prior enrollments. Flynn Aff. ¶ 24 (ECF No. 49). The only administrative change absent the purge would be that enrollments would persist in the CVR for purposes of building toward 10,000 enrollments—provided that the party has initially qualified for elections based on 5,000 enrollments and persists in declaring its intention to pursue 10,000 enrollments. In the meantime, the Secretary would be free to deny the party's candidates access to the primary ballot and to treat its voters as unenrolled for all other administrative purposes.

Nor would the act of retaining a voter's Libertarian enrollment inevitably lock her out of voting in another party's primary. *See* Def.'s Mot. 22. Though primary elections in Maine are presumptively limited to party members, a party may choose to permit non-members to vote in its primaries. 21-A M.R.S. § 340(1). Thus, whether a member of the Libertarian Party may vote in another party's primary depends only on what "enrollment

qualification" the other party adopts, *id.*, regardless of whether the voter's Libertarian enrollment is retained. After all, Maine law makes clear that members of disqualified political parties have the same rights as unenrolled voters, inasmuch as a member of disqualified party is "considered an unenrolled voter for all purposes," *see* § 306—"all purposes" presumably includes the purpose of participating in a major party primary should that party choose to permit it.

The purge inflicts serious and unnecessary damage on a minor party struggling to qualify for ballot access in Maine. *See Baines*, 466 F. Supp. 3d at 285. Although the burden imposed by the purge is not necessarily "severe," it strays perilously close to the line; in any event, it outweighs the barely theoretical interests, specifically as they relate to this case, of voter confusion and administrative ease that are said to justify the forced disaffiliation of members of actively aspiring political parties. The lesser burden that already exists under Maine law—conditioning ongoing ballot access on a showing of sufficient enrollment or candidate performance—is strong enough medicine to safeguard the state's interest in winnowing the field of candidates, without also purging existing enrollments from the CVR. Mainers have demonstrated that they want their association with a legitimate political organization to be reflected on the voter rolls, and the Secretary has already acknowledged them in that very manner for purposes of two election cycles. The act of purging voter enrollment is a punishment in search of a wrong that would make Kafka blush. Aspiring political parties and their adherents ought not have their ballot access be conditioned on the statutory equivalent of pushing rope uphill.

**CONCLUSION**

Plaintiffs' Motion for Summary Judgment (ECF No. 55) is GRANTED IN PART and DENIED IN PART. Defendant's Motion for Summary Judgment (ECF No. 54) is likewise GRANTED IN PART and DENIED IN PART.

The party-member signature requirement of § 335(2) is unconstitutional as applied to Plaintiffs, in violation of the associational and equal protection rights protected by the First and Fourteenth Amendments of the United States Constitution. The Secretary's practice of forcibly disaffiliating members of disqualified political parties is also unconstitutional as applied to Plaintiffs, in violation of the right to associate protected by the First and Fourteenth Amendments of the United States Constitution. In all other respects, Plaintiffs' challenge to Maine's election laws fails.

**SO ORDERED.**

**Dated this 17th day of November, 2021.**

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE